Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRIAN CALLERY | : | CIVIL ACTION NO. 20-cv-03652 |
| | : | |
| and | : | |
| | : | |
| TINA FASANO | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| HOP ENERGY, LLC | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND CERTIFICATION OF CLASS FOR SETTLEMENT PURPOSES

Plaintiffs Brian Callery and Tina Fasano submit this unopposed motion pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, requesting that the Court grant preliminary approval of the parties' settlement agreement, certify a class for settlement purposes, appoint plaintiffs' class representatives, appoint plaintiffs' counsel as class counsel, approve the settlement administrator and approve the proposed notice to the class. Plaintiffs request that the Court schedule a hearing for final approval of the class after the notice period. Under the proposed settlement, Class Members[1] will receive partial reimbursements for alleged overcharges for heating oil purchased in all of the states where HOP Energy, LLC ("Defendant" or "HOP") did business from June 2014 to the present. This proposed settlement follows four years of hard-fought litigation, investigation and discovery, and multiple mediation sessions with two different experienced third-party mediators.

---

[1] Capitalized terms have the meaning set forth in the Settlement Agreement.

The proposed settlement is driven by the fact that Defendant is in a weak financial position and the only asset available to fund a settlement, Defendant's insurance policy, is eroding daily due to the costs of defense. While Plaintiffs in this action agreed to stay merits discovery pending mediation, counsel in the more recently filed copycat actions in New York did not and they are aggressively pursuing merits discovery. As a result of New York counsel's actions, the $5 million policy is reduced to $2,627,530.

The proposed settlement is a non-reversionary common fund settlement where Class Members who are known to Defendant will receive payments without being required to submit a claim form, under a formula recommended by Plaintiffs' experts at North American Forensic Accounting, LLC ("NAFA"). The settlement distribution formula takes account of the volume of heating oil the Class Member purchased, and the nature of the allegedly wrongful pricing scheme the Class Member was allegedly victimized by, Capped Price, Rollover, or Promotional Prevailing Retail Price. The amount of the common fund is $2,327,530., plus any amount of a $300,000 reserve held back by Defendant's insurance company which is not spent on defense costs. This represents the entire amount remaining of the insurance policy which covers the defense of this action and the New York Actions, *Melville* and *Mullaney*. Because of HOP's weakened financial condition, it is unable to contribute funds beyond the insurance policy's remaining proceeds. If the District Court in the *Melville* and *Mullaney* actions stays those proceedings, it is anticipated that most of that $300,000 reserve will be added to the common fund for distribution to Class Members. Members of the putative classes in *Melville* and *Mullaney* are also Class Members in *Callery* and will share in the common fund settlement on the same basis as other customers of HOP.

2

Plaintiffs move for preliminary approval of the settlement which is set forth in the Settlement Agreement which is attached as Exhibit 1 to the Sworn Declaration of M. Frances Ryan, Esq., Exhibit A hereto. The settlement satisfies the requirements for preliminary approval. It is fair, reasonable, adequate and in the best interest of the Class Members.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural History

Plaintiff Callery filed this action in the Chester County Court of Common Pleas in June 2020, and Defendant promptly removed the case to this Court. Plaintiff Tina Fasano learned of the case and retained Plaintiff's counsel to represent her in making similar claims. Plaintiffs have today filed an Amended Complaint conforming to the Federal Rules of Civil Procedure and including Ms. Fasano's claims.

Defendant HOP is one of the largest heating oil suppliers in the United States. Plaintiffs seek to represent a class of customers of HOP who entered into contracts with HOP under which they were to be charged what HOP calls a variable price or prevailing retail price for home heating oil. Some of the class members had Capped Price contracts, under which they were to be charged the lower of their capped price specified in their contracts or a prevailing price. HOP advertised to the public that under its Capped Price contracts, "your home heating oil price follows the market but doesn't go above your CAP rate." Plaintiffs are referring to these class members as Capped Price Customers. Some of the class members started off with one year Capped or Fixed Price contracts, under which after the term ended or they had purchased the specified number of gallons, they were to be charged HOP's variable price or a prevailing retail price. Plaintiffs are referring to these class members as Rollover Customers. A small group of

Class Members in the State of Connecticut had contracts that specified that rollover customers would be charged HOP's Promotional Prevailing Retail Price for First Year Customers. Plaintiffs are referring to these class members as Promotional Customers.

One of the central issues in the case the meaning of the phrase prevailing retail price. Plaintiffs contend that prevailing retail price means the public price HOP quotes over the phone and on its Dollarwise website, the only HOP price that "follows the market." Defendant contends that it , in fact, maintained "variable" or "prevailing retail prices" and variable price or prevailing retail price in its contracts is a reference to those internal prices, which Defendant had the discretion to set at any level it chose, under the contract.

Plaintiffs took certain discovery, including a corporate designee deposition of Defendant's then-CFO, in connection with Plaintiff's motion to remand for lack of the requisite amount in controversy. In March 2023 this Court denied, in part, Defendant's Motion to Dismiss and ordered merits discovery to commence.

In December 2021 and August 2023 putative class action complaints were filed against HOP in the U.S. District Court for the Southern District of New York, *Melville v. HOP Energy LLC* and *Mullaney v. HOP Energy LLC*. The classes alleged in those two actions are subsumed within the class alleged in this action. All members of those putative classes will benefit from the Settlement Agreement in this action on the same basis as other members of the class.

## B. Counsel's Investigation and Discovery

Counsel served interrogatories and requests for production on each other in May and June 2023. Defendant was slow to respond to Plaintiff's request, and Plaintiff filed a Motion to

4

Compel in July 2023. While that motion was pending, Defendant retained new defense counsel, Matthew McLaughlin of Nixon Peabody LLP.

Mr. McLaughlin approached Plaintiffs' counsel and stated that twenty percent of the Defendant's $5 million insurance policy had already been consumed by defense costs billed by the prior firm, that Defendant was in a weak financial position, and therefore it would be wise to suspend merits discovery and focus on voluntary discovery in aid of mediation and settlement. Callery's counsel agreed, but the plaintiffs' counsel in the *Mellville* and *Mullaney* SDNY actions refused, although they wanted to participate in a global mediation nevertheless. As a result, another million dollars of insurance coverage, which would otherwise be available to fund a settlement, has been spent on defending the aggressive discovery sought by New York counsel. Only $2,627,530 of insurance coverage remains.

Since September 2023 Plaintiffs' counsel in this action have requested and received extensive discovery in aid of mediation, with no motion practice or other use of judicial resources, on the following topics: (1) Defendant's customer database from 2014 through the present, with detailed information on all heating oil transactions; (2) exemplars of all of Defendant's consumer heating oil contracts for all branches; (3) customer complaints from Defendant's computer system from 2014 to the present; and (4) extensive information on Defendant's finances, including audited and unaudited financial statements from 2021 to the present, and documentation of Defendant's relationships with its secured lenders.

Plaintiffs' counsel retained a forensic accountant, Michael Breon of North American Forensic Accounting, LLC, to examine Defendant's financial records. Defendant made available for interview by Plaintiffs' counsel and Mr. Breon its restructuring expert, Michael Buenzow, who is familiar with Defendant's finances. Defendant has agreed to confirmatory discovery to

provide, under oath, testimony confirming the facts counsel and Mr. Buenzow have provided. Plaintiffs have attached a redacted version of Mr. Breon's Report to this Memorandum. See Exhibit A-2. Defendant will be filing a Motion for Permission to File Under Seal the unredacted report. The reason for the motion to seal is to protect the extremely confidential financial information revealed therein.

In sum, Plaintiffs' counsel's investigation revealed that Defendant could be found liable for over $80 million in damages, before interest, statutory multipliers and attorneys' fees. However, such a judgment would push Defendant into bankruptcy. Defendant's secured debt is in excess of $120 million, and there is a $14 million pension liability with bankruptcy priority, far higher than any assets which could be liquidated in a bankruptcy proceeding. See Breon Report at 14. Therefore the class would receive nothing in a bankruptcy proceeding.

Counsel for the parties in this action and *Melville* and *Mullaney* agreed to mediate the cases in the hope achieving a universal settlement of all of the cases, before Hon. Diane Welsh of JAMS. Judge Welsh conducted a full day mediation meeting in Philadelphia in December 2023 and had extensive telephone negotiations for months after that meeting. The parties were unable to reach a settlement because New York counsel would not reduce the plaintiffs' demand to a level the Defendant could afford to pay. Judge Welsh declared an impasse. Ryan Declaration at Par. 11.

In light of the impasse caused by New York counsel, Plaintiffs and HOP agreed to retain another mediator to preside over further negotiations, provided that Defendant provided additional, more recent financial information documenting its finances. Ryan Declaration at Par. 12. Hon. James T. Giles (ret.) agreed to mediate. In a mediation meeting on June 6, 2024,

6

presided over by Judge Giles, the parties reached an agreement in principle to settle the matter on the terms set forth in the attached Settlement Agreement.

Originally, Defendant's insurance carrier undertook the defense of these cases under a reservation of rights, including the policy exclusion of breach of contract claims and certain consumer claims. However, in light of the Settlement Agreement, the carrier has agreed to tender the remaining policy limits in the amount of $2,627,530 less the Holdback Amount, of which $2,327,530 million will be paid into a Qualified Settlement Account under the control of the Settlement Administrator and this Court within thirty days of this Court's preliminary approval. Because of ongoing costs of defense of the SDNY actions and any anticipated litigation in this Court, the parties have agreed to create a reserve fund in the amount of $300,000 out of the remaining policy limits which is available to pay costs of defense (the "Holdback Amount"). Any amount that is left over in the reserve fund and not used to fund the defense will be added to the common fund that will be available to pay the class.

## II.    SUMMARY OF THE SETTLEMENT TERMS

### A. <u>The Members of the Settlement Class</u>

The Settlement Class consists of all persons in the United States who, between June 23, 2014 and the date of the Preliminary Approval Order, entered into a contract(s) with Defendant for the delivery of heating oil to a residence and who received delivery of heating oil pursuant to such contract during such period pursuant to the contractual "capped" price or pursuant to a variable or prevailing price (including, but not limited to, a "prevailing retail price," "prevailing" price or rate, "prevailing commercial rate," or "Promotional Prevailing Retail" price). Excluded from the Class are: (a) HOP; (b) the officers, directors, and employees of HOP; former HOP

employees; (c) any entity in which HOP has a controlling interest; (d) any affiliate or legal representative of HOP; (e) the Judges and Mediators to whom the Action is assigned, the Judge's and Mediators' staff and any member of their immediate family; and (f) any heirs assigns and/or successors of any such persons or entities in their capacity as such.

## B. **The Settlement Amount and Distribution of the Settlement Fund**

The Settlement Amount is $2,627,530, subject to a holdback reserve of $300,000 which will be used to pay defense costs between now and final approval. The funds will be distributed to the Class Members under a formula recommended by Plaintiffs' expert, Steve Kokoska, Ph.D., a mathematician with expertise in statistics and applied mathematics. Ryan Dec. at Par. 21. The distribution method in the Settlement Agreement is a points system that takes account of the volume of heating oil each Class Member purchased as well as the nature of the claims. Dr. Kokoska determined the volume of heating oil that represented the bottom quartile, the middle two quartiles, and the top quartile in total volume of heating oil purchased for Class Members. Those Class Members who fall in the top quartile receive more points than the middle quartiles, who receive more points than the bottom quartile. The distribution method in the Settlement Agreement divides Class Members into three groupings, those who were charged their contract price but contend that they should have been charged HOP's COD price, ("Capped Customers"); those who were charged HOP's Variable Price but contend that they should have been charged HOP's COD price ("Variable Customers"); and those who were charged HOP's Variable Price but contend that they should have been charged a lower, Promotional Prevailing Retail Price ("Promotional Customers"). Promotional Customers receive more points than Variable Customers, who receive more points than Capped Customers. This is because, in theory,

Promotional Customers claim that they were entitled to an even lower price than Variable

Customers claim they were entitled to, and Variable Customers were charged higher prices than

Capped Customers. *Id.* at Par. 22-23.

## C. Attorneys' Fees and Service Awards

Subject to the Court's approval, Plaintiffs may seek a service award in recognition of the

effort expended in acting as representatives of the settlement class. Defendant does not oppose a

Named Plaintiff Enhancement Award for Plaintiff Callery in the amount of ten thousand dollars

($10,000) and for Plaintiff Fasano in the amount of five thousand dollars ($5,000.00), as

compensation for their efforts in bringing the action and achieving the benefits of the settlement

for the settlement class. These Service Awards are similar to awards that have been approved by

courts in the past. *See Molloy v. Aetna Life Insurance Co.* 2024 WL 290283 (E.D. Pa. Jan. 25,

2024) (Rufe, J.).

Finally, Defendant has also agreed that, subject to the Court's approval at the Final

Approval Hearing, Class Counsel may seek an award of attorneys' fees and expenses in an

amount up to one third of the Maximum Settlement Amount. This award will include Class

Counsel's expenses such as the fees of North American Forensic Accounting, LLC. This

proposed maximum fee is comparable to fees approved by courts in other class actions. *See*

*Barletti* \*6; *McIntyre v. RealPage, Inc.*, No. 18-03934, 2023 WL 2643201 at \*3, n.5 (E.D. Pa.

Mar. 24, 2023); *e.g., Williams v. Aramark Sports, LLC*, No. 10-1044, 2011 WL 4018205, at \*10

(E.D. Pa. Sept. 9, 2011).

9

### D. **The Settlement Administrator**

The parties have agreed to retain Verita Global LLC, ("Verita") formerly known as Gilardi, as Settlement Administrator. Verita is one of the largest settlement administrators in the world and it has been approved by many courts, including by this Court in *Western Pennsylvania Electrical Employees Pension Fund v. Alter*, 2014 WL 12608966 (E.D. Pa. April 21, 2014) (Rufe, J.). Ryan Dec. at Par. 24.

### E. **Notice to Class Members**

Under the Settlement Agreement Class Members will receive a payment without being required to submit a claim form, based on Defendant's customer records. Settlement Agreement Sec. 7.3.2. In addition, the Settlement Administrator will send out short for notices by postcards and email notices to Class Members identified from Defendant's records. Settlement Agreement Sec. 6.5. The Settlement Administrator will establish a dedicated web site to explain the settlement to potential Class Members and to include the long-form notice, among other documents. *Id.* at 6.7.

## III. **ARGUMENT**

### A. **Preliminary Approval is Appropriate**

Review of proposed Rule 23 class settlement typically proceeds in two steps: (1) a preliminary approval and (2) a subsequent fairness hearing. *Barletti v. Connexin Software, Inc.* 2024 WL 1096531 *2 (E.D. Pa. March 13, 2024); *citing In re Nat'l Football League Players' Concussion Inj. Litig.,* 961 F. Supp. 2d 708, 713-14 (E.D. Pa. 2014). Preliminary approval of a

10

proposed class action settlement is left to the discretion of the trial court. *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 317 (3d Cir. 1998). "The fair, reasonable and adequate standard is lowered, and the court is required to determine whether the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies...." *Nat'l Football League*, 961 F. Supp. 2d at 714 (quotation omitted). Nevertheless, "preliminary approval is not simply a judicial 'rubber stamp' of the parties' agreement." *Id*. Rather, it is "based on an examination of whether the proposed settlement is 'likely' to be approved under Rule 23(e)(2)." *Wood v. Saroj & Manju Invs. Philadelphia LLC*, No. CV 19-2820-KSM, 2020 WL 7711409, at *10 (E.D. Pa. Dec. 28, 2020) (citing Fed. R. Civ. P. 23(e)(1)(B)(i)).

Where settlement precedes class certification, a court may preliminarily certify the class for purposes of providing notice. *See Nat'l Football League*, 775 F.3d at 581-82; *see also Amchem v. Windsor*, 521 U.S. 591, 620-22 (1997). Certification at this stage is not final. *See In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 476 (E.D. Pa. 2010) (citing *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods.*, 55 F.3d 768, 786 (3d Cir. 1995)). "Final certification *vel non* of the class is determined by the court at the same time as the court rules on whether the final settlement agreement is to be approved." *Id*.

## B. Class Certification

To succeed on a class certification motion, a plaintiff must satisfy all four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *See Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 183 (3d Cir. 2001). Rule 23(a) requires a showing of: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. *See* Fed. R. Civ. P. 23(a). If a plaintiff satisfies these four requirements, he must meet at least one subsection of Rule 23(b). In this case, the Class Reps seek

11

certification pursuant to Rule 23(b)(3). Rule 23(b)(3) contains two explicit requirements: predominance and superiority. *See Carrera v. Bayer Corp.*, 727 F.3d 300, 305 (3d Cir. 2013). As part of a preliminary approval motion, courts can conduct a "less rigorous analysis" than the final approval stage requires. *In re: Amtrak Train Derailment In Philadelphia, Pa.*, No. 15-MD-2654, 2016 WL 1359725, at * 4 (E.D. Pa. Apr. 6, 2016).

### 1. Rule 23(a) factors

#### a. Numerosity

To satisfy the numerosity requirement, a plaintiff must show that the proposed class is so numerous that joinder of all members is impracticable. This generally requires more than 40 class members. *See In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249-50 (3d Cir. 2016). There are tens of thousands of affected customers of Defendant. Therefore, the Class Representatives have shown that joinder is impracticable.

#### b. Commonality

The commonality requirement requires a plaintiff to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality does not require the perfect identity of questions of law or fact among all class members. *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015). Instead, a plaintiff seeking class certification must demonstrate that his claims "depend upon a common contention," the resolution of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). There can be legal and factual differences among the class members if the defendant subjected them all to the same harmful conduct. The commonality bar

12

is not a high one. *See Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013). "[F]or purposes of Rule 23(a)(2), even a single common question will do." *Wal-Mart*, 564 U.S. at 359.

The Class Representatives have cleared this low bar. Were the Class Representatives to proceed as individual plaintiffs, each would have to prove that (1) they entered into contracts with Defendant containing an interation of the term HOP's "prevailing" price; (2) they purchased heating oil from Defendant and were charged more than the prevailing retail price or the contractual price, if lower; (3) the Defendant engaged in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding; and (4) they incurred losses of money or property as a result of Defendant's conduct.

### c. Typicality

The typicality factor aids a court in determining whether "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interest of the class members will be fairly and adequately protected in their absence." *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 594 (3d. Cir. 2012) (citation omitted). A class can meet this requirement when the representatives' claims "arise from the same alleged wrongful conduct" as do the class's claims. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004). To determine whether a named plaintiff is so different as to prevent a finding of typicality, a court must address three distinct concerns: "(1) the claims of the class representative must be the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the

representative must be sufficiently aligned with those of the class." *Marcus*, 687 F.3d at 598. The Third Circuit has set a "low threshold" for typicality, such that even "relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *Nat'l Football League*, 821 F.3d at 428 (quotes omitted).

The Class Representatives satisfy the typicality requirement. Each named plaintiff entered into home heating oil contracts with Defendant which contained the misleading language regarding HOP's "prevailing" price. Plaintiff Callery was a victim of a Capped Price contract scheme, under which he was charged his contractual Capped Price instead of the much lower market-based prevailing retail price on the date in question. Plaintiff Fasano is a victim of a Rollover contract scheme, in which she was charged HOP's internal Prevailing Retail Price instead of a strict, market-based prevailing retail price for heating oil after she had used up the gallons specified in her contract and rolled over to Defendant's variable price. In both cases, the plaintiffs should have been charged Defendant's actual prevailing retail price, such as its cash on delivery price, but were charged higher prices instead.

### d. Adequacy

This final Rule 23(a) factor considers both the plaintiffs and counsel's adequacy to represent the class. "Whether adequacy has been satisfied 'depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.' " *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 477 (E.D. Pa. 2009) (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007)). "The second

14

factor 'seeks to uncover conflicts of interest between named parties and the class they seek to represent.' " *Id.* (quoting *Warfarin Sodium*, 391 F.3d at 532).

There is nothing to call into question the adequacy of class representatives. They assert the same claims as class members and are not antagonistic to other members. They have participated in the case, including providing written discovery and consulting on settlement. Plaintiffs' counsel satisfies the adequacy threshold. Class counsel has extensive experience in complex commercial litigation.

### 2. Rule 23(b) factors

#### a. Predominance

Predominance requires a court to find "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) (internal quotation marks omitted). The predominance requirement "does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (internal quotes omitted). Nevertheless, "[t]o assess whether predominance is met at the class certification stage, a district court must determine whether the essential elements of the claims brought by the putative class are 'capable of proof at trial through evidence that is common to the class rather than individual to its members.' " *Gonzalez v. Corning*, 885 F.3d

15

186, 195 (3d Cir. 2018) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2009)).

Plaintiffs bring claims for breach of contract and violations of New York's as well as plaintiffs' home states' consumer protection laws that forbid fraudulent or deceptive conduct that creates a likelihood of consumer confusion or misunderstanding. All of the claims depend on the interpretation of the term HOP's "prevailing retail price" or HOP's "Promotional Prevailing Retail Price for First Year Customers" and whether Defendant used the term "prevailing" in a misleading way which was likely to confuse customers about the prices they would be charged for home heating oil. This issue of interpretation of the phrase "prevailing retail price" predominates over individual inquiries. Accordingly, the predominance inquiry is satisfied for this action.

### b. Superiority

The superiority analysis calls for a determination that a class action is the best method of achieving a "fair and efficient adjudication of the controversy." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001), *as amended* (Oct. 16, 2001) (citing Fed. R. Civ. P. 23(b)(3)). This requires a "balance, in terms of fairness and efficiency, [of] the merits of a class action against those of 'alternative available methods' of adjudication." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996) (citation omitted). In determining whether a class action is the superior method to adjudicate a controversy, courts should consider: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of

the claims in the particular forum; and (D) the likely difficulties in managing a class action."

Fed. R. Civ. P. 23(b)(3)(A)-(D). In considering a motion to certify a class for settlement purposes only, a court need not consider the likely difficulties with managing the class through trial. *See Amchem*, 521 U.S. at 620.

As applied to the proposed class, these factors weigh in favor of class certification. The number of class members, the common interest of class members, and the prevalence of common questions of law and fact make class action a more efficient vehicle for resolving these claims.

### C. Settlement Approval

#### 1. Rule 23(e) factors

"In evaluating a class action settlement under Rule 23(e), a district court determines whether the settlement is fundamentally fair, reasonable, and adequate." *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 592 (3d Cir. 2010) (citing Fed. R. Civ. P. 23(e)). In making this determination, district courts consider whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

17

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

### 2.    Adequate representation

This factor focuses "on the actual performance of counsel acting on behalf of the class." Fed. R. Civ. P. 23 Advisory Committee Notes (Dec. 1, 2018). Plaintiffs' counsel expended considerable time and effort on this case, briefed and won a Rule 12 motion to dismiss, engaged in extensive discovery, retained a forensic accounting expert to calculate the damages to the class and to evaluate the Defendant's financial condition, and held multiple rounds of mediation with Judge Welsh and Judge Giles. Counsel evaluated the strengths and weaknesses of the claims and defenses and examined Defendant's claims about its financial condition before reaching the proposed settlement agreement. Thus, this factor weighs in favor of preliminary approval.

### 3.    Arm's-length negotiation

The parties agreed to settle this case after multiple mediation sessions with Judge Welsh, a retired United States Magistrate Judge and respected mediator and Judge Giles, the retired Chief Judge of this District. "[T]he participation of an independent mediator in settlement negotiations virtually [e]nsures that the negotiations were conducted at arm's length and without collusion between the parties." *Bellum v. Law Offices of Frederic I. Weinberg & Assocs., P.C.*, No. 15-2460, 2016 WL 4766079, at *6 (E.D. Pa. Sept. 13, 2016) (citation and quotation omitted). This factor weighs in favor of preliminary approval.

18

### 4. Adequacy of relief

#### a. Costs, risks, and delay of trial

This factor balances the "relief that the settlement is expected to provide to class members" against "the cost and risk involved in pursuing a litigated outcome." Fed. R. Civ. P. 23 Advisory Committee Notes (Dec. 1, 2018). While the Class Representatives believe that their claims are strong, continued litigation risks exhaustion of the Defendant's insurance policy in payment of defense costs instead of funding a settlement. The relief takes into account the risk that Defendant's financial weakness would have led to a bankruptcy filing in the absence of a settlement. Such a filing would have left class members as unsecured creditors with unliquidated claims. The Defendant's tangible assets that would be available for sale in a bankruptcy proceeding are dwarfed by Defendant's secured debt of $120 million and priority pension liability of $14 million. Accordingly, the Class Members would likely not recover anything as part of a reorganization or liquidation. In addition, Defendant has asserted, and continues to assert, defenses to Plaintiffs' claims on the merits.

### 5. The proposed method of distributing relief

Under this factor, the court "scrutinize[s] the method of claims processing to ensure that it facilitates filing legitimate claims ... [and] should be alert to whether the claims process is unduly demanding." Fed. R. Civ. P. 23 Advisory Committee Notes (Dec. 1, 2018). The proposed settlement agreement provides that payments will be sent to Class Members without requiring them to submit any claim form, based on Defendant's records. To ensure that all eligible Class Members have the opportunity to participate, the Settlement Administrator will also send Short Form Notices by postcards sent by U.S. Mail, as well as longer form notices sent by email,

19

where Defendant has email addresses for its customers. The Settlement Administrator will also establish a stand-alone web site to inform the public about the terms of the Settlement. The web site will include a very detailed Long Form Notice.

### 6. Terms of proposed attorney's fees

The proposed attorneys' fees and expenses for this case are one third of the Settlement Fund. Courts in the Third Circuit have identified contingent fee requests of this magnitude as "squarely within the range of awards found to be reasonable[ ]." *Barletti at \*6; McIntyre v. RealPage, Inc.*, No. 18-03934, 2023 WL 2643201 at \*3, n.5 (E.D. Pa. Mar. 24, 2023); *e.g., Williams v. Aramark Sports, LLC*, No. 10-1044, 2011 WL 4018205, at \*10 (E.D. Pa. Sept. 9, 2011).

### 7. Whether the proposal treats class members equitably relative to each other

Under the proposed settlement agreement, Class Members who suffered greater harm, either because they purchased more heating oil than other customers, or because they were overcharged more than other customers, will receive a greater share of the Settlement Fund than Class Members who suffered lesser harm. Because the proposed settlement treats class members equitably relative to each other, this factor weighs in favor of preliminary approval.

20

### 8.    The *Girsh*, *Prudential*, and *Baby Products* factors

The Third Circuit has prescribed factors to evaluate the fairness of a proposed settlement in addition to those established in Rule 23(e)(2). *See In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010) (listing factors from *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975) and *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998)); *In re Baby Products Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013). In *Girsh*, the Third Circuit articulated nine factors for courts to consider, some of which were later incorporated into Rule 23 of the Federal Rules of Civil Procedure. *Compare Girsh*, 521 F.2d at 157 *with* Fed. R. Civ. P. 23. The factors that require the Court's analysis in this case include (a) the reaction of the class to the settlement; (b) the stage of the proceedings and the amount of discovery completed; (c) the ability of the defendants to withstand a greater judgment; and (d) the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation. Under the Third Circuit's rulings in *Prudential* and *Baby Products*, the Court must also consider (e) whether class or subclass members are accorded the right to opt out of the settlement and (f) the degree of direct benefit to the class.

### 9.    The reaction of the class to the settlement

This factor gauges "whether members of the class support the settlement." *Prudential*, 148 F.3d at 318. Because the Class Representatives seek only provisional approval of the proposed settlement and preliminary class certification, the Court cannot assess the reaction of the class to the settlement at this time. However, the proposed settlement provides adequate time for class members to offer objections.

21

## 10. The stage of the proceedings and the amount of discovery completed

This factor "captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Automotive Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 342 (3d Cir. 2007). The Class Representatives have engaged in formal discovery as well as informal exchange of information necessary to calculate damages and assess liability. The Class Representatives have also obtained settlement-related financial information and retained a forensic accountant to analyze the Defendant's financial condition. Plaintiffs' counsel acquired Defendant's complete sales database for the entire class period, detailing every heating oil transaction for the relevant time period. Plaintiffs' Counsel obtained tens of thousands of pages of documents through discovery. Based on the ample record created in advance of and during the mediation sessions, it is clear that the parties entered negotiations with a comprehensive understanding of the merits of this case and agreed to the settlement with a full understanding of Defendant's financial position. This factor weighs in favor of approval.

## 11. The ability of the defendants to withstand a greater judgment

A court must consider whether the proposed settlement offer is significantly below the threshold a defendant could withstand. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 240 (3d Cir. 2001). Still, even where a defendant has the practical ability to pay greater amounts than the settlement agreement provides, courts will regularly approve the proposed settlement. *See, e.g., McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 645 (E.D. Pa. 2015). Defendant has argued

22

that it cannot withstand a judgment greater than the one that the proposed settlement provides, and Plaintiffs' Counsel and their forensic accounting expert have done due diligence to confirm that fact. Ryan Declaration Ex. 2. In these circumstances, even if the settlement fund is less than might be awarded from the class trying the case to a favorable verdict, the guarantee of a settlement that Defendant can pay, and the avoidance of bankruptcy proceedings, weighs in favor of approval.

### 12. The range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation

These factors "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case. The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Warfarin Sodium*, 391 F.3d at 538. In assessing the value of a case, a lawyer must consider three things: (i) the odds of proving liability; (ii) the likelihood of different amounts of damages; and (iii) the collectability of any award. In this case, the path to liability is far from certain, the amount of damages is potentially very high, and it would be hard (if not impossible) to collect a larger award from Defendant, given its financial position. This settlement is reasonable, given the risks that the Class Representatives faced in securing and collecting on a larger judgment, or any judgment at all.

## 13. Whether class or subclass members are accorded the right to opt out of the settlement

The proposed notice to class members includes clear means to opt out of the settlement agreement, providing a sixty-day window from the date of notice to make such an election. This, coupled with Rule 23's requirement that notice permit class members to opt out of the settlement, weighs in favor of approval.

## 14. The degree of direct benefits provided to the class

Class members are the direct beneficiaries of the proposed settlement. The distribution method agreed to by the parties was recommended by Plaintiff's expert Steve Kokoska, Ph.D., of North American Forensic Accounting, LLC, a mathematician with expertise in statistics and applied mathematics. Ryan Dec. Par. 21. Dr. Kokoska devised a fair method of allocating the settlement funds given the limited pot of money available. The distribution method in the Settlement Agreement is a points system that takes into account the volume of heating oil purchased by all non-fixed rate customers, which included all Class Members, as well as the nature of the claims. Ryan Dec. Par. 22. Dr. Kokoska determined the volume of heating oil that represented the bottom quartile, the middle two quartiles, and the top quartile in total volume of heating oil purchased for Class Members. Those Class Members who fall in the top quartile receive more points than the middle quartiles, who receive more points than the bottom quartile. *Id.*

The distribution method in the Settlement Agreement divides Class Members into three groupings, those who were charged their contract price but contend that they should have been charged HOP's COD price, ("Capped Customers"); those who were charged HOP's Variable

24

Price but contend that they should have been charged HOP's COD price ("Rollover Customers"); and those who were charged HOP's Variable Price but contend that they should have been charged a lower, Promotional Prevailing Retail Price ("Promotional Customers"). Ryan Dec. Par. 23. Promotional Customers receive more points than Variable Customers, who receive more points than Capped Customers. This is because, in theory, Promotional Customers claim that they were entitled to an even lower price than Variable Customers claim they were entitled to, and Variable Customers were charged higher prices than Capped Customers. *Id.*

Also, the settlement fund is non-reversionary, so Class Members will reap the full benefit of the settlement regardless of how many make claims. This factor weighs in favor of approving the settlement.

## 15. Notice

Under Rule 23, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). The notice must state, in plain, understandable language, the following information:

> the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)."

Fed. R. Civ. P. 23(c)(2)(B). The Parties propose to mail a Short Form Notice, consisting of a description of the claims in this action, a description of the class, the amount of the settlement, and instructions on how to object or opt out. This postcard notice will include the Settlement Administrator's toll-free phone number and the address of the website containing the Long Form

Notice, as well as the other facts required by Rule 23(c)(2)(B). The Short Form Notice explains Class Counsel's role, and the fact that Class Members may retain their own lawyer and appear at the Fairness Hearing. Finally, the Short Form Notice explains that the settlement will be binding on all Class Members who remain in the class and do not exclude themselves from the class. This form of notice satisfies the requirements of Rule 23. *Barletti* at *8.

A lengthier Email Notice with additional information will be sent by email to all Class Members for whom Defendant has an email address. Finally, a Long Form Notice will be posted on a dedicated web site. The Email Notice will explain to any recipients who do not receive a Short Form Notice at their current home address, e.g. those who have moved since using HOP's services, that they may submit a claim using a Claim Form on the website.

## IV.     CONCLUSION

The proposed Settlement Agreement is fair, reasonable and adequate and there are no grounds to doubt its fairness or other obvious deficiencies. This action is appropriate for class certification for the purpose of settlement. Accordingly, the Court should grant this Unopposed Motion.

Respectfully submitted,

Date: July 16, 2024

By:    */s/M. Frances Ryan*
M. Frances Ryan
Edward C. Sweeney
WUSINICH, SWEENEY & RYAN, LLC
102 Pickering Way, Suite 403
Exton, PA 19341
(610) 594-1600
mfrancesryan@wusinichsweeney.com
*Attorney for Plaintiff*

26

# EXHIBIT A

## SWORN DECLARATION OF M. FRANCES RYAN IN SUPPORT OF MOTION FOR

## PRELIMINARY APPROVAL OF SETTLEMENT

1. I submit this declaration in support of Plaintiffs' Unopposed Motion For Preliminary Approval Of Class Action Settlement And Certification Of Class For Settlement Purposes

2. A copy of the Settlement Agreement is attached as Exhibit 1.

3. Brian Callery, a longstanding client of my partner Edward C. Sweeney, retained us to represent him in this action in 2020. Tina Fasano learned of the case and contacted us to represent her in late 2022.

4. After investigating Defendant's business practices, we filed a class action complaint in the Court of Common Please for Chester County, Pennsylvania in June 2020. The case was removed to this Court.

5. After the Court denied Defendant's motion to dismiss, we commenced discovery.

6. I served interrogatories and requests for production on Defendant in May 2023. Defendant was slow to respond to our requests, and I filed a Motion to Compel in July 2023. While that motion was pending, Defendant retained new defense counsel, Matthew McLaughlin of Nixon Peabody LLP.

7. Mr. McLaughlin approached us and stated that twenty percent of the Defendant's insurance policy had already been consumed by defense costs billed by the prior firm, that Defendant's financial position was not strong, and therefore it would be wise to suspend merits discovery and focus on voluntary discovery in aid of mediation and settlement, so as to preserve the insurance policy for use to pay the class a settlement.

WSR agreed, but the plaintiffs' counsel in the *Mellville* and *Mullaney* SDNY actions refused, although they requested to be part of any mediation.

8. As a result of New York counsel refusing to stay merits discovery to focus on voluntary discovery in aid of mediation and settlement, another significant portion of Defendant's insurance coverage, which would otherwise be available to fund a settlement, has been spent on defending the aggressive merits discovery sought by New York counsel since Nixon Peabody took over the defense.

9. Since September 2023 WSR has requested and received extensive discovery, with no motion practice or other use of judicial resources, on the following topics: (1) Defendant's customer database from 2014 through the present, with detailed information on all heating oil transactions and prices; (2) exemplars of all of Defendant's consumer heating oil contracts for all branches; (3) customer complaints from Defendant's computer system from 2014 to the present; and (4) extensive information on Defendant's finances, including audited and unaudited financial statements from 2021 to the present, and documentation of Defendant's relationships with its secured lenders.

10. In sum, Plaintiff's counsel's investigation revealed that Defendant could be found liable for over $80 million in damages, before interest, statutory multipliers and attorneys' fees. However, such a judgment would push Defendant into bankruptcy. As is set forth in Mr. Breon's Report, the class would receive nothing in a bankruptcy proceeding.

11. Counsel for the parties in this action and *Melville* and *Mullaney* agreed to mediate the cases in the hope achieving a universal settlement of all of the cases, before Hon. Diane Welsh of JAMS. Judge Welsh conducted a full day mediation meeting in Philadelphia in December 2023 and had extensive telephone negotiations for months after that meeting.

During these negotiations, Judge Welsh indicated that HOP was willing to contribute to a settlement its own funds, in addition to the insurance policy funds available, but HOP's financial position was not strong. Judge Welsh urged the Plaintiffs to lower their demand to a level that Defendant was able to pay. We were unable to reach a settlement because New York counsel would not reduce the demand to a level the Defendant could afford to pay. Judge Welsh declared an impasse and was conflicted from engaging in any further mediation efforts between WSR and Defendant.

12. In light of the impasse caused by New York counsel, we agreed to retain another mediator to preside over further negotiations, provided that Defendant provided additional, more recent financial information documenting its inability to pay. Hon. James T. Giles (ret.) agreed to mediate.

13. WSR retained a forensic accountant, Michael Breon of North American Forensic Accounting LLC, initially to calculate damages to the class, and more recently to examine Defendant's financial records and ability to pay a judgment or settlement. Mr. Breon's report is attached hereto as Exhibit 2. As noted in Mr. Breon's report, counsel requested and received from Defendant the following confidential documents:

- HOP Energy Holdings, Inc. and Subsidiaries Consolidated Financial Statements (audited) Years Ended September 30, 2021, 2022, & 2023
- HOP Energy Holdings, Inc. Consolidated Balance Sheet, Statement of Operations, Statement of Changes in Stockholders' Equity, and Statement of Cash Flows (unaudited) for the seven months ended April 30, 2024
- Credit agreement and Forbearance HOP Energy LLC and ABL OPCO LLC Amended May 14, 2024

14. Defendant made available for interview by WSR and Mr. Breon its restructuring expert, Michael Buenzow, who is familiar with Defendant's finances. Defendant has agreed to confirmatory discovery to provide, under oath, testimony confirming the facts counsel

and Mr. Buenzow have provided. Plaintiffs' Counsel and Mr. Breon asked probing questions about Defendant's financial status during this interview and received a detailed explanation of Defendant's condition.

15. In a mediation meeting on June 6, 2024, presided over by Judge Giles, the parties reached an agreement in principle to settle the matter for, in essence, the remaining insurance policy limits, less a holdback for defense costs which will be added to the Settlement Fund if not expended in defense costs.

16. Defense counsel has represented to us, subject to confirmatory discovery, that only $2,627,530 million remains of Defendant's insurance policy.

17. Plaintiffs' counsel believes that if this action is not settled promptly, the remaining proceeds of Defendant's insurance policy will be eaten up in defense costs and there will be no assets available to pay a judgment or settlement, given the priorities established in the Bankruptcy Code.

18. The Settlement Agreement is the result of arms-length negotiations presided over by highly respected and experienced mediators.

19. Based not only on Mr. Breon's analysis, but on their own judgment, Plaintiffs believe that Defendant could not have withstood a judgment or paid a settlement materially greater than the amount it has agreed to pay.

20. There was no discussion of attorneys' fees, expenses or service payment awards to Plaintiffs before the parties reached an agreement on the amount of the settlement, the method of distribution and all other terms affecting Class Members.

21. The distribution method agreed to by the parties was recommended by Plaintiff's expert Steve Kokoska, Ph.D., of North American Forensic Accounting, LLC, a mathematician

with expertise in statistics and applied mathematics.  Dr. Kokoska's curriculum vitae is attached as Exhibit 3.  Dr. Kokoska devised a fair method of allocating the settlement funds given the limited pot of money available.

22. The distribution method in the Settlement Agreement is a points system that takes into account the volume of heating oil purchased by all non-fixed rate customers, which included all Class Members, as well as the nature of the claims.  Dr. Kokoska determined the volume of heating oil that represented the bottom quartile, the middle two quartiles, and the top quartile in total volume of heating oil purchased for Class Members.  Those Class Members who fall in the top quartile receive more points than the middle quartiles, who receive more points than the bottom quartile.

23. The distribution method in the Settlement Agreement divides Class Members into three groupings, those who were charged their contract price but contend that they should have been charged HOP's COD price, or a price consistent with the prevailing market price ("Capped Customers"); those who were charged HOP's Variable Price but contend that they should have been charged HOP's COD price or a price consistent with the prevailing market price ("Rollover Customers"); and those who were charged HOP's Variable Price but contend that they should have been charged a lower, Promotional Prevailing Retail Price ("Promotional Customers").  Promotional Customers receive more points than Variable Customers, who receive more points than Capped Customers.  This is because, in theory, Promotional Customers claim that they were entitled to an even lower price than Variable Customers claim they were entitled to, and Variable Customers were charged higher prices than Capped Customers.

24. The parties have agreed to retain Verita Global LLC, ("Verita") formerly known as Gilardi, as Settlement Administrator. Verita is one of the largest settlement administrators in the world and it has been approved by many courts, including by this Court in *Western Pennsylvania Electrical Employees Pension Fund v. Alter*, 2014 WL 12608966 (E.D. Pa. April 21, 2014) (Rufe, J.).

25. There are no conflicts between Plaintiffs and the Settlement Class. Plaintiffs' interest is aligned with Settlement Class members in seeking recovery of any alleged damages and Plaintiffs are vigorously pursuing those interests, while at the same time preserving the only asset available to pay the Class Members, Defendant's insurance policy. Plaintiffs have acted in the best interest of the class in agreeing to stay merits discovery pending discovery in aid of mediation, because to do otherwise would result in the insurance proceeds being wasted on defense costs.

26. Plaintiffs have retained counsel with the required experience and competence to serve as Class Counsel.

27. Plaintiffs believe that the Settlement is fair, adequate and in the best interest of the Settlement Class. At all times the parties' negotiations were vigorous and at arm's length.

28. As outlined in Plaintiff's Unopposed Motion for Preliminary Approval of Settlement, the Settlement Class meets the requirements for preliminary certification.

29. I am a member of the bar of the Commonwealth of Pennsylvania, having been admitted in 1991.

30. I was graduated from the University of Chicago, J.D. 1991 with honors, where I was a member the Law Review. I graduated *summa cum laude* from the University of Scranton in 1988.

31. I clerked for the Hon. Franklin S. Van Antwerpen of the U.S. District Court for the Eastern District of Pennsylvania from 1991-1992.

32. I joined Dechert LLP in 1992 and was elected an equity partner effective January 1, 2000.

33. At Dechert I worked on complex commercial litigation, including representing some of the largest companies in the world, such as The Boeing Company, Siemens, 3M, GlaxoSmithkine and PricewaterhouseCoopers.

34. At Dechert I worked on a number of complex litigations and mass tort cases, including:

- *McClam-Brown v. Boeing*; co-lead counsel for The Boeing Company in nationwide race discrimination class action. Successfully argued opposition to motion to consolidate before Judicial Panel on Multidistrict Litigation. Successfully argued summary judgment motion and defended on appeal.
- *Conrail Railway Labor Act mass tort*. Lead counsel for Conrail in mass disability discrimination claims by approximately 30 current and former employees.
- *Alphin v. Cotter*. Represented outside directors in shareholder's derivative action against Reading Entertainment, Inc.
- *Wartsila NSD North America v. Hill International, Inc.* Co-lead counsel for defendant in construction litigation resulting in over $2 million verdict which was reversed on appeal by the Third Circuit.
- *Winters v. Investment Savings Plan for Employees of Knight-Ridder, Inc.* Lead counsel for Knight-Ridder in ERISA claim. Successfully obtained summary judgment and conducted successful oral argument on appeal upholding the judgment for defendants.

35. I left Dechert in 2007.

36. I have been a partner in Wusinich, Sweeney & Ryan ("WSR") since 2020. At WSR we represent plaintiffs in employment discrimination, personal injury and consumer fraud

cases, including collective actions under the Fair Labor Standards Act. We also advise

individuals on negotiation of employment and severance agreements.

37. My partner, Edward C. Sweeney, has been a member of the bar of the Commonwealth of

Pennsylvania since 1991. He is a graduate of LaSalle University, *maxima cum laude*, and

the University of Chicago Law School. Mr. Sweeney clerked for Hon. James R.

Cavanaugh of the Pennsylvania Superior Court from 1991-1993. Since 1993 he has been

in private practice in Chester County, PA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _July 16_, 2024.

M. Frances Ryan

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

BRIAN CALLERY and TINA FASANO,

                                    Plaintiffs,

                    v.                                    Case No. 2:20-cv-03652-CMR

HOP ENERGY, LLC,

                                    Defendant.

**CLASS ACTION SETTLEMENT AGREEMENT**

Plaintiffs Brian Callery and Tina Fasano, acting individually and on behalf of the Settlement Class as defined herein ("Plaintiffs"), and Defendant HOP Energy, LLC (the "Defendant" or "HOP") enter into this Settlement Agreement ("Agreement") as of July 15, 2024. Plaintiffs and HOP are collectively referred to herein as the "Parties" and each, individually, as a "Party." Capitalized terms used herein are defined in Section II of this Agreement or indicated in parentheses elsewhere in this Agreement. Subject to the Court's approval, the Parties hereby stipulate and agree that, in consideration for the promises and covenants set forth in the Settlement and upon the entry by the Court of a Final Approval Order and the occurrence of the Effective Date, the Action (as defined in Section 1.1 of this Agreement) shall be settled and compromised upon the terms and conditions contained herein.

**I     RECITALS**

**1.1**     On June 23, 2020, Plaintiff Brian Callery filed a Complaint against HOP in the Court of Common Pleas of Pennsylvania, Chester County, alleging claims for breach of contract, breach of the covenant of good faith and fair dealing, fraud, violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, violation of New York Consumer Protection Law,

1

and violation of other states' consumer protection laws. Plaintiff sought to represent a class of all Defendant's customers "who entered into contracts with Defendants for the delivery of heating oil to a residence, under terms including a capped pricing program and/or a prevailing retail price for the price of heating oil, and who received delivery of heating oil during the time period commencing six years before" the filing date. On July 28, 2020, HOP removed the case to the United States District Court for the Eastern District of Pennsylvania. On March 22, 2023, the Court issued an Opinion granting in part and denying in part Defendant's Renewed Motion to Dismiss. In connection with this Agreement and the filing of papers seeking preliminary approval of the Settlement, Plaintiffs are concurrently filing an Amended Class Action Complaint. Defendants consented to the Amended Class Action Complaint for settlement purpose only, without prejudice to Defendants' rights.

**1.2    The New York Actions.** On December 6, 2021, Ryan Melville ("Melville"), filed a class action complaint against HOP, styled as *Melville v. HOP Energy, LLC*, No. 21-CV-10406-KMK (the "Melville Action"), with allegations substantially similar to the *Callery* Action, in the United States District Court for the Southern District of New York. On April 26, 2023, Melville filed a First Amended Complaint, which repeated the allegations of the original complaint but narrowed the breadth of the putative class. On August 18, 2023, Michelle Mullaney and Robert Mullaney filed a class action complaint against HOP, styled as *Mullaney v. HOP Energy, LLC*, No. 23-CV-7318-KMK (the "Mullaney Action" and, together with the Melville Action, the "New York Actions"), with allegations substantially similar to the *Callery* action, in the United States District Court for the Southern District of New York. On May 17, 2024, the Court in *Melville* and *Mullaney* ordered the New York Actions to be consolidated for all purposes and further appointed the *Melville* and *Mullaney* counsel to be interim class co-counsel in the New York Actions.

2

**1.3**     Following the *Callery* Court's Order on Defendant's renewed motion to dismiss, the Parties agreed to attempt mediation of their dispute and engaged in a comprehensive exchange of information regarding the facts underlying the claims and defenses in the Action. During this time period, counsel for the Plaintiffs in the New York Actions sought to participate in the Parties' mediation efforts.

**1.4**     In November 2023, the Parties agreed to pursue mediation before the Honorable Diane Welsh (U.S. Magistrate Judge, Ret.) of JAMS.

**1.5**     On December 7, 2023, the Parties, along with the parties in the New York Actions, participated in a mediation before Judge Welsh;

**1.6**     On April 30, 2024, settlement negotiations involving counsel in the New York Actions broke down;

**1.7**     In May 2024, the Parties agreed to pursue mediation before the Honorable James T. Giles (U.S.D.J., Ret.);

**1.8**     On June 6, 2024, the Parties participated in a mediation before Judge Giles and reached a settlement in principle.

**1.9**     Plaintiffs have completed a full analysis of the strengths and weaknesses of their case, including an exchange, review, and analysis of discovery, mediation information exchange, confirmatory discovery, and extensive legal briefing in the Action;

**1.10**     The Parties recognize the time and expense that would be incurred by further litigation, the uncertainties and risks inherent in such litigation, and that the interests of the Parties, including the putative Settlement Class members would be served best a settlement of the Action;

**1.11**     In connection with settlement discussions and negotiations leading to the execution of the Agreement, counsel for the Parties did not discuss the appropriateness or amount of any

3

application by Plaintiff's Counsel for an award of attorneys' fees and expenses until the substantive terms of the settlement had been negotiated at arm's-length and agreed upon;

**1.12** Plaintiffs believe that the claims asserted in the Action have merit. However, Plaintiffs are mindful of the issues of proof under, and possible defenses to, the claims in the Action. Plaintiffs further recognize and acknowledge the expense and length of time it would take to prosecute the Action against HOP through trial, post-trial proceedings, and appeals. Counsel for Plaintiffs have taken into account the uncertain outcome and risks of the litigation, including the difficulties and delays inherent in such litigation and the likelihood of protracted appeals as well as the likely ability of HOP to satisfy any judgment against it. Counsel for Plaintiffs have, therefore, determined that the Settlement set forth in this Agreement is fair, reasonable, and adequate, and that the Settlement confers substantial benefits upon, and is in the best interests of, the Plaintiffs and the Settlement Class (hereafter defined).

**1.13** HOP (i) has vigorously denied, and continues to deny, that it committed any breach of contract, duty or any other law, or engaged in any of the wrongful acts alleged, and expressly maintains that it scrupulously complied with its contractual and legal duties, to the extent such duties exist; (ii) disputes the allegations in Plaintiff's complaint and maintains that its marketing, advertising, pricing and billing practices for its products at all times were and are in compliance with all applicable agreements and laws; and (iii) is entering into this Settlement solely to eliminate the burden, expense, distraction and uncertainties inherent in further litigation;

NOW THEREFORE, in consideration of the mutual covenants and promises set forth in this Agreement, as well as the good and valuable consideration provided for herein, the Parties hereto agree to a full and complete settlement of the Action on the terms and conditions set forth herein, which are subject to the Court's approval under Fed. R. Civ. P. 23(e).

4

## II    DEFINITIONS

As used in this Agreement and attached exhibits (which are an integral part of the Settlement and are incorporated in their entirety by reference), the following terms shall have the meanings set forth below, unless this Agreement specifically provides otherwise. Other capitalized terms in this Agreement but not defined in this section shall have the meanings ascribed to them elsewhere in this Agreement.

**2.1**    "Administration Expenses" means the taxes, reasonable fees and expenses incurred by the Settlement Administrator for all tasks the Settlement Administrator performs in furtherance of the notice and administration of the Settlement.

**2.2**    "Agreement" or "Settlement" means this Class Action Settlement Agreement, including all terms, conditions, and exhibits, which contain the entire agreement between the Parties.

**2.3**    "Amended Complaint" means the amended complaint in this action filed concurrently with the Motion for Preliminary Approval of Settlement.

**2.4**    "Attorneys' Fees and Costs" means all reasonable attorneys' fees and out-of-pocket litigation costs and expenses that may be awarded by the Court based on the Settlement described herein to compensate Class Counsel as determined by the Court, as described more particularly in Section VIII of the Settlement.

**2.5**    "Benefit" means the cash payment available to a member of the Settlement Class Member and the non-cash benefit described in Section 6.8.

**2.6**    "Class Counsel" means M. Frances Ryan and Edward C. Sweeney of Wusinich, Sweeney & Ryan, LLC.

**2.7**    "Class Member(s)" means all persons in the United States who, between June 23, 2014 and the date of the Preliminary Approval Order, entered into a contract(s) with Defendant for

5

the delivery of heating oil to a residence and who received delivery of heating oil pursuant to such contract during such period pursuant to the contractual "capped" price or pursuant to a variable or prevailing price (including, but not limited to, a "prevailing retail price," "prevailing" price or rate, "prevailing commercial rate," or "Promotional Prevailing Retail" price). Excluded from the Class are: (a) HOP; (b) the officers, directors, and employees of HOP; former HOP employees; (c) any entity in which HOP has a controlling interest; (d) any affiliate or legal representative of HOP; (e) the Judges and Mediators to whom the Action is assigned, the Judge's and Mediators' staff and any member of their immediate family; and (f) any heirs assigns and/or successors of any such persons or entities in their capacity as such.

      **2.8**    "Class Notice" means the notice of pendency and proposed settlement of class action that the Parties will ask the Court to approve in connection with the Motion for Preliminary Approval of Class Action Settlement. The Class Notice, which will be available to Settling Class Members on the website created and maintained by the Settlement Administrator, shall be in the forms of **Exhibits A-C** to this Agreement.

      **2.9**    "Class Period" means from June 23, 2014 through the date of the Preliminary Approval Order.

      **2.10**    "Class Representatives" mean Plaintiffs Brian Callery and Tina Fasano.

      **2.11**    "Court" means the United States District Court for the Eastern District of Pennsylvania.

      **2.12**    "Defendant" or "HOP" means HOP Energy, LLC, including its officers, directors, owners, operators, parents, subsidiaries, employees, agents, representatives, lawyers, insurers, and/or affiliates. It also includes all entities through which HOP has conducted or conducts business, including, but not limited to Altemos Energy, Alliance Express, Automatic TLC Energy,

Brinker's Energy, Cernak Fuel, CRC Energy, DDLC Energy, DDM Energy, Dominic Fuel, Galbraith Oil, Kaufman Fuel, Keyser Energy, Kosco Heritage, Mercury Energy, Metro Energy, Oil Express, Point Oil, Supreme Energy, and Valley Oil.

**2.13** "Effective Date" means ten (10) business days after the date of entry of the Court's Final Approval Order and the expiration of the time for filing a notice of appeal from the Final Approval Order, if no appeal is filed, or if an appeal is filed, the latest of: (a) the date of final affirmance of the Final Approval Order; (b) the expiration of the time to petition for writ of certiorari to review the Final Approval Order, if affirmed, and if certiorari is granted, the date of final affirmance of the Order following review pursuant to that grant; or (c) the date of final dismissal of any appeal from the Final Approval Order or the final dismissal of any proceeding on certiorari to review the Order that has the effect of confirming the Order.

**2.14** "Email Notice" means the notice of pendency and proposed settlement of class action that the Parties will ask the Court to approve in connection with the Motion for Preliminary Approval of Class Action Settlement. The Email Notice, which will be available to Settlement Class Members only on the website created and maintained by the Settlement Administrator, shall be substantially in the form of **Exhibit B** attached to the Agreement. The Email Notice will include an identification number or login/PIN unique to each account maintained by any Settlement Class Member.

**2.15** "Fairness Hearing" or "Final Approval Hearing" means the final hearing to be conducted by the Court, on notice to the Settlement Class, to consider approval of the Settlement and Class Counsel's motion for approval of attorneys' fees and reimbursement of costs and expenses. The Parties will ask the Court to schedule a Fairness Hearing approximately ninety (90) days from the entry of the Preliminary Approval Order.

**2.16** "Final Approval Order" means the Order entered by the Court granting final approval to the Settlement, approving this Agreement under Fed. R. Civ. P. 23(e) and making such other findings and determinations as the Court deems necessary and appropriate to effectuate the terms of this Agreement, without modifying any terms of this Agreement that either Party deems material. The Final Approval Order should not be entered earlier than ninety (90) days after the appropriate state and federal officials have been served with notice of the Settlement in accordance with the Class Action Fairness Act of 2005, as codified at 28 U.S.C. § 1715(b).

**2.17** "Holdback Amount" means $300,000, which funds shall be used for the payment of any legal fees and/or legal expenses actually incurred by HOP in connection with this Action and the New York Actions through the date of the Final Approval Order.

**2.18** "Individual Settlement Amount" means the monetary amount/benefit calculated as of the end date of the Class Period that is allocated to each Settlement Class Member.

**2.19** "Long-Form Notice" means the notice of pendency and proposed settlement of class action that the Parties will ask the Court to approve in connection with the Motion for Preliminary Approval of Class Action Settlement. The Long-Form Notice, which will be available to Settlement Class Members only on the website created and maintained by the Settlement Administrator, shall be substantially in the form of **Exhibit C** attached to the Agreement.

**2.20** "Maximum Settlement Amount" means the total amount of $2,627,530 less the Holdback Amount. Under no circumstances shall HOP be required to pay or contribute any more funds in relation to the Settlement.

**2.21** "Named Plaintiff Enhancement Awards" or "Enhancement Awards" means the monetary amounts awarded by the Court in recognition of the assistance provided by the named Plaintiffs in the prosecution of the Action, the amounts of which are as set forth in Section VIII.

**2.22** "Net Settlement Fund" means the Settlement Fund less: (i) the Attorneys' Fees and Costs; (ii) the Enhancement Awards; (iii) the Notice and Administration Costs; (iv) defense costs and expenses in excess of the Holdback Amount, if any; and (v) any applicable taxes.

**2.23** "Notice and Administration Costs" means the taxes and reasonable costs and fees of notice and administration of the Settlement that are incurred by the Settlement Administrator in connection with providing notice to the Settlement Class and distributing the Settlement Fund.

**2.24** "Notice of Proposed Class Action Settlement" means the notices described in the Notice Plan as approved by the Court.

**2.25** "Notice Plan" means the planned method by which notice of this Agreement will be given to the Settlement Class.

**2.26** "Objection" means an objection filed with the Court by a Member of the Settlement Class, objecting to any aspect of the Settlement.

**2.27** "Objection Deadline" means the last date on which a Settlement Class Member may object to the Settlement, and submit a Request for objection as set forth in the Preliminary Approval Order and which will be no more than sixty (60) days from the date upon which Notice of the Proposed Class Action Settlement is commenced. The Objection Deadline will be specified in the Preliminary Approval Order and the Notice of Proposed Class Action Settlement.

**2.28** "Opt-Out" means a timely request by a Settlement Class Member to be excluded from the Settlement Class by following the procedures set forth in the Preliminary Approval Order and Notice of Proposed Class Action Settlement.

**2.29** "Opt-Out Deadline" means the last date on which a Settling Class Member may request to be excluded from the Settlement Class and submit a Request for Exclusion as set forth

9

in the Preliminary Approval Order and which will be no more than sixty (60) days from the date upon which Notice of the Proposed Class Action Settlement is commenced.

**2.30** "Parties" means, collectively, the Class Representatives and HOP, and "Party" means any one of them.

**2.31** "Person" means any natural person, corporation, partnership, business organization, association, or other type of legal entity.

**2.32** "Preliminary Approval Order" means the order issued by the Court provisionally (i) granting preliminary approval of this Agreement; (ii) certifying the Class for settlement purposes; (iii) appointing Class Representatives and Class Counsel; (iv) approving the form and manner of the Notice Plan and appointing a Settlement Administrator; (v) establishing deadlines for Requests for Exclusion and the filing of objections to the proposed settlement contemplated by this Agreement; (vi) finding that the Parties have complied with 28 U.S.C. § 1715; and (vii) scheduling the Final Approval Hearing. The Preliminary Approval Order shall be substantially in the form of **Exhibit D** attached to this Agreement.

**2.33** "QSF" means a Court-approved Qualified Settlement Fund for federal tax purposes pursuant to Treas. Reg. § 1.468B-1 set up by the Settlement Administrator in which the Settlement Fund will be deposited.

**2.34** "Released Claims" means the following: In exchange for the benefits exchanged in accordance with this Agreement, the Releasing Parties shall release the Released Persons from and for any and all claims, liens, demands, actions, causes of action, obligations, damages, punitive damages, treble damages, penalties, rescission, declaratory or injunctive relief, disgorgement, liabilities, interest, and costs, including attorneys' fees, of any nature or kind whatsoever, that arose or arise at any time through the date of the Preliminary Approval Order, whether legal, equitable

or otherwise, whether known or unknown, suspected or unsuspected, existing now or arising in the future, that actually were, or could have been, asserted in the Action regarding the claims alleged by Plaintiffs in the Amended Complaint, including, but not limited to, claims for violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, New York Consumer Protection Law, Connecticut Unfair Trade Practices Act, Delaware Uniform Deceptive Trade Practices Act, Massachusetts Consumer Protection Law, New Jersey Consumer Fraud Act, Rhode Island Deceptive Trade Practices Law, Vermont Consumer Protection Act, as well as common-law claims for breach of contract, breach of the covenant of good faith and fair dealing, fraud, breach of implied contract and/or unjust enrichment/quantum meruit, and any and all claims related to or arising from any conduct alleged in the Amended Complaint (including, but not limited to, relating to any variable or prevailing rates the Defendant charged for the supply of heating oil under any agreements, understandings or programs and whether the alleged conduct or related conduct may have occurred and/or is based, or could be based, on any act, omission, inadequacy, misstatement, representation, harm, matter, cause or event by any of the Released Persons, including, without limitation, any claims which arise or arose under, or relate to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, New York Consumer Protection Law, Connecticut Unfair Trade Practices Act, Delaware Uniform Deceptive Trade Practcies Act, Massachusetts Consumer Protection Law, New Jersey Consumer Fraud Act, Rhode Island Deceptive Trade Practices Law, or the Vermont Consumer Protection Act. In addition, Plaintiffs agree to release (and Released Claims shall also include) all claims, liens, demands, actions, causes of action, obligations, damages, punitive damages, treble damages, penalties, liabilities, interest and costs, including attorneys' fees, of any nature or kind whatsoever, which Plaintiffs have, had, or which arose against the Released Persons at any time through the date of the Preliminary Approval Order, whether

11

legal, equitable or otherwise, whether known or unknown, suspected or unsuspected, as alleged in the Amended Complaint.

**2.35** "Released Persons" means HOP and its present and former parents, assignors, subsidiaries, divisions, affiliates, predecessors, successors and assigns, as well as their respective current and former officers, directors, members, stakeholders, owners, employees, agents, licensees, accountants, attorneys and insurers.

**2.36** "Releasing Parties" means Plaintiffs, all Settlement Class Members, Class Counsel, and any Person claiming by or through him/her/them/it, including any Person claiming to be his/her/their/its spouse, parent, child, heir, guardian, associate, co-owner, attorney, agent, administrator, devisee, predecessor, successor, assignee, representative of any kind, shareholder, partner, director, employee or affiliate.

**2.37** "Request for Exclusion" means the form that must be completed and returned in the manner and within the time period specified in this Agreement for a Settlement Class Member to request exclusion from the Settlement Class.

**2.38** "Settlement" means all of the terms, conditions and exhibits attached to this Agreement.

**2.39** "Settlement Administrator" means a third-party class action Settlement administrator who will implement the designated aspects of this Agreement. The Settlement Administrator will be charged with determining the applicable Individual Settlement Amount for each Class Member in accordance with this Agreement and the data provided by HOP. The Settlement Administrator, subject to Court approval, will be Verita Global, unless another third-party administrator is later agreed to by the Parties in writing and approved by the Court.

12

**2.40** "Settlement Class" or "Settlement Class Members" means all Class Members that do not Opt-Out of the Settlement.

**2.41** "Settlement Fund" means the non-reversionary cash fund established by the Settlement Administrator that shall be funded by HOP in the total amount of Two Million Six Hundred Twenty Seven Thousand, Five Hundred Thirty Dollars ($2,627,530.00) less the Holdback Amount. The Settlement Fund is the total sum that HOP will pay in connection with this Agreement. In no event will HOP be responsible for contributing monies to the Settlement Fund other than this $2,627,530.00 less the Holdback Amount.

**2.42** "Settlement Website" means the Internet website created and maintained by the Settlement Administrator, which shall include information about Action and the Settlement terms, relevant documents, and electronic and printable forms relating to the Settlement. The Settlement Website shall be activated no later than thirty (30) days after the Court enters the Preliminary Approval Order. The URL of the Settlement Website shall be provided in the Class Notice.

**2.43** "Short-Form Notice" means the summary notice of the pendency and proposed settlement of class action that the Parties will ask the Court to approve in connection with the motion for class notice of settlement. The Short-Form Notice shall be substantially in the form of **Exhibit A** to this Agreement. The Short-Form Notice will include an identification number or login/PIN unique to each account maintained by any Settlement Class Member.

## III    CONDITIONAL CERTIFICATION OF THE SETTLEMENT CLASS

**3.1** The Parties agree that the Action may be certified as a class action for settlement purposes only under Fed. R. Civ. P. 23(a) and (b)(3) in accordance with the terms of this Agreement and without prejudice to HOP's right to contest class certification in the event that this Agreement fails to become effective or is not fully implemented in accordance with its terms. HOP denies that the claims asserted against it are suitable for class certification for any purposes other than for

13

settlement purposes, and no Plaintiff or Class Counsel will argue or in any way assert that HOP's willingness to enter into the Settlement or any judicial approval or preliminary approval of the Settlement is evidence that any Claim asserted by any Plaintiff is suitable for class certification for any reason other than for settlement purposes.

If the Settlement is not approved or this Agreement fails to be fully implemented, HOP reserves all rights to object to any subsequent motion to certify a class in the Action or any other lawsuit and no representation or concession made in connection with the Settlement or this Agreement shall be considered law of the case or an admission by HOP or to have any kind of preclusive effect against HOP or to give rise to any form of estoppel or waiver by HOP in these actions or any other proceeding.

**3.2** HOP expressly denies any and all liability and/or wrongdoing with respect to any and all of the claims alleged in the Action, the New York Actions, and any similar lawsuit and enter into the Settlement solely to compromise disputed claims. Accordingly, any references to the alleged business practices of HOP in the Settlement, this Agreement, or the related Court hearings and processes shall raise no inference respecting the propriety of those business practices or any other business practices of HOP.

## IV    REQUIRED EVENTS

**4.1** As soon as practicable after the execution of this Agreement, Class Counsel shall file this Agreement and a motion for preliminary approval seeking entry of the Preliminary Approval Order, substantially in the form of **Exhibit D**, which order by its terms shall accomplish all of the following:

**4.1.1** Preliminarily approve the Settlement as within the range of reasonableness to the Settlement Class;

14

**4.1.2**  Conditionally certify the Settlement Class for the purpose of effectuating the Settlement;

**4.1.3**  Designate Plaintiffs as the representatives of the Settlement Class;

**4.1.4**  Designate Class Counsel as counsel for the Settlement Class;

**4.1.5**  Approve the Settlement Administrator and instruct the Settlement Administrator to perform the following functions in accordance with the terms of this Agreement and the Preliminary Approval Order:

    i.    Before disseminating Class Notice, establish the Settlement Website, which Settling Class Members can visit to read and obtain additional information regarding the Settlement; and

    ii.    Process Objections to the Settlement in accordance with Section X of this Agreement; and

**4.1.6**  Enter an order to stay any other proceedings affecting the certified class pending in any other Court, pending the issuance of the Final Approval Order; and

**4.1.7**  Approve the form, contents, and method of notice to be given to the Settlement Class as set forth in Section VI of this Agreement, and direct HOP to provide, or cause to be provided, such notice and to file with the Court a declaration of compliance with those notice requirements, as set forth in Section VI of this Agreement.

## V    SETTLEMENT FUND

**5.1**  The Settlement Fund shall be used to pay: (i) Attorneys' Fees and Costs; (ii) Enhancement Awards; (iii) Notice and Administration Costs; (iv) any additional legal fees and expenses incurred by HOP in excess of the Holdback Amount, if any; and (v) any applicable taxes.

The balance remaining in the Settlement Fund, i.e., the "Net Settlement Fund," shall be distributed to Settling Class Members as provided herein. In no event shall HOP or any Released Parties bear any responsibility for any such amounts, fees, costs, or expenses beyond HOP's responsibility to pay the Settlement Fund pursuant to Section V of this Agreement.

    **5.2**    Within thirty (30) days after the grant of preliminary approval, HOP shall arrange for the deposit of $2,327,530 into the Settlement Fund. Within seven (7) business days after the Effective Date of the Settlement, HOP shall arrange for the deposit of the remainder of the Holdback Amount, if any, into the Settlement Fund, but in no event shall HOP's cumulative payment to the Settlement Fund exceed the Maximum Settlement Amount.

    **5.3**    The Settlement Fund shall be a Court-approved QSF for federal tax purposes pursuant to Treas. Reg. § 1.468B-1. HOP shall be the "transferor" to the QSF within the meaning of Section 1.468B-1(d)(1) of the Treasury Regulations with respect to the Settlement Fund. The Settlement Administrator shall be the "administrator" of the QSF within the meaning of Section 1.468B-2(k)(3) of the Treasury Regulations, responsible for causing the filing of all tax returns required to be filed by or with respect to the QSF, paying from the QSF any taxes owed by or with respect to the QSF, and complying with any applicable information reporting or tax withholding requirements imposed by Section 1.468B-2(l)(2) of the Treasury Regulations or any other applicable law on or with respect to the QSF.  HOP shall provide to the Settlement Administrator any documentation reasonably required for the Settlement Administrator to facilitate obtaining QSF status for the Settlement Fund pursuant to Treas. Reg. §1.468B-l. All taxes on income or interest generated by the Settlement Fund, if any, shall be paid out of the Settlement Fund.

    **5.4**    The Settlement Administrator shall invest the Settlement Fund exclusively in an account or accounts where the principal will not decrease and is fully insured by the United States

Government or an agency thereof, including certificates of deposit, a U.S. Treasury Fund or a bank account that is either (a) fully insured by the Federal Deposit Insurance Corporation ("FDIC") or (b) secured by instruments backed by the full faith and credit of the United States Government. The Settlement Fund escrow bank shall reinvest the proceeds of these instruments, if any, as they mature in similar instruments at their then-current market rates. All interest earned, if any, on the investment of the Settlement Fund shall be added to the Settlement Fund for distribution as set forth herein.

**5.5** Other than payment of the Settlement Fund, HOP will have no financial obligations to Class Representatives, Settlement Class Members, Class Counsel, any other attorney representing any Class Member, or the Settlement Administrator with respect to the Released Claims or otherwise. The Settlement Fund represents the total extent of HOP's monetary obligations under this Agreement. In no event shall HOP's total monetary obligations with respect to this Agreement exceed the Maximum Settlement Amount.

**5.6** The Settlement Fund will be used to cover all obligations with respect to costs related to this Agreement, including the reasonably incurred expenses of the Settlement Administrator, the Notice Plan, payments to Settlement Class Members, any Enhancement Awards, any Attorneys' Fees and Costs, any applicable taxes, and any other reasonably incurred administrative fees and expenses in connection with this Agreement; provided, however, that Class Counsel in conjunction with counsel for HOP, must approve any payments to the Settlement Administrator prior to the Settlement Administrator incurring such expenses. The Parties intend that, after the foregoing payments and disbursements are made, there will be no funds remaining. Nonetheless, to the extent any funds remain, no portion of the Settlement Fund will be returned to HOP.

17

**5.7**    If this Agreement is terminated, the Settlement Administrator will return all funds to HOP within ten (10) days of the termination date; provided, however, that the Settlement Administrator need not return any funds already spent on notice and on reasonable Settlement Administrator expenses before the termination date. Notwithstanding any provision herein, in the event this Agreement is not approved by any court, or terminated for any reason, or the Settlement set forth in this Agreement is declared null and void, or in the event that the Effective Date does not occur, Settlement Class Members, Class Representatives, and Class Counsel shall not in any way be responsible or liable for any administration expenses, taxes with respect to the Settlement Fund, or any expenses, including costs of notice and administration associated with the Settlement or this Agreement, except that each Party shall bear its own attorneys' fees and costs and HOP's future payment obligations shall cease.

**5.8**    The Released Persons, and the Releasing Parties shall have no liability, obligation or responsibility with respect to the investment, disbursement, or other administration or oversight of the Settlement Fund or QSF and shall have no liability, obligation or responsibility with respect to any liability, obligation or responsibility of the Settlement Administrator, including but not limited to, liabilities, obligations or responsibilities arising in connection with the investment, disbursement or other administration of the Settlement Fund and QSF.

**5.9**    Once deposited by HOP, the Settlement Fund shall be deemed and considered to be in *custodia legis* of the Court and shall remain subject to the jurisdiction of the Court until such time as such funds shall be distributed pursuant to this Agreement, or this Agreement is terminated, or the Court declines to enter the Final Approval Order, or pursuant to further order(s) of the Court.

18

**5.10** Notwithstanding any effort, or failure, of the Settlement Administrator or the Parties to treat the Settlement Fund as a QSF, any tax liability, together with any interest or penalties imposed thereon, incurred by HOP or any Releasees resulting from income earned on the Settlement Fund or the payments made from the Settlement Fund (or the receipt of any payment under this paragraph) shall be reimbursed from the Settlement Fund in the amount of such tax liability, interest or penalties promptly upon and in no event later than five (5) days after HOP's or any Released Party's written request to the Settlement Administrator.

**5.11** For avoidance of doubt, neither Released Persons nor Releasing Parties shall have any liability, obligation, or responsibility whatsoever for tax obligations arising from payments to any Settlement Class Member or based on the activities and income of the QSF. In addition, neither Released Persons nor Releasing Parties shall have any liability, obligation, or responsibility whatsoever for tax obligations arising from payments to Class Counsel. The QSF will be solely responsible for its tax obligations. Each Settlement Class Member will be solely responsible for his, her, or its tax obligations. Each Class Counsel or other attorney or firm receiving a distribution from the Settlement Fund will be solely responsible for his, her, or its tax obligations.

**5.12** Neither Class Counsel nor counsel for HOP are providing legal advice regarding the taxability of any amount paid hereunder and nothing contained herein shall be interpreted as constituting legal advice regarding the taxability of any amount paid hereunder, nor shall it be relied upon as such. Any tax issues raised by this Agreement may be unique as to each Party and Settlement Class Member, and each Party and Settlement Class Member is advised to obtain tax advice from his, her, or its own tax advisor with respect to any payments resulting from this Agreement. Each Party and Settlement Class Member will be responsible for paying his, her, or

19

its own respective share of all applicable state, local, and federal taxes on all amounts received or paid pursuant to this Agreement.

**5.13**  HOP shall have no liability whatsoever with respect to (i) any act, omission, or determination by Class Counsel or the Settlement Administrator, or any of their respective designees or agents, in connection with the administration of the Settlement or otherwise; (ii) the management, investment, or distribution of the Settlement Fund; (iii) the determination, administration, or calculation of Benefits to be paid to Settlement Class Members from the Settlement Fund; or (iv) the payment or withholding of taxes or related expenses, or any expenses or losses incurred in connection therewith. The Releasing Parties and Class Counsel release the Released Persons from any and all liability and claims arising from or with respect to the administration, investment, and/or distribution of the Settlement Fund.

**5.14**  No person shall have any claim against Class Representatives, Class Counsel, the Released Persons, counsel of record for any party in the Action, the Settlement Administrator, or any other person designated by Class Counsel, based on determinations or distributions made substantially in accordance with this Agreement and the Settlement contained herein, administration of the Settlement Fund and the QSF, or further order(s) of the Court.

**VI**  **PROCEDURES FOR PROVIDING NOTICE AND BENEFIT TO SETTLEMENT CLASS MEMBERS**

**6.1**  The Parties shall jointly ask the Court to approve Verita Global as the Settlement Administrator. The Settlement Administrator shall, subject to the supervision of the Court, administer the relief provided by this Agreement by providing Notice and administering the Benefits in a rational, responsive, cost effective, and timely manner. The Settlement Administrator shall maintain reasonably detailed records of its activities under this Agreement. The Settlement Administrator shall maintain all records as are required by applicable law in accordance with its

normal business practices and such records will be made available to Class Counsel, counsel for HOP, the Parties, and their representatives promptly upon request.

**6.2** The Settlement Administrator shall be responsible for, among other things, providing notice as set forth in the Notice Plan and administering the Settlement Website, Opt-Out process, and Settlement process described herein (including receiving and maintaining on behalf of the Court and the Parties any Settlement Class Members' correspondence regarding Opt-Out requests from the Settlement Class).

**6.3** Settlement Class Members will be identified based on the records maintained by HOP provided that, if the Settlement Administrator determines, pursuant to the procedures set forth herein, that a Settlement Class Member's current mailing address is different from the last known mailing address, then such current mailing address will be employed for all communications with the Settlement Class Member.

**6.4** The Parties will be jointly responsible for agreeing upon the form and language of the notice to the Settlement Class and they agree to cooperate in drafting that notice and ensuring that the notice complies with the requirements of Federal Rule of Civil Procedure 23 and due process, subject to Court approval. Copies of the proposed notice to the Settlement Class shall be served and filed with the motion for preliminary approval of the Settlement.

**6.5** No later than forty-five (45) days after entry of the Preliminary Approval Order approving this Agreement and the Notice Plan, the Short-Form Notice will be sent by United States Mail to those Settlement Class Members for whom HOP has an address on file, postage prepaid, a preprinted postcard format. The Email Notice will also be sent by email to those Settlement Class Members for whom HP Has an e-mail address on file. The Long-Form Notice will be available on the Settlement Website to all Settlement Class Members.

21

**6.6** No later than twenty-one (21) days prior to the Final Approval Hearing, the Settlement Administrator shall certify to the Court compliance with the notice provisions of this Section.

**6.7** No later than twenty-one (21) days after entry of the Preliminary Approval Order approving the Settlement, the Settlement Administrator will create and maintain the Settlement Website to provide, among other things, copies of the Long-Form Notice, the Settlement Administrator's and Class Counsel's contact information, and certain selected pleadings and Court orders from the Action. The website will also contain a section, subject to input and approval by the Parties, setting forth, among other things, procedures for requesting exclusion from the Settlement Class pursuant to the terms of the Preliminary Approval Order; procedures for objecting to the Settlement pursuant to the terms of the Preliminary Approval Order; the scheduled date for the Final Approval Hearing; and deadlines relevant to the Settlement as established in the Preliminary Approval Order, including the dates for seeking exclusion from the Settlement Class and objecting to the Settlement.

**6.8** In addition to the cash payment Benefit, HOP has agreed to revise its customer contracts to make clear that its "Prevailing Retail Price" is determined in HOP's sole discretion, varies based upon a customer's delivery address, and is different from its cash on delivery price per gallon.

## VII   FORMULA FOR DETERMINING CLASS MEMBER BENEFIT

**7.1** Each Settlement Class Member shall receive a share of the Net Settlement Fund based on their points as set forth below:

> **7.1.1** For Class Members who were charged only their contractual "capped" rate, if the Class Member received total delivery(ies) of fewer than 218 gallons of heating oil from HOP, the Class Member shall be credited with 1 point,

22

if the Class Member received total delivery(ies) between 218 and 976 gallons of heating oil from HOP, the Class Member shall be credited with 2 points, and if the Class Member received total delivery(ies) in excess of 976 gallons of heating oil from HOP, the Class Member shall be credited with 4 points.

**7.1.2** For Class Members who were charged for any delivery of heating oil HOP's variable rate (*e.g.*, its "Prevailing Retail Rate," "Prevailing" rate, or "Prevailing Commercial Rate"), if the Class Member received total delivery(ies) of fewer than 218 gallons of heating oil from HOP, the Class Member shall be credited with 1.25 points, if the Class Member received total delivery(ies) between 218 and 976 gallons of heating oil from HOP, the Class Member shall be credited with 2.5 points, and if the Class Member received total delivery(ies) in excess of 976 gallons of heating oil from HOP, the Class Member shall be credited with 4.5 points.

**7.1.3** For Class Members with a Connecticut delivery address who entered into a contract with HOP between January 1, 2016 and December 31, 2020—and therefore whose contract referred to a "Promotional Prevailing Retail" price—if the Class Member received total delivery(ies) of fewer than 218 gallons of heating oil from HOP, the Class Member shall be credited with 1.50 points, if the Class Member received total delivery(ies) between 218 and 976 gallons of heating oil from HOP, the Class Member shall be credited with 3 points, and if the Class Member received total delivery(ies)

23

in excess of 976 gallons of heating oil from HOP, the Class Member shall be credited with 5.5 points.

**7.2** The distribution of the Settlement Fund shall have the following preferential order:

**7.2.1** Payment of all Notice and Administration Costs;

**7.2.2** Payment of any taxes associated with the Settlement Fund;

**7.2.3** Payment of any Attorneys' Fees and Costs plus any interest or income earned on the Attorneys' Fees and Costs portion of the Settlement Fund and Enhancement Awards;

**7.2.4** Payment of any legal fees and expenses incurred by HOP after the filing of the Motion for Preliminary Approval in excess of the Holdback Amount, if any;

**7.2.5** Payment of the Net Settlement Fund to Settlement Class Members in accordance with the Final Approval Order or any subsequent order of the Court within thirty (30) days of the Effective Date, with a second-round distribution of uncashed checks to Settlement Class Members who have cashed their checks; and

**7.2.6** Payment of any uncashed second-round check(s) to the Pennsylvania IOLTA Board as set forth in this Agreement.

**7.3** Settlement Payments to Settlement Class Members

**7.3.1** Within seven (7) days after the Effective Date, HOP, as transferor, will transfer into the QSF any remaining Holdback Amount. The Settlement Administrator will administer any funds transferred into the QSF.

**7.3.2** The Settlement Administrator shall mail each Settlement Class Member his or her settlement payment, or transfer the settlement payment by electronic means if the Settlement Class Member so chooses, within thirty (30) days of the Effective Date.

**7.3.3** Checks issued pursuant to this Agreement shall expire 120 calendar days after they are issued, but a failure by any Settlement Class Member to deposit or cash a check within the period allotted shall have no effect on that individual's release pursuant to Section XIII. Any check that remains uncashed 120 calendar days after the Effective Date will be forfeited by the Settlement Class Member, and the underlying funds will be redistributed pro-rata to the Settlement Class Members who have cashed their checks or received electronic payments. Any such second-round check that remains uncashed 60 days after issuance will be forfeited by the Settlement Class Member, and the underlying funds will be donated to the Pennsylvania IOLTA Board.

## VIII CLASS COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF COSTS, AND NAMED PLAINTIFF ENHANCEMENT AWARDS

**8.1** The Parties agree, subject to Court approval, that M. Frances Ryan and Edward C. Sweeney of Wusinich, Sweeney & Ryan, LLC shall be appointed as Class Counsel, without prejudice to HOP's right to contest the appointment in the event that this Agreement is not fully implemented in accordance with its terms. If the Settlement is not approved or this Agreement fails to be implemented fully, HOP reserves all rights to object to any subsequent motion to appoint class counsel in these or any other actions.

25

**8.2**    Class Counsel will submit an application (the "Fee and Expense Application") to the Court for an award from the Settlement Fund of: (i) attorneys' fees not to exceed 33 1/3% of the Settlement Fund; (ii) reimbursement of litigation expenses, plus interest, incurred in connection with the prosecution of the Action; and/or (iii) Enhancement Awards for Class Plaintiffs in conjunction with their representation of the Class. HOP will take no position regarding the Fee and Expense Application. Attorneys' fees, expenses, and interest, as awarded by the Court ("Fee and Expense Award") to Class Counsel, shall be paid from the Settlement Fund to Class Counsel ten (10) days after the Effective Date.

**8.3**    In connection with its Fee and Expense Application, Class Counsel intends to ask the Court for approval of Enhancement Awards to Class Representatives to be paid from the Settlement Fund in the following amounts: Plaintiff Callery: $10,000; Plaintiff Tina Fasano: $5,000. All Enhancement Awards shall be paid from the Settlement Fund. Should the Court award less than the amounts requested, the difference in the amounts sought and the amounts ultimately awarded shall remain in the Settlement Fund.

**8.4**    It is not a condition of this Agreement that any particular amount of attorneys' fees, costs, or expenses or Enhancement Awards be approved by the Court, or that such fees, costs, expenses or awards be approved at all. Any order or proceeding relating to the amount of any award of attorneys' fees, costs, or expenses or Enhancement Awards, or any appeal from any order relating thereto, or reversal or modification thereof, shall not operate to modify, terminate or cancel this Agreement, or affect or delay the finality of the Final Order and Judgment, except that any modification, order or judgment cannot result in HOP's overall obligation exceeding the agreed-upon amount of the Settlement Fund.

**8.5**     Except as otherwise provided herein, each Party will bear its own costs, including attorneys' fees, incurred in connection with the Action.

## IX     NOTICE AND DISSEMINATION TO THE SETTLEMENT CLASS

**9.1**     Subject to Court approval, the Parties agree that the Settlement Administrator shall cause notice of the proposed Settlement to be provided to the Settlement Class as provided below.

**9.2**     The Parties agree that the Class Notice shall be in the manner and form agreed upon by the Parties and approved by the Court. Collectively, the Class Notice shall in general terms set forth and sufficiently inform the Settlement Class Members of: (1) a short, plain statement of the background of the Action, the Class certification, and the essential terms of the Settlement; (2) the appropriate means for obtaining additional information regarding the Settlement and the Action; (3) the appropriate information concerning the procedure for Opting-Out from the Settlement and filing an Objection to the Settlement, if they should wish to do so; and (4) that any relief to Settlement Class Members is contingent on the Court's final approval of the Settlement. The Parties will request the Court to approve the Class Notice in the Motion for Preliminary Approval.

## X     OPT OUTS AND OBJECTIONS

Subject to an Order of the Court so providing, the Parties agree that:

### 10.1     Opt-Out

Any potential Settlement Class Member may elect to be excluded from the Settlement and from the Settlement Class by Opting-Out of the Settlement Class. Any potential Settlement Class Member who desires to be excluded from the Settlement Class must give written notice of the election to Opt-Out on or before the date specified in the Preliminary Approval Order, with copies mailed to the Settlement Administrator, Class Counsel, and counsel for HOP. Opt-Out requests must: (i) be signed by the Settlement Class Member who is requesting exclusion; (ii) include the full name, address, and phone number(s) of the Settlement Class Member requesting exclusion;

27

and (iii) include the following statement: "I/We request to Opt-Out from the settlement in the Action." No Opt-Out request will be valid unless all of the information described above, of the functional equivalent, is included. No Settlement Class Member, or any person acting on behalf of or in concert or participation with that Settlement Class Member, may exclude any other Settlement Class Member from the Settlement Class. The last date for Settlement Class Members to Opt-Out of the Settlement will, subject to Court approval, be on the Opt-Out Deadline contained in the Preliminary Approval Order.

The Class Representatives affirmatively support this Settlement and agree not to Opt-Out of the Settlement. None of the Class Representatives, Class Counsel, HOP, or their counsel shall in any way encourage any Settlement Class Member to opt out or discourage any Settlement Class Member from participating in the Settlement.

### 10.2 Objections

Any Settlement Class Member who wishes to object to the Settlement must file a written Objection and, if the Settlement Class Member wishes to appear at the Fairness Hearing, a notice of intention to appear before the Court at the Fairness Hearing, and serve copies on the Settlement Administrator, Class Counsel, and counsel for HOP. To be heard at the Fairness Hearing, the Settlement Class Member must make any Objection in writing, file it with the Clerk of Court by the Opt-Out and Objection Deadline, and file a notice of intention to appear. The Objection must also be mailed to each of the following, received no later than the last day to file the objection: (i) Class Counsel via M. Frances Ryan, Wusinich, Sweeney & Ryan, LLC, 102 Pickering Way, Exton, PA 19341, and (ii) counsel for HOP via Matthew T. McLaughlin, Nixon Peabody LLP, Exchange Place, 53 State Street, Boston, MA 02109. Any Objection must (a) attach documents establishing, or provide information sufficient to allow the Parties to confirm, that the objector is a Settlement

28

Class Member; (b) include a statement of such Settlement Class Member's specific Objection; (c) state the grounds for the Objection; and (d) identify any documents such objector desires the Court to consider. Any Objection to be considered timely must be filed by the Objection Deadline contained on the Preliminary Approval Order.

## XI     XII. PROCEDURES FOR SETTLEMENT APPROVAL

### 11.1     Approval of Class Notice of Settlement

Promptly after the execution of this Agreement, Plaintiffs will move the Court for an order preliminary approving the Settlement and requesting that the Court approve the form and content of the Short-Form Notice, Email Notice, and Long-Form Notice, substantially in the forms of **Exhibits A-C**, as described in Section VI above, and:

     **11.1.1** Certifying the Settlement Class, for settlement purposes only, pursuant to Federal Rule of Civil Procedure 23(a)(1)-(4) and (b)(3), with Plaintiffs Brian Callery and Tina Fasano appointed as Class Representatives for the Settlement Class and counsel for Plaintiffs, as stated herein, appointed as Class Counsel for the Settlement Class;

     **11.1.2** Setting the date of the Fairness Hearing, upon notice to the Settlement Class, to consider:

          i.    whether the Settlement should be approved as fair, reasonable, and adequate and whether the Action should be dismissed with prejudice;

          ii.   Class Counsel's motion for an award of attorneys' fees, costs and expenses; and

          iii.  Class Counsel will file a motion for final approval of the Settlement, and an application for the award of attorneys' fees, costs, and

29

enhancement awards for the Class Representatives, no later than 45 days following the mailing of Class Notice. Class Counsel will respond to any objections to the foregoing motions no later than seven (7) days prior to the date of the Final Fairness Hearing.

Upon the filing of Plaintiff's Motion for Preliminary Approval of Class Notice of Settlement, the Parties will instruct the Settlement Administrator to mail copies of the proposed Settlement to the appropriate officials pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1715 no later than ten (10) days thereafter.

### 11.2   Final Approval of the Court

This Agreement and the Settlement embodied herein are subject to Final Approval by the Court. If the Settlement is approved, the Court will enter a judgment dismissing the Action with prejudice. The Parties waive any right to appeal or collaterally attack a Final Approval Order entered by the Court.

If this Agreement or any material part of it is modified by the Court or is materially modified upon appeal or remand, either Party may terminate this Agreement pursuant to Section XII.

## XII   <u>ELECTION TO TERMINATE</u>

If no Party timely elects to terminate, then the Parties shall remain bound to the Settlement as so modified. No order or action of the court pertaining to attorneys' fees or expenses shall be considered to constitute a modification so long as such order, action, or modification does not increase the cost of settlement to be borne by HOP, and does not require that HOP do anything not specifically set forth herein, or is one that significantly affects the rights or obligations of one or more of the Parties. Similarly, no order or action of the court pertaining to the Named Plaintiff Enhancement Awards shall be considered to constitute a material modification so long as such

order, action or modification does not increase the cost of Settlement to be borne by HOP and does not require that HOP do anything not specifically set forth herein.

## XIII    **RELEASES**

Upon the Effective Date and without any further action by the court or by any Party to this Agreement, Plaintiffs and the Settlement Class Members and all of their administrators, executors, personal representatives, heirs, agents, attorneys, assigns, predecessors and successors, for good and sufficient consideration, the receipt and adequacy of which are acknowledged, shall be deemed to, and shall, in fact, have remised, released and forever discharged any and all Released Claims, which they, or any of them, had or has or may in the future have or claim to have against any of the Released Persons.

The Releasing Parties hereby fully release and forever discharge the Released Parties from the Released Claims.

Without limiting the foregoing, the release specifically extends to Claims that the Releasing Parties do not know or suspect to exist in their favor at the time that the Settlement, and the release contained herein, becomes effective. This paragraph constitutes a waiver of, without limitation as to any other applicable law, section 1542 of the California Civil Code, which provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

The Releasing Parties understand and acknowledge the significance of these waivers of California Civil Code section 1542 and any other applicable federal or state statute, case law, rule or regulation relating to limitations on releases. In connection with such waivers and relinquishment, the Releasing Parties acknowledge that they are aware that they may hereafter discover facts in addition to, or different from, those facts that they now know or believe to be true

31

with respect to the subject matter of the Settlement, but that it is their intention to release fully, finally and forever all Released Claims with respect to the Released Parties, and in furtherance of such intention, the release of the Released Claims will be and remain in effect notwithstanding the discovery or existence of any such additional or different facts.

## XIV   FINAL JUDGMENT AND SETTLEMENT APPROVAL

This Agreement is subject to and conditioned upon the issuance by the Court of the Final Approval Order that finally certifies the Settlement Class for the purposes of the Settlement, grants final approval of this Agreement, and provides the relief specified herein, which relief shall be subject to the terms and conditions of this Agreement and the Parties' performance of their continuing rights and obligations hereunder.

## XV   REPRESENTATIONS AND WARRANTIES

Each Party represents and warrants to, and agrees with, the other Parties as follows:

**15.1**   Each Party has had the opportunity to receive, and has received, independent legal advice from his, her, or its attorneys regarding the advisability of making the Settlement, the advisability of executing this Agreement, and the legal and income tax consequences of this Agreement, and fully understands and accepts the terms of this Agreement.

**15.2**   HOP represents and warrants: (a) that it has the requisite company power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby; (b) that the execution, delivery and performance of this Agreement and the consummation by it of the actions contemplated herein have been duly authorized by necessary company action on the part of HOP; and (c) that this Agreement has been duly and validly executed and delivered by HOP and constitutes its legal, valid and binding obligation.

**15.3**   The Class Representatives represent and warrant that they are entering into this Agreement on behalf of themselves individually and as proposed representatives of the Settlement

32

Class Members, of their own free will and without the receipt of any consideration other than what is provided in this Agreement or disclosed to, and authorized by, the Court. The Class Representatives represent and warrant that they have reviewed the terms of this Agreement in consultation with Class Counsel and believes them to be fair and reasonable, and covenants that they will not file an Opt-Out request from the Settlement Class or object to this Agreement.

**15.4** Plaintiffs represent and warrant that no portion of any claim, right, demand, action, or cause of action against any of the Released Parties that Plaintiffs have, may have arising out of these lawsuits or could have asserted in these lawsuits, and no portion of any recovery or settlement to which Plaintiffs may be entitled, has been assigned, transferred, or conveyed by or for Plaintiffs in any manner; and no Person other than Plaintiffs has any legal or equitable interest in the claims, demands, actions, or causes of action referred to in this Agreement as those of Plaintiffs..

**15.5** No Party relies or has relied on any statement, representation, omission, inducement, or promise of any other Party (or any officer, agent, employee, representative, or attorney for any other party) in executing this Agreement, or entering the Settlement provided for herein, except as expressly stated in this Agreement.

## XVI    NO ADMISSIONS OF FAULT

The Agreement and every term contained in it is conditioned upon final approval of the Court and is made for settlement purposes only. Whether or not consummated, this Agreement shall not be construed as, offered in evidence as, received in evidence as, and/or deemed to be, evidence of a presumption, concession or an admission by Plaintiffs, HOP, any Settlement Class Member or Released Party, of the truth of any fact alleged or the validity of any claim or defense that has been, could have been, or in the future might be asserted in any litigation, or the deficiency of any claim or defense that has been, could have been, or in the future might be asserted in any litigation, or of any liability, fault, wrongdoing or otherwise of such Party.

## XVII  **MISCELLANEOUS PROVISIONS**

### 17.1    Termination of Agreement

Except as expressly set forth herein, the Parties shall have the right to terminate the Settlement and this Agreement by providing written notice of their election to do so to the other Party within sixty (60) days after the date which (a) the Court declines to enter the Preliminary Approval Order or makes material changes thereto; (b) the Court refuses to approve the Settlement or any material part thereof; (c) the Court declines to enter the Final Approval Order or makes material changes thereto; (d) the Final Approval Order is vacated, modified or reversed in any material respect; or (e) the Effective Date otherwise does not occur.

If any of the Plaintiffs or more than five percent (5%) of the Settlement Class Members Opt-Out of the Settlement, HOP may, in its sole discretion, terminate the Settlement within five (5) business days after receiving notice from the Settlement Administrator that this threshold has been reached, which notice shall be provided by the Settlement Administrator no later than ten (10) days before the Fairness Hearing.

### 17.2    Entire Agreement

This Agreement, together with the Exhibits attached hereto, constitutes the complete and entire agreement between the Parties with respect to the subject matter of the Settlement and supersedes all prior negotiations, communications, memoranda, and agreements between the Parties. Neither Plaintiffs nor HOP are entering into this Agreement in reliance upon any representations, warranties, or inducements other than those contained in this Agreement.

### 17.3    Change of Time Periods

The time periods and/or dates described in this Agreement with respect to the giving of notices and hearings are subject to approval and change by the Court or by the written agreement

34

of Plaintiffs' Counsel and counsel to HOP, without notice to Settlement Class Members except that the Settlement Administrator shall ensure that such dates are posted on the Settlement Website.

### 17.4 Extension of Time

The Parties reserve the right, by agreement and subject to the Court's approval, to grant any reasonable extension of time that might be needed to carry out any of the provisions of this Agreement.

### 17.5 Plaintiffs' Authority

Class Counsel represent and warrant that they are authorized to take all appropriate actions required or permitted to be taken by or on behalf of the Plaintiffs and, subsequent to an appropriate Court Order, the Settlement Class in order to effectuate the terms of this Agreement and are also authorized to enter into appropriate modifications or amendments to this Agreement on behalf of the Plaintiffs and, subsequent to an appropriate Court Order, the Settlement Class Members.

### 17.6 Counterparts

This Agreement may be executed in one or more counterparts, all of which together shall be deemed to be one and the same instrument. The Parties agree that a copy of the executed counterparts may be filed with the Court in connection with the motion to approve the Settlement, either in portable document format or some other suitable electronic form, as an exhibit to Plaintiffs' Motion for Preliminary Approval without the need to collate and file a copy with original signatures.

### 17.7 Cooperation.

The Parties shall cooperate with the Settlement Administrator to the extent reasonably necessary to assist and facilitate the Settlement Administrator in carrying out its duties and

responsibilities. The Parties will also cooperate so that Class Counsel may have such confirmatory discovery as is reasonably necessary in connection with this Agreement.

### 17.8    Binding Nature

This Agreement shall be binding upon the heirs, executors, administrators, successors and assigns of the Plaintiffs, Settlement Class Members, and HOP.

### 17.9    Construing this Agreement

This Agreement shall not be construed more strictly against one Party than another merely by virtue of the fact that it may have been initially drafted by counsel for only one of the Parties. It is recognized that this Agreement is the result of arm's-length negotiations between the Parties, and it is acknowledged that all Parties have contributed substantially to the preparation of this Agreement; accordingly, the doctrine of *contra proferentum* shall not apply in construing this Agreement, nor shall any other such similar doctrine apply.

### 17.10   Choice of Law

This Agreement shall be governed by and interpreted in accordance with the substantive law of the Commonwealth of Pennsylvania, exclusive of choice of law principles.

### 17.11   Jurisdiction

The Parties submit to the exclusive jurisdiction of the United States District Court for the Eastern District of Pennsylvania for the purpose of enforcing this Agreement or implementing any part of the Settlement embodied in this Agreement.

### 17.12   Headings

The captions and headings employed in this Agreement are for convenience only, are not a part of this Agreement, and shall not be used in construing or interpreting this Agreement.

### 17.13 Evidentiary Preclusion

The Parties, Class Counsel, and Counsel for HOP agree that, to the fullest extent permitted by law, neither this Agreement nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of this Agreement or the Settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any claim or of any wrongdoing or liability of the Released Parties; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any Released Party or the appropriateness of class certification regarding any claims against any individual or any entity in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal.

The Parties, Class Counsel, and counsel for HOP further agree that they may not use this Agreement for any purpose other than to effectuate the Settlement and/or enforce the Agreement's terms. In addition, any failure of the Court to approve the Settlement and/or any objections or interventions may not be used as evidence in the Action or any other proceeding for any purpose whatsoever.

### 17.14 Effect of Non-approval

In the event that this Agreement is not approved by the Court in substantially its present form, any Objection to the Settlement is sustained by the Court, or the Settlement does not become final for any reason including termination, the terms and provisions of this Agreement shall have no further force and effect with respect to the Parties or the Settlement Class Members, and shall not be used in the Action or in any other action or proceeding for any purpose, and any order or judgment entered by the Court in accordance with the terms of this Agreement shall be treated as vacated, *nunc pro tunc.* In such event, this Agreement and all negotiations, proceedings, documents prepared and statements made in connection with this Agreement shall be without prejudice to any

Party or Settlement Class Member and shall not be admissible or offered into evidence in any action or proceeding, and shall not be deemed, asserted or construed to be an admission or confession by any Party or any other Person or entity of any fact, matter or proposition of law, and shall not be used or asserted in any other manner or for any purpose, and all Parties and Settlement Class Members shall stand in the same position as if this Agreement and Settlement had not been negotiated, made or submitted to the Court.

## 17.15 Effectiveness, Amendments, and Binding Nature

This Agreement may be amended only in writing signed by the Parties. Except as otherwise stated above, each Party, including Plaintiffs on behalf of themselves and the Settlement Class, expressly accepts and assumes the risk that, if facts or laws pertinent to matters covered by this Agreement are hereafter found to be other than as now believed or assumed by that party to be true or applicable, this Agreement shall nevertheless remain effective.

This Agreement is binding on, and shall inure to the benefit of, the Parties and their respective agents, employees, representatives, officers, directors, parents, subsidiaries, assigns, executors, administrators, insurers, and successors in interest. All Released Parties other than HOP, which is a Party, are intended to be third-party beneficiaries of this Agreement.

## 17.16 Stay Pending Court Approval

Class Counsel and counsel for HOP agree that, as soon as reasonably practicable after the Amended Complaint is filed, they shall move to stay all proceedings impacted by this Agreement, specifically the New York Actions, and request that such stays remain in place until the Effective Date of the Settlement has occurred.

The Parties also agree to use their best efforts to seek the stay and dismissal of, and to oppose entry of any interim or final relief in favor of any Settlement Class Member in, any other

38

proceedings against any of the Released Parties which challenges the Settlement or otherwise asserts or involves, directly or indirectly, a Released Claim.

### 17.17  Notices

Whenever this Agreement requires or contemplates that one Party shall or may give notice to the other, notice shall be provided in writing by certified or guaranteed overnight mail, and email to:

a.  If to Plaintiffs or Class Counsel:

M. Frances Ryan
Wusinich, Sweeney & Ryan, LLC
102 Pickering Way, Suite 403
Exton, PA 19341

b.  If to HOP or its Counsel:

Matthew T. McLaughlin
Nixon Peabody LLP
Exchange Place
53 State Street
Boston, MA 02109

### 17.18  Good Faith

The Parties agree that they will act in good faith and will not engage in any conduct that will or may frustrate the purpose of this Agreement. The Parties further agree, subject to Court approval as needed, to reasonable extensions of time to carry out any of the provisions of this Agreement.

### 17.19  Protective Orders

All orders, settlement agreements and designations regarding the confidentiality of documents and information ("Protective Orders") remain in effect, and all Parties and counsel remain bound to comply with the Protective Orders, including the provisions to certify the destruction of "Confidential" documents.

### 17.20 Confidentiality

The terms of this Agreement shall remain confidential until filed in the United States District Court for the Eastern District of Pennsylvania.

### 17.21 Binding on Successors

The Agreement shall be binding upon, and inure to the benefit of, the heirs, and Released Parties.

### 17.22 Arms-Length Negotiations

The determination of the terms and conditions contained herein and the drafting of the provisions of this Agreement has been by mutual understanding after negotiation, with consideration by, and participation of, the Parties hereto and their counsel. This Agreement shall not be construed against any Party on the basis that the Party was the drafter or participated in the drafting. Any statute or rule of construction that ambiguities are to be resolved against the drafting party shall not be employed in the implementation of this Agreement and the Parties agree that the drafting of this Agreement has been a mutual undertaking.

### 17.23 Waiver

The waiver by one Party of any provision or breach of this Agreement shall not be deemed a waiver of any other provision or breach of this Agreement.

### 17.24 Exhibits

All Exhibits attached to this Agreement are material and integral parts hereof, and are incorporated by reference as if fully rewritten herein.

40

**17.25  Retain Jurisdiction**

The Court shall retain jurisdiction with respect to the implementation and enforcement of the terms of this Agreement, and all Parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing the agreements embodied in this Agreement.

**17.26  Taxes**

The Plaintiffs, Settlement Class Members, and Class Counsel receiving funds pursuant to this Agreement shall be solely responsible for filing all information and other tax returns necessary or making any tax payments related to funds received pursuant to this Agreement. The Parties provide no legal advice and make no representations to the Plaintiffs, Settlement Class Members, or Class Counsel regarding the legal or tax consequences of this agreement, including any benefit or monies paid and received. The Plaintiffs, Settlement Class Members, and Class Counsel shall be solely responsible for any tax or legal consequences for any Benefit paid and/or received pursuant to this Agreement.

**17.27  Media and Contact of Class Members**

The Parties and their counsel agree that they will not issue any press release or hold any press conference or initiate any contact with the press, media, or any industry association about the Action and/or the facts, amount or terms of the Settlement. If the Parties or their counsel are contacted by the press, media, or any industry association, they will respond only that the Action has been amicably resolved to the Parties' mutual satisfaction. No Party or their counsel shall make any reference to the value of the Settlement on any website, in any promotional material or otherwise, except as required by law. Notwithstanding the foregoing, Class Counsel may post a copy of language from the notices attached as Exhibits A, B, and C and provide a hyperlink to the Settlement Website.

41

### 17.28   Support from the Parties

After a full investigation, discovery and arms-length negotiations, the Parties and their counsel agree that they: (a) shall support motions for entry of the Preliminary Approval Order and Final Approval Order; and (b) will not encourage any Persons to Opt-Out or file an Objection to the Settlement or this Agreement.

### 17.29   Authority to Execute Settlement Agreement

Each counsel executing this Settlement Agreement or any of its exhibits on behalf of any party hereto warrants that such person has the authority to do so.

*          *          *

IN WITNESS HEREOF, the Settling Parties have caused this Settlement Agreement to be executed by their duly authorized attorneys, as of July 15, 2024.

**ON BEHALF OF THE PLAINTIFFS**

_____          Date: _____
M. Frances Ryan

_____          Date: _____
Edward C. Sweeney

**ON BEHALF OF HOP ENERGY, LLC**

_____          Date: _____7/15/24_____
Matthew T. McLaughlin

### 17.28  Support from the Parties

After a full investigation, discovery and arms-length negotiations, the Parties and their counsel agree that they: (a) shall support motions for entry of the Preliminary Approval Order and Final Approval Order; and (b) will not encourage any Persons to Opt-Out or file an Objection to the Settlement or this Agreement.

### 17.29  Authority to Execute Settlement Agreement

Each counsel executing this Settlement Agreement or any of its exhibits on behalf of any party hereto warrants that such person has the authority to do so.

*     *     *

IN WITNESS HEREOF, the Settling Parties have caused this Settlement Agreement to be executed by their duly authorized attorneys, as of July 15, 2024.

**ON BEHALF OF THE PLAINTIFFS**

_____  Date: ___7/15/24___
M. Frances Ryan

_____  Date: ___7/15/24___
Edward C. Sweeney

**ON BEHALF OF HOP ENERGY, LLC**

_____  Date: _____
Matthew T. McLaughlin

42

# Exhibit A

*Notice of Settlement*

---

## You Are Covered by the Settlement of this Class Action Lawsuit

A settlement has been proposed in a class action lawsuit against HOP Energy, LLC. This Notice informs you of a proposed settlement in a class action lawsuit against HOP Energy, LLC ("HOP" or "Defendant") claiming that HOP solicited customers by promising a variable rate for home heating oil that was to fluctuate based on market conditions, and that the variable rate was allegedly not priced in accordance with market conditions. Plaintiffs maintain that Defendant's actions constitute violations of various states' consumer protection laws, as well as other laws. Defendant denies Plaintiffs' claims and charges, denies that it violated any laws, and maintain that its actions have been in accordance with its contractual commitments and not deceptive. Both parties have agreed to settle the lawsuit. A complete copy of the Settlement Agreement and Long Form Notice are available at [website].

**Who Is Included?** You are a Class Member if you entered into a contract(s) with Defendant (including any entities through which HOP has conducted or conducts business, which includes, but is not limited to Altemos Energy, Alliance Express, Automatic TLC Energy, Brinker's Energy, Cemak Fuel, CRC Energy, DDLC Energy, DDM Energy, Dominic Fuel, Galbraith Oil, Kaufman Fuel, Keyser Energy, Kosco Heritage, Mercury Energy, Metro Energy, Oil Express, Point Oil, Supreme Energy, and Valley Oil) for the delivery of heating oil to a residence and who received delivery of heating oil pursuant to such contract during such period pursuant to the contractual "capped" price or pursuant to a variable or prevailing price (including, but not limited to, a "prevailing retail price," "prevailing" price or rate, "prevailing commercial rate," or "Promotional Prevailing Retail" price) on or after June 23, 2014.

**What Does the Settlement Provide?** If the Settlement is approved by the Court, HOP will pay up to $2,627,530.00 into a Settlement Fund to be used to pay cash distributions to Settlement Class Members, payment of fees and expenses incurred by the Settlement Administrator, awarded attorneys' fees and expenses, and Enhancement Awards for the Class Representatives.

**How much will my estimated payment be?** That depends. Each Settlement Class Member is eligible to receive a share of the Settlement Fund depending on the number of gallons of heating oil delivered by HOP, the price(s) charged by HOP for such delivery(ies), and/or the type of contract that the Settlement Class Member entered into with HOP.

**What Are Your Other Options?** If you do not want to receive a payment and do not want to be legally bound by the Settlement, you must send a written request to exclude yourself from the Settlement Class, to be received no later than [date]. If you don't exclude yourself, you will give up the right to sue HOP about any of the issues related to this case. If you don't exclude yourself, you may object to the Settlement, the request for fees and costs by Class Counsel, and/or the Enhancement Awards for the Named Plaintiffs. The Long Form Notice, available at [website], explains how to exclude yourself or object. The Court will hold a Final Approval Hearing regarding the final approval of the Settlement in this case at the United States District Court for the Eastern District of Pennsylvania, U.S. Courthouse, 601 Market Street, Philadelphia, PA 19106, on [date], 2024. At this hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate and will consider Class Counsel's request for attorneys' fees and expenses. Plaintiffs and the Settlement Class are represented by Class Counsel. You will not be charged personally for these lawyers. You do not need to attend the hearing, but you may. You may also hire an attorney at your expense to represent you and speak on your behalf at the Final Approval Hearing, but you do not have to. The date and time of the Hearing may change, please check the Settlement website often for updates. If you stay in the Settlement, you may object to it by **[Month Day,]** 2024. The Court will hold a hearing on **[Month Day,]** 2024 to consider whether to approve the Settlement and the requested attorneys' fees. If you wish, you or your own lawyer may ask to appear and speak at the hearing at your own cost. **The Settlement Notice on the website explains how to exclude yourself or object. If you remain in the class and the settlement is approved, you will be bound by it and will release all claims against HOP about the issues in this lawsuit.**
**For more information: Visit [*website*] or call [*administrator*]**

**If you enrolled in one of HOP Energy, LLC's residential home heating oil contracts you may be entitled to payment from a Class Action Settlement. In order to obtain more information about the Settlement, visit [website].**

A Court has authorized this Notice. This is <u>not</u> a solicitation from a lawyer.

Notice No.

HOP Energy. LLC Litigation Administrator
c/o [administrator]

John Doe
123 Main Street
[City], [State] 01111

# Exhibit B

## Email Notice

Legal Notice

*Brian Callery et al. v. HOP Energy, LLC*, Case No. 2:20-cv-03652-CMR
United States District Court, Eastern District of Pennsylvania

## OUR RECORDS INDICATE THAT YOU ENROLLED IN ONE OF HOP ENERGY, LLC'S RESIDENTIAL HOME HEATING OIL CONTRACTS ON OR AFTER JUNE 23, 2014 AND THEREFORE YOU ARE COVERED BY THIS CLASS ACTION SETTLEMENT.

## THE UNITED STATES DISTRICT COURT HAS AUTHORIZED THIS NOTICE, WHICH SUMMARIZES THE TERMS OF THE SETTLEMENT AND EXPLAINS YOUR RIGHTS UNDER THE SETTLEMENT.

## PLEASE READ THIS DOCUMENT CAREFULLY.

This Notice informs you of a proposed Settlement in a class action lawsuit against HOP Energy, LLC (referred to as "HOP" or "Defendant") claiming that claiming that HOP solicited customers by promising a variable rate for home heating oil that was to fluctuate based on market conditions, and that the variable rate was allegedly not priced in accordance with market conditions. Plaintiffs maintain that Defendant's actions constitute violations of various states' consumer protection laws, as well as other laws. Defendant denies Plaintiffs' claims and charges, denies that it violated any laws, and maintain that its actions have been in accordance with its contractual commitments and not deceptive. Both parties have agreed to settle the lawsuit. A complete copy of the Settlement Agreement and Long Form Notice are available at the Settlement Website at [website].

**Who's included?** You are a Class Member if you entered into a contract(s) with Defendant (including any entities through which HOP has conducted or conducts business, which includes, but is not limited to Altemos Energy, Alliance Express, Automatic TLC Energy, Brinker's Energy, Cernak Fuel, CRC Energy, DDLC Energy, DDM Energy, Dominic Fuel, Galbraith Oil, Kaufman Fuel, Keyser Energy, Kosco Heritage, Mercury Energy, Metro Energy, Oil Express, Point Oil, Supreme Energy, and Valley Oil) for the delivery of heating oil to a residence and who received delivery of heating oil pursuant to such contract during such period pursuant to the contractual "capped" price or pursuant to a variable or prevailing price (including, but not limited to, a "prevailing retail price," "prevailing" price or rate, "prevailing commercial rate," or "Promotional Prevailing Retail" price) on or after June 23, 2014.

**Visit the Settlement Website for additional details.**

**What does the Settlement provide?** If the Settlement is approved by the Court, HOP will pay up to $2,627,530.00 into a Settlement Fund to be used to pay cash distributions to Settlement Class Members, payment of fees and expenses incurred by the Settlement Administrator, awarded attorneys' fees and expenses, and Named Plaintiff Enhancement Awards for the Class Representatives.

**Do I have a lawyer?** Plaintiff and the Settlement Class are represented by M. Frances Ryan and Edward C. Sweeney of Wusinich, Sweeney & Ryan, LLC, who have been appointed by the Court as Class Counsel. You will not be charged personally for these lawyers. You may hire an attorney at your own expense to represent you and speak on your behalf at the Final Approval Hearing. Class Counsel will ask the Court at the Final Approval Hearing for approval for the following items to be paid out of the Settlement Fund: (a) attorneys' fees; reimbursement of litigation expenses; Named Plaintiff Service Awards; and notice and administration costs of the Settlement.

**What can I get from the Settlement?** If the Court approves the settlement, you will receive a check or, if you prefer, payment by electronic means, which you can specify by visiting the settlement website. Your individual payment amount is determined based on the number of gallons of heating oil delivered by HOP, the price(s) charged by HOP for such delivery(ies), and/or the type of contract that you entered into with HOP.

**How can I receive a settlement payment?** If this Notice is addressed to you, then you are covered by the Settlement and *you do not need to do anything to receive a settlement payment* unless your current mailing address is different than the mailing address you used when you were last a customer of HOP (in which case, you may visit the settlement website to update your contact information). Of course, the payment will not be made unless and until the Court approves the settlement.

**What are your options?** If you don't want to receive a payment and don't want to be bound by the Settlement and any judgment, you must send a written request to exclude yourself from the Settlement Class, to be received no later than [60 days from Notice Dissemination]. If you exclude yourself, you will not receive benefits from the Settlement. If you don't exclude yourself, you will give up the right to sue the Defendant about any of the issues related to this case. If you don't exclude yourself, you may object to the Settlement, the request for fees and costs by Class Counsel, and/or the Enhancement Awards for the Named Plaintiffs. The longer form of this Notice, available at the Settlement website, explains how to exclude yourself or object. The Court will hold a Final Approval Hearing regarding the final approval of the Settlement in this case at the United States District Court for the Eastern District of Pennsylvania, U.S. Courthouse, 601 Market Street, Philadelphia, PA 19106, on [date]. Plaintiffs and the Settlement Class are represented by Class Counsel. You do not need to attend the hearing, but you may. You may also hire an attorney at your own expense to represent you and speak on your behalf at the Final Approval Hearing, but you do not have to. The Hearing will be accessible by telephone or other electronic means. The date and time of the Hearing may change, please check the Settlement website often for updates.

**If you wish to notify the Settlement Administrator of any change in your contact information, please visit the Settlement Website.**

Toll-Free: [number]
[website]

# Exhibit C

## Notice of Pendency and Proposed Settlement of Class Action

      This Notice is to inform you of a proposed settlement of a class action lawsuit that will resolve claims against HOP Energy, LLC (referred to as "HOP" or "Defendant"). If you entered into a contract(s) with Defendant (including any entities through which HOP has conducted or conducts business, which includes, but is not limited to Altemos Energy, Alliance Express, Automatic TLC Energy, Brinker's Energy, Cernak Fuel, CRC Energy, DDLC Energy, DDM Energy, Dominic Fuel, Galbraith Oil, Kaufman Fuel, Keyser Energy, Kosco Heritage, Mercury Energy, Metro Energy, Oil Express, Point Oil, Supreme Energy, and Valley Oil) for the delivery of heating oil to a residence and received delivery of heating oil pursuant to such contract on or after June 23, 2014, *your legal rights may be affected by the Settlement*.

### This Notice is given to you pursuant to Rule 23 of the Federal Rules of Civil Procedure. Please review this document carefully.

### You are not being sued.

| YOUR LEGAL RIGHTS AND OPTIONS | |
|---|---|
| DO NOTHING | If you do nothing, you will be bound by the Settlement, if it is approved, and you will receive a cash distribution |
| EXCLUDE YOURSELF | Write to the Settlement Administrator if you do not want to benefit from, or be bound by, the Settlement. The deadline to exclude yourself is MONTH DAY, 20XX. |
| OBJECT | File an objection with the Court if you are not satisfied with the Settlement. The deadline to object to the Settlement is MONTH DAY, 20XX. |
| GO TO A HEARING | If you file an objection and a notice of intent to appear, you may speak in Court or electronically about the fairness of the Settlement. The Final Approval Hearing will be held on MONTH DAY, 20XX. |

Your legal rights and options--**and the deadlines to exercise them**--are explained in this Notice. Your legal rights may be affected whether you act or do not act. Please read this Notice carefully. Capitalized terms in this Notice have the same meaning as provided in the Settlement Agreement on file with the Court.

### 1. Why did the Court issue this notice?

This Notice is given to inform you that (1) a class action lawsuit is pending in the United States District Court for the Eastern District of Pennsylvania entitled *Brian Callery et al. v. HOP Energy, LLC*, Case No. 2:20-cv-03652-CMR (the "Action"); (2) you are a Class Member regarding the Action; (3) the Parties to the Action have proposed to settle the Action; (4) the proposed Settlement may affect your legal rights; and (5) you have a number of options.

### 2. What is this Action about?

Plaintiffs have brought this action against HOP, on behalf of themselves and all other persons who entered into a contract(s) with Defendant for the delivery of heating oil to a residence and received delivery of heating oil pursuant to such contract on or after June 23, 2014 (the "Class Period").

Plaintiffs allege that Defendant promised to charge customers a variable price for oil that was to fluctuate based on market conditions, and that the price charged was allegedly not priced in accordance with market conditions. Plaintiffs maintain that Defendant's actions constitute violations of various states' consumer protection laws, as well as other laws.

Defendant denies Plaintiffs' claims and charges, denies they have violated any laws, and maintain that its actions were in accordance with its contractual commitments and not deceptive.

### 3. How do I know if I am part of the Settlement Class?

The Court has conditionally certified a Settlement Class defined as the following:

All persons in the United States who, between June 23, 2014 and the date of the Preliminary Approval Order, entered into a contract(s) with Defendant for the delivery of heating oil to a residence and who received delivery of heating oil pursuant to such contract during such period pursuant to the contractual "capped" price or pursuant to a variable or prevailing price (including, but not limited to, a "prevailing retail price," "prevailing" price or rate, "prevailing commercial rate," or "Promotional Prevailing Retail" price).

Excluded from the Class are: (a) HOP; (b) the officers, directors, and employees of HOP; former HOP employees; (c) any entity in which HOP has a controlling interest; (d) any affiliate or legal representative of HOP; (e) the Judges and Mediators to whom the Action is assigned, the Judge's and Mediators' staff and any member of their immediate family; and (f) any heirs assigns and/or successors of any such persons or entities in their capacity as such.

### 4. What are the reasons for the Settlement?

The Court did not decide in favor of the Plaintiffs or Defendant. Instead, both sides agreed to a settlement that they believe is a fair, reasonable, and adequate compromise of their respective positions. The Parties reached this agreement only after extensive negotiations, an exchange of information, and consideration of the risks and benefits of settlement.

Counsel for Plaintiffs and the Settlement Class Members have considered the substantial benefits from the proposed Settlement that will be given to the Settlement Class Members and balanced these benefits with the risk that a trial could end in a verdict for Defendants. They also considered the value of the immediate benefit to Settlement Class Members versus the costs and delay of litigation through trial and appeals and the risk that a class would not be certified. Even if Plaintiffs were successful in these efforts, Settlement Class Members may not receive any benefits for years.

**BENEFITS.** If the proposed Settlement is ultimately approved by the Court, it will provide cash payments to the Settlement Class Members. In return for the relief described below, the Settlement Class Members release their rights to pursue any claims against HOP and related entities concerning or relating to the allegations raised in the Action. The central provisions of the Settlement are as follows:

> **Monetary Relief.** Defendants will pay a total of up to $2,627,530.00 into a cash fund ("Settlement Fund"). The Settlement Fund will be used to pay (i) Settlement Class Members' cash benefits, (ii) awarded attorneys' fees and expenses, (iii) the Named Plaintiff Enhancement Awards, and (iv) all settlement administration feed and costs, and notice costs.

> Each Settlement Class Member who does not exclude himself/herself/themselves from the Settlement shall receive a pro-rata share of the Net Settlement Fund. That pro-rata share shall be based on the number of gallons of heating oil delivered by HOP, the price(s) charged by HOP for such delivery(ies), and/or the type of contract that the Class Member entered into with HOP.

**NOTICE AND ADMINISTRATION.** The costs of Notice and to administer the Settlement will be paid out of the Settlement Fund.

**PAYMENT PROCEDURE.** To receive a cash payment, you do not need to take any additional steps.

**RELEASE.** Unless you exclude yourself from the Settlement Class, approval of this proposed Settlement will result in a release by you of all Claims against Defendants and other related entities and individuals concerning or relating to the allegations or claims raised in the Action.

**MORE INFORMATION.** The complete terms of the Settlement are in the Settlement Agreement, which is available online at [website].

| **6.  Do I have a lawyer in the case?** |
| --- |

Plaintiffs and the Settlement Class are represented by M. Frances Ryan and Edward C. Sweeney of Wusinich, Sweeney & Ryan, LLC, who have been appointed by the Court as Class Counsel. You will not be charged personally for these lawyers. You may hire an attorney at your own expense to represent you and speak on your behalf at the Final Approval Hearing.

| **7.  How will the lawyers for the Settlement Class be paid?** |
| --- |

Lead Class Counsel and Class Counsel will, subject to Court approval, make an application for attorneys' fees not to exceed 33 1/3% of the Settlement Fund. Further, the Class Representatives will request the Court to grant Enhancement Awards up to $10,000 to Brian Callery and $5,000 for Tina Fasano, as further described in the Settlement Agreement. Defendant takes no position on the requested attorneys' fees, and expenses or Enhancement Awards.

Class Counsel will file any motion for an award of Class Counsel's Fees on or before [Date of set by the Court].

### 8. What happens if I do nothing after receiving this notice?

If you do nothing, and the Court approves the Settlement, you will receive a cash payment and be bound by the terms of the Settlement and will be unable to pursue claims against HOP and other related entities concerning or relating to the allegations or claims raised in the Action.

As long as you do not request exclusion from the Settlement Class, you will be entitled to the payments described in Section 5.

### 9. What does it mean to request exclusion from the Settlement Class?

If you come within the Settlement Class definition, you will be a Settlement Class Member and will be bound by the Settlement if the Court approves the Settlement, unless you exclude yourself from the Settlement Class (also known as "Opting-Out"). Being "bound by the Settlement" means that you will be precluded from bringing, or participating as a claimant in, a similar lawsuit. Persons who exclude themselves from the Settlement Class will not be bound by the terms of the proposed Settlement for purposes of damages claims and will not be eligible to receive any money from the proposed Settlement, but they will retain the right to sue Defendant for damages, at their own cost.

You cannot exclude yourself from the Settlement Class and the proposed Settlement if you wish to object to the Settlement and/or appear before the Court during the Final Approval Hearing (see Sections 11 and 12), as you need to be a Settlement Class Member affected by the Settlement to object or appear.

### 10. How do I request exclusion?

You may exclude yourself from the Settlement Class provided that your request for exclusion is made in writing and *delivered* before [**60 Days after Notice Dissemination**]. To exclude yourself, you can download an exclusion form available at [website] or send a letter that includes (a) the signature of the Settlement Class Member requesting exclusion from the Settlement, (b) the full name, address, and phone number(s) of the Settlement Class Member requesting exclusion, and (c) include the following statement (or a functional equivalent): "I/We request to Opt-Out from the Settlement in the Action." Your written request to exclude yourself from the Settlement must be sent to Verita Global at [address].

You will be excluded from the Settlement only if your request is *delivered* on or before [**60 Days after Notice Dissemination**], and includes the required information. Settlement Class Members who fail to submit a valid and timely request for exclusion on or before the date specified, shall be bound by all terms of the proposed Settlement and any related Final Order and Judgment, regardless of whether they have requested exclusion from the proposed Settlement.

4

In determining whether you want to exclude yourself from the Settlement, you are advised to consult your own personal attorney, as there may be issues particular to your circumstances that require consideration.

## 11. What if I do not like the Settlement?

If you are a Settlement Class Member, you can object to the proposed Settlement. To object, you must provide the following information in writing: (a) documents establishing, or providing information sufficient to allow the Parties to confirm that the objector is a Settlement Class Member; (b) a statement of such Settlement Class Member's specific Objection; (c) the grounds for the Objection; (d) identification of any documents such objector desires the Court to consider; and (e) all information requested on the Claim Form.

Your objection must be *delivered* before **[60 Days after Notice Dissemination]** to the Settlement Administrator at [Verita Global/[address] and served on Class Counsel and on Counsel for HOP.

If your objections do not meet all of the requirements set forth in this section, they will be deemed invalid and will be overruled.

Finally, subject to approval of the Court, any objecting Settlement Class Member may appear, in person or by counsel, at the Final Approval Hearing held by the Court, to show cause why the proposed Settlement should not be approved as fair, adequate, and reasonable, or object to any petitions for attorneys' fees, Named Plaintiff Enhancement Awards, and reimbursement of reasonable litigation costs and expenses. Settlement Class Members may also appear at the Final Approval Hearing by telephone or other electronic means. The objecting Settlement Class Member must file with the Clerk of the Court and serve upon Class Counsel and Counsel for HOP (at the addresses listed below), a notice of intention to appear at the Final Approval Hearing ("Notice of Intention to Appear") on or before **[60 Days after Notice Dissemination]**.

When required to mail counsel for the Parties, use the below addresses:

1.    Plaintiffs: M. Frances Ryan, Wusinich, Sweeney & Ryan, LLC, 102 Pickering Way, Suite 403, Exton, PA 19341

2.    Defendant: Matthew T. McLaughlin, Nixon Peabody LLP, Exchange Place, 53 State Street, Boston, MA 02109.

The Notice of Intention to Appear must include copies of any papers, exhibits, or other evidence that the objecting Settlement Class Member (or his/her/its counsel) will present to the Court in connection with the Final Approval Hearing. Any Settlement Class Member who does not provide a Notice of Intention to Appear in complete accordance with the deadlines and other specifications set forth in this Notice, will not be allowed to speak or otherwise present any views at the Final Approval Hearing.

## 12. When and where will the Court determine whether to approve the settlement?

The Court has scheduled a Final Approval Hearing for **[Final Approval Hearing Date]** at the the United States District Court for the Eastern District of Pennsylvania, U.S. Courthouse, 601 Market Street, Philadelphia, PA 19106. This hearing may be continued or rescheduled by the Court without further notice. At this hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate and will consider Class Counsel's request for attorneys' fees and expenses. The Court also will consider objections. The Court may decide these issues at the Final Approval Hearing or take them under consideration. We do not know how long these decisions will take.

### 13. Do I have to come to the hearing?

No. You are not required to come to the hearing, but you are welcome to come at your own expense. The hearing may be in person or via video conference, subject to the Court's order. If the hearing is in person, the Court will make the hearing accessible to Settlement Class Members by telephone or other electronic means.

Settlement Class Members who object to the proposed Settlement do not need to attend the Final Approval Hearing for their objections to be considered. If you wish to appear either personally or through your own personal attorney at the Final Approval Hearing, you must send both a timely objection and a Notice of Intention to Appear to the Clerk of the Court at the address set forth in Section 11 above, and serve copies on Class Counsel and counsel for Defendants at the addresses set forth in Section 11 above no later than **[60 Days after Notice Dissemination]**.

### 14. What if the proposed Settlement is not approved?

If the proposed Settlement is not granted final approval, the putative Settlement Class which has been preliminarily approved will be decertified, the Action will proceed without further notice, and none of the agreements set forth in this notice will be valid or enforceable.

### 15. How do I get more information about the settlement?

This Notice only summarizes the Settlement. The official terms of the Settlement are available by visiting the Settlement Website at [website] or by reviewing the public files at the Clerk of Court, Eastern District of Pennsylvania. In the event of a conflict between the terms of this Notice and the Settlement, the terms of the Settlement will govern.

All questions you may have concerning the Settlement Agreement or this Notice should be directed to the Settlement Administrator at [complete].

**Please DO NOT Contact the Court**

# Exhibit D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRIAN CALLERY | : | CIVIL ACTION NO. 20-cv-03652 |
| | : | |
| and | : | |
| | : | |
| TINA FASANO | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| HOP ENERGY, LLC | : | |
| | : | |
| Defendant. | : | |

## [PROPOSED] ORDER CERTIFYING CLASS FOR SETTLEMENT PURPOSES ONLY AND GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

WHEREAS, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, the parties seek entry of an Order preliminarily approving the settlement of this Action pursuant to the settlement agreement fully executed on July 15, 2024 (the "Settlement Agreement" or "Settlement"), which, together with its attached exhibits, sets forth the terms and conditions for a proposed settlement of the Action and dismissal of the Action with prejudice; and

WHEREAS, the Court has read and considered the Settlement and its exhibits, and Plaintiffs' Unopposed Motion for Preliminary Approval and accompanying exhibits dated July 15, 2024;

**NOW, THEREFORE, IT IS ON THIS __ DAY OF ___, 2024, ORDERED THAT:**

1. This Order incorporates by reference the definitions in the Settlement Agreement, and all terms used in this Order shall have the same meanings as set forth in the Settlement Agreement.

1

2. The Court preliminarily approves the Settlement as being a fair, reasonable, and adequate resolution of the claims of Plaintiffs and the Settlement Class, subject to further consideration at the Final Approval Hearing described below.

3. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court certifies, solely for purposes of effectuating the Settlement, the Settlement Class as follows:

> All persons in the United States who, between June 23, 2014 and the date of the Preliminary Approval Order, entered into a contract(s) with Defendant for the delivery of heating oil to a residence and who received delivery of heating oil pursuant to such contract during such period pursuant to the contractual "capped" price or pursuant to a variable or prevailing price (including, but not limited to, a "prevailing retail price," "prevailing" price or rate, "prevailing commercial rate," or "Promotional Prevailing Retail" price). Excluded from the Class are: (a) HOP; (b) the officers, directors, and employees of HOP; former HOP employees; (c) any entity in which HOP has a controlling interest; (d) any affiliate or legal representative of HOP; (e) the Judges and Mediators to whom the Action is assigned, the Judge's and Mediators' staff and any member of their immediate family; and (f) any heirs assigns and/or successors of any such persons or entities in their capacity as such.

4. The Court appoints M. Frances Ryan and Edward C. Sweeney of Wusinich, Sweeney & Ryan, LLC as Lead Class Counsel.

5. The Court appoints Plaintiffs Brian Callery and Tina Fasano as Class Representatives.

6. The Court preliminarily finds, solely for purposes of the Settlement, that: (a) the Settlement Class is so numerous that joinder of all Settlement Class Members in the Action is impracticable; (b) there are questions of law and fact common to the Settlement Class that predominate over any individual questions; (c) the claims of the Class Representatives are typical of the claims of the Settlement Class; (d) the Class Representatives and Lead Class Counsel have and will continue to fairly and adequately represent and protect the interests of the Settlement Class; and (e) a class action is superior to all other available methods for the fair and efficient implementation

2

of the Settlement. The Court preliminarily finds that certification of the Settlement Class is appropriate when balanced against the risks relating to further litigation. It further appears that extensive and costly investigation, research, and exchanges of information and data have been conducted such that the attorneys for the parties are reasonably able to evaluate the benefits of the Settlement, which will avoid substantial additional costs to the Parties and reduce delay and risks associated with this Action. It further appears that the Settlement has been reached as a result of intensive, arm's-length negotiations using an experienced third-party neutral.

7.     The Court approves the form and content of the Class Notices (Exhibits A, B, and C to the Settlement Agreement). The Court finds that the emailing and mailing of the Class Notices in the manner set forth in the Settlement, as well as the establishment of a settlement website and toll-free number, is the best notice practicable, constitutes due and sufficient notice to all persons entitled thereto, and satisfies due process. The Court authorizes the Parties to make non-material modifications to the Class Notices prior to publication if they jointly agree that any such changes are appropriate.

8.     The Court appoints Verita Global as the Settlement Administrator.

9.     The Settlement Administrator is directed to perform all settlement administration duties set out in the Settlement Agreement, including, but not limited to:

    a. Establishing, maintaining, and administering a toll-free phone number and a website, on or before _____, 2024 dedicated to the Settlement which will provide information about the Settlement including all relevant documents and will provide information on how Settlement Class Members may receive the Settlement Benefits.

    b. Disseminating Settlement Class Notice on or before _____, 2024 by:

3

i. Individual direct email will be sent to all Settlement Class Members for whom HOP has an email address on file.

ii. Individual Short-Form Notice will be sent by U.S. Mail to all Settlement Class Members; and

iii. Publication of the Long-Form Notice on a website to be established and maintained by the Settlement Administrator.

10. All Notice and Administration Costs approved and reasonably incurred by the Settlement Administrator shall be paid in accordance with the Settlement Agreement and Settlement Administrator Services Agreement without further order from the Court.

11. No later than twenty-one (21) days prior to the Final Approval Hearing, the Settlement Administrator shall certify to the Court compliance with the notice provisions of this Section.

12. If Settlement Class Members do not wish to participate in the Settlement, they may exclude themselves. All requests to be excluded from the Settlement Class, in order to be valid, must (1) be in writing; (2) list the full name, address, and phone number(s) of the Settlement Class Member; (3) be signed by the Settlement Class Member; (4) contain the following statement (or its functional equivalent) that "I request to opt-out from the settlement in the Action"; and (5) be delivered to the Settlement Administrator on or before the Opt-Out Deadline, which is _____ _____, 2024. No Opt-Out request will be valid unless all of the information described above is included. All Settlement Class Members who exclude themselves from the Settlement Class will not be eligible to receive any benefits under the Settlement, will not be bound by any further orders or judgments entered for or against the Settlement Class, and will preserve their ability to independently pursue any claims they may have against HOP.

4

13.     Any Settlement Class Member who has not previously submitted an Opt-Out request may object to the Settlement.

a.  In order to be valid, the following information must be provided in the Settlement Class Member's written Objection: (a) documents establishing, or providing information sufficient to allow the Parties to confirm that the objector is a Settlement Class Member; (b) a statement of such Settlement Class Member's specific Objection; (c) the grounds for the Objection; and (d) identification of any documents the objector desires the Court to consider. In addition, any Settlement Class Member objecting to the Settlement shall provide a list of all other Objections submitted by the objector, or the objector's counsel, to any class action settlements submitted in any Court in the United States in the previous five years. If the Settlement Class Member or his/her or its counsel has not objected to any other class action settlement in the United States in the previous five years, he/she or their counsel shall affirmatively so state in the Objection.

b.  All objections must be in writing, sent to the Clerk of this Court, the Settlement Administrator, Lead Class Counsel, and HOP's counsel at the addresses set forth in the Class Notice. All objections and requests to appear must be postmarked on or before _____, 2024.

14.     Any Settlement Class Member who does not object in the manner provided in this Order shall be deemed to have waived such objections and shall forever be foreclosed from objecting to the fairness, reasonableness, and/or adequacy of the Settlement and any judgment approving the Settlement.

5

15. Any Settlement Class Member who wishes to appear at the Final Approval Hearing shall file a notice of intent to appear on or before _____, 2024 if he or she wishes to show good cause why the Settlement should, or should not, be approved as fair, reasonable, and adequate.

16. Lead Class Counsel shall file their motion for an award of attorneys' fees, costs, and expenses, by _____, 2024. Any objection or opposition to the motion must be made by ___, 2024. Class Counsel shall file any reply papers by ___, 2024. Class Counsel shall file their Final Approval Motion by ___, 2024.

15. The Court hereby schedules the Final Approval Hearing for ___, 2024 at [time] in The Court has scheduled a Final Approval Hearing for [Final Approval Hearing Date] in Courtroom [number] at the United States District Court for the Eastern District of Pennsylvania, U.S. Courthouse, 601 Market Street, Philadelphia, PA 19106, to determine whether the proposed Settlement should be approved as fair, reasonable, and adequate, whether a judgment should be entered approving the Settlement, and whether Lead Counsel's application for attorneys' fees and the Named Plaintiff Enhancement Awards should be approved. The Court may adjourn the Final Approval Hearing without further notice to Settlement Class Members.

16. All other deadlines pending in this Action are hereby stayed.

IT IS SO ORDERED:

Dated:

_____

Honorable Cynthia M. Rufe
United States District Judge

6

# EXHIBIT 2

Brian Callery

vs.

HOP Energy, LLC and DDM Energy

FORENSIC REPORT
July 8, 2024

Prepared by:



NORTH AMERICAN
FORENSIC
ACCOUNTING
———— LLC ————

North American Forensic Accounting LLC
3461 Market Street, Suite 101
Camp Hill, PA 17011
(717) 412-4713



July 8, 2023

M. Frances Ryan
Wusinich, Sweeney & Ryan, LLC
102 Pickering Way, Suite 403
Exton, PA 1934

**Re:** Callery vs. HOP Energy, LLC and DDM Energy

Dear Attorney Ryan:

North American Forensic Accounting LLC ("NAFA") was engaged to perform forensic accounting and litigation support services related to matters in the case Brian Callery vs. HOP Energy, LLC and DDM Energy, specifically this segment of our work focused on assessing HOP Energy's finances and risk of financial failure. Performing this assessment included reviewing financial statements, performing ratio analysis and industry benchmarking, conducting interviews with company representatives, and assessing other qualitative factors to form an opinion regarding HOP Energy's finances and preparing this Forensic Report.

Our services were performed in accordance with the American Institute of Certified Public Accountants ("AICPA") Statement on Standards for Forensic Services and do not constitute an engagement to provide audit, review, compilation, or attest services as described in the pronouncements on professional standards issued by the AICPA. These forensic accounting services also comply with the Code of Professional Ethics and Code of Professional Standards established by the Association of Certified Fraud Examiners as well as the applicable Professional Standards set forth by the National Association of Certified Valuators and Analysts as they relate to this engagement.

**This report may not be disclosed, copied, published, or used, in whole or in part, without the prior permission of North American Forensic Accounting LLC, except as ordered by legal process or court of competent jurisdiction.** We reserve the right to modify our report when and if additional information becomes available, or when and if we deem it necessary to do so.

North American Forensic Accounting LLC

Michael Breon, CPA, CIA, CFE, MAFF, MBA
Partner

---

Brian Callery vs. HOP Energy, LLC and DDM Energy

## TABLE OF CONTENTS

Page(s)

FORENSIC REPORT                                    2 - 14

APPENDIX A – SOURCES OF INFORMATION RELIED UPON IN THIS REPORT     15

APPENDIX B – FEE ARRANGEMENTS & LIMITING CONDITIONS     16

APPENDIX C – QUALIFICATIONS OF EXPERT     17 - 27

APPENDIX D – FINANCIAL RATIO ANALYSIS     28 - 34

CONFIDENTIAL

3

Brian Callery vs. HOP Energy, LLC and DDM Energy

# FORENSIC REPORT

North American Forensic Accounting LLC ("NAFA", "Our", or "We") was retained to perform forensic accounting and litigation support services related to matters in the case Brian Callery vs. HOP Energy, LLC and DDM Energy (collectively referred to as "HOP Energy"). This report specifically evaluates HOP Energy's claim that it is encountering financial difficulties and as a result would be limited in its ability to pay the claims sought in the aforementioned case.

## BACKGROUND

This matter arises from a contract entered into between Brian Callery and DDM Energy, a branch of HOP Energy, on April 2, 2020 for the delivery of up to 1,000 gallons of home heating oil. According to the contract, DDM Energy agreed to deliver home heating oil under the "Capped Price Program" for the period April 2, 2020 through April 30, 2021 at a price not to exceed \$2.099 per gallon, plus applicable taxes. The contract stated, "If our prevailing retail price for home heating oil drops below the Capped Price during the Pricing Period then you will pay our prevailing retail price for home heating oil."

On May 19, 2020, HOP Energy delivered 54 gallons of home heating oil to Mr. Callery and charged him \$2.099 a gallon, his contracted capped price, for a total bill of \$113.35. Mr. Callery called DDM Energy and inquired about the prevailing retail price and was told that their prevailing retail price was \$1.55 a gallon. When challenged about the possible billing error, Mr. Callery was transferred to another employee who told him that their "prevailing retail price for capped price customers" was \$2.49 a gallon and asserted that Mr. Callery was billed properly for the delivery.

Mr. Callery alleges that HOP Energy overcharged him and other customers by using an artificially inflated price as their prevailing retail price instead of a prevailing retail price that is representative of the fair market retail price. In the May 19, 2020 example, Mr. Callery believes that he was overcharged \$.54 or \$.55 (\$2.099 - \$1.55) per gallon (depending on rounding and actual price quoted in the call) for a total overcharge between \$29.16 and \$29.70.

Mr. Callery also asserts that damages could have been incurred by customers of other pricing plans beyond the Capped Price Program, for which he was involved, who may have been misled by HOP Energy's reference to their prevailing retail price.

NAFA provided various scenarios with associated damage calculations based on information received from HOP Energy and calculated potential interest on those damages as part of our original report. The parties subsequently entered into mediation upon which time it was alleged by HOP Energy that their financial hardship would interfere with the payment of any claim agreed to through mediation or awarded by the court, and they would be forced to consider bankruptcy as a remedy. Counsel asked NAFA to review HOP Energy's financial statements and provide our opinion whether based on the information provided the company had the wherewithal to pay claims in the amounts calculated in our original report dated November 27, 2023, which

Page | 2

CONFIDENTIAL

Brian Callery vs. HOP Energy, LLC and DDM Energy

were at a minimum $35,000,000 based on various scenarios. NAFA's conclusion was that HOP Energy did not have the ability to pay the amounts calculated in our first report. Furthermore, based on our initial review, it was not clear whether an award in excess of $1 to $2 million could be paid (not considering any insurance) without additional debt or equity. HOP Energy's financial constraints stymied negotiations as part of mediation. Subsequently, counsel for both sides have been working together to determine an equitable solution which includes the possibility of settling the class action for approximately $2.7 million which is to be funded by an insurance policy maintained by HOP Energy. NAFA has been tasked with performing a deeper dive to evaluate the merits of HOP Energy's claim of financial hardship and the claim that the company is on the verge of bankruptcy.

## ANALYSIS

Evaluating whether a company is experiencing financial troubles requires a thorough analysis of various financial, operational, and external factors. Our analysis considered financial information provided by HOP Energy, industry reports, discussion with company representatives, and other documentation cited in Appendix A of this report. ***NOTE – Numbers are in thousands throughout the Analysis Section and Appendix D.***

### Financial Analysis

Ratio analysis is a powerful tool for evaluating a company's financial well-being due to its simplicity, comprehensive insight, and benchmarking capability. By transforming complex financial data into meaningful metrics, ratio analysis helps various stakeholders make informed decisions about a company's financial health and future prospects.

In Appendix D, we evaluated critical ratios to develop a comprehensive view of HOP Energy's financial health and to identify potential signs of financial distress or impending bankruptcy. The Appendix shows an overview of each ratio along with the result and a rule of thumb as to what the result means. We also provided an industry specific benchmark, where available, for the ratios for comparative purposes taken from the IBIS*World Fuel Dealers in the US* Industry Report dated October 2023. We have also provided an indicator as to whether the ratio is positive or negative based on our assessment. The section below provides additional commentary and analysis and should be used in conjunction with Appendix D.

**Liquidity ratios** are financial metrics used to evaluate a company's ability to meet its short-term obligations using its most liquid assets. These ratios provide insights into the company's capacity to cover its current liabilities without needing to sell long-term assets or secure additional financing.

*Our analysis indicates that current liabilities exceed current assets. If HOP Energy needed to immediately pay their current liabilities, they would either need to sell long-term assets or they would need additional financing. Furthermore, the liquidity of longer-term assets is limited. As of April 30, 2024, long-term assets with a book value of approximately $15,000 would be available as the other long-term assets are mainly intangible (e.g. goodwill, know*

Page | 3

Brian Callery vs. HOP Energy, LLC and DDM Energy

*how, and customer lists). See the discussion regarding intangible assets on page 8. Liquidity ratios evaluated include the **current ratio** and the **quick ratio** both of which lagged both the industry benchmark and the "rule of thumb" cited by financial analysis publications and accounting and finance textbooks.*
*Assessment:*

**Solvency ratios** are financial metrics used to assess a company's ability to meet its long-term debt obligations and overall financial stability. These ratios provide insights into the company's long-term viability by comparing its debt levels to its equity, assets, and earnings.

*The **debt-to-equity ratio** analysis shows heightened financial risk particularly as of April 30, 2024 and fiscal 2023 where equity is negative. Negative equity typically indicates that a company has accumulated losses that exceed its assets. This is a significant red flag, suggesting potential financial distress or insolvency. Furthermore, a negative debt to equity ratio reflects an extreme level of financial leverage, where the company is entirely reliant on debt financing. This situation is unsustainable in the long term. Companies with negative equity are considered high-risk investments and are likely to face difficulties in securing additional financing. Lenders and investors are cautious as the company's ability to meet its debt obligations is severely compromised. When a company has negative equity, the debt-to-equity ratio becomes less meaningful, highlighting the need for alternative measures to assess financial health.*
*Assessment:*

*The **interest coverage ratio** has turned negative in 2023 and is at .20 for the first seven months of fiscal year 2024. A negative ratio shows that the company cannot cover its interest expenses with its current earnings, indicating that it may struggle to meet its debt obligations. The 2024 ratio of .20 is also a red flag as anything under 1 is critical. Furthermore, the interest coverage ratio is considerably lower than the industry average of 2.5.*
*Assessment:*

**Profitability ratios** are financial metrics used to evaluate a company's ability to generate profit relative to its revenue, assets, equity, and other financial elements. These ratios provide insights into various aspects of a company's financial health and operational efficiency. By analyzing profitability ratios, stakeholders can gain a deeper understanding of a company's financial health, operational efficiency, and overall performance, aiding in more informed decision-making.

*el **Profit margin** analysis provides insights into the profitability of a company. Higher margins indicate a higher level of profitability, suggesting that the company is more efficient in converting sales into actual profit. As noted in the chart below, profit margin of the Fuel Dealer Industry in the US has ranged between 1.5% in 2011 to 4.5% in 2023. For the time period of our analysis, 2021 through April 2024, the industry has sustained profit margins between approximately 3.5% and 4.5%. HOP Energy is below industry averages when it comes to profit margin. According to IBISWorld, the industry is notorious for its low profit margins. Low profit margins combined with high interest costs, because of its high level of debt, is contributing to HOP Energy's financial struggles.*
*Assessment:*

Page | 4

Brian Callery vs. HOP Energy, LLC and DDM Energy

## Profit Margin
Total profit margin (%) and annual change from 2010 – 2023



*Source: IBISWorld*

***Return on assets (ROA)*** *measures how efficiently a company is using its assets to generate profits. A higher ROA indicates that the company is effectively converting its investments in assets into earnings. ROA provides insights into the sustainability of a company's profitability. Companies with a high ROA are typically better positioned to sustain profitability over the long term, as they effectively utilize their assets. While not a direct measure of debt, a high ROA can indicate that a company is generating sufficient returns from its assets to cover its debt obligations and reinvest in growth. HOP Energy's return on assets has either been negative or significantly below the industry average. A persistent negative ROA can be a sign of financial distress, indicating that the company may struggle to sustain its operations in the long term. Negative returns could be indicative of issues with the company's asset base, such as overvaluation or impairment of assets. See the discussion regarding assets on page 8.*
*Assessment:* ▓▓▓▓▓

***Return on equity (ROE)*** *measures the profitability of a company in relation to its shareholders' equity. It indicates how effectively the company is using the equity invested by its shareholders to generate profits. The mathematical calculation of ROE with negative net income and negative shareholders' equity is not meaningful, however it is a sign of financial distress. HOP Energy's amount of debt is significant when compared to its equity (approximately equal or higher throughout the period). With this capital structure, the return on equity observed in 2021 and 2022 even though positive should be taken in context and not weighted heavily.*
*Assessment:* ▓▓▓▓▓

**Cash flow analysis** is a financial metric through which stakeholders can gain a comprehensive understanding of a company's liquidity, operational efficiency, and financial health. Consistent negative or declining cash flows, high reliance on debt, and depleted cash reserves are significant red flags that a company may be struggling or even on the verge of bankruptcy. This analysis provides early warning signs and helps in making informed decisions about the company's financial stability.

Page | 5

Case 2:20-cv-04065-MCS-MR Document 85-36 Filed 05/16/24 Page 109 of 151

Brian Callery vs. HOP Energy, LLC and DDM Energy

*Operating cash flow (OCF)* is a metric for assessing a company's financial health and operational efficiency. OCF is a measure of a company's liquidity, indicating whether it generates sufficient cash to cover its operating expenses and obligations without needing external financing. Lenders and creditors evaluate OCF to determine the company's ability to service its debt. Strong OCF enhances a company's creditworthiness and may result in more favorable borrowing terms. HOP Energy's operating cash flow is mixed during the years of our analysis however, the significant negative cash flows in 2022 and for the first seven months of 2024 suggest the company is not generating enough cash from its operations to cover its operating expenses, which can lead to liquidity problems. Companies with negative OCF may need to rely on external financing (debt or equity) to fund their operations, which can increase financial risk and interest expenses. If not addressed, prolonged negative OCF can lead to financial distress and potentially insolvency or bankruptcy.
Assessment: ▨▨▨

**Leverage Ratios** are financial metrics used to evaluate the degree to which a company is using borrowed money (debt) to finance its operations and growth. These ratios provide insights into the company's financial structure, risk, and ability to meet its long-term obligations. High leverage indicates that a company relies heavily on debt, which can amplify both potential returns and risks.

The **debt to asset ratio** measures the proportion of a company's assets that are financed by debt. This ratio helps assess the level of financial leverage and risk a company has taken on. The debt to asset ratio is a crucial metric for assessing a company's financial leverage and risk. By providing insights into how much of the company's assets are financed through debt, it helps stakeholders evaluate the company's financial health, risk level, and creditworthiness. This ratio provides insight into an organization's capital structure. Capital structure is typically a mix of equity and debt. Capital structure is a fundamental aspect of a company's financial success. It impacts the cost of capital, financial risk, flexibility, control, tax efficiency, market perception, and strategic execution. An optimal capital structure balances debt and equity to minimize the cost of capital, manage financial risk, and support the company's strategic objectives.

HOP Energy's debt to asset ratio regardless of how it is calculated (with or without intangibles – see discussion on page 8) shows a very high level of debt in comparison to equity. This introduces risk and uncertainty. HOP Energy's ratio is never less than .91 which is indicative of higher financial risk. This high level of debt comes at a significant price to HOP Energy as interest rates have increased, furthermore, HOP Energy's overall financial condition has contributed to even higher interest rates being incurred.
Assessment: ▨▨▨

CONFIDENTIAL

Brian Callery vs. HOP Energy, LLC and DDM Energy

**Activity Ratios** also known as efficiency or turnover ratios, measure how effectively a company utilizes its assets to generate sales and manage its operations. These ratios provide insights into various aspects of a company's operational efficiency and financial health. They are crucial in evaluating whether a company is using its resources optimally and can indicate potential financial distress or risk of bankruptcy.

*Inventory turnover is a financial metric that measures how many times a company's inventory is sold and replaced over a specific period, typically a year. This ratio helps evaluate the efficiency of inventory management and indicates how well a company is converting its inventory into sales. A high inventory turnover ratio generally indicates that a company is efficiently managing its inventory, with inventory being sold and replaced frequently. This can suggest strong sales and effective inventory management. However, an excessively high ratio may indicate that the company is not keeping enough inventory on hand, which could lead to stockouts and lost sales opportunities. High turnover can also strain the supply chain and lead to increased costs due to frequent reordering and expedited shipping. HOP Energy's inventory turnover is approximately 14 times higher than the industry average. This suggests that either the company is doing an extraordinary job of managing its inventory or they are not keeping enough inventory on hand.*

*Assessment:* ▦▦▦ *or* ▦

*Accounts receivable turnover is a financial metric that measures how efficiently a company collects revenue from its credit sales. It indicates how many times, on average, a company collects its accounts receivable during a specific period, typically a year. It provides valuable insights into the effectiveness of credit policies, cash flow management, and overall financial health. By monitoring and optimizing this ratio, companies can improve their liquidity, reduce the risk of bad debts, and enhance operational efficiency. HOP Energy's accounts receivable turnover for 2022 and 2023 were approximately 4 times higher than the industry average. A very high accounts receivable turnover ratio, particularly one that is 4 times the industry average, is a concerning signal. While it indicates rapid collection of receivables, the context of the company's overall financial struggles suggests that this ratio may be the result of unsustainable practices rather than genuine operational efficiency. Stakeholders should closely examine the company's credit policies, customer relationships, sales trends, and overall financial strategy to understand the root causes of the high turnover ratio and address the underlying issues contributing to the company's decline. HOP Energy has improved liquidity because of its rapid collections. However, aggressive collections can damage long-term customer relationships, leading to a loss of business and a decline in sales. Customers may turn to competitors with more flexible credit terms. Conservative credit policies and focus on quick collections might limit the company's ability to grow sales and market share, exacerbating the company's decline. Offering discounts for early payments can reduce profit margins, impacting overall profitability and contributing to financial instability.*

*Assessment:* ▦▦▦ *or* ▦

CONFIDENTIAL

9

Brian Callery vs. HOP Energy, LLC and DDM Energy

**Altman Z-Score** is a financial metric developed by Edward I. Altman in 1968 to predict the likelihood of a company entering bankruptcy within the next two years. It is particularly useful for evaluating the financial health of manufacturing companies but has also been adapted for other types of firms. The Z-score combines five key financial ratios, weighted by coefficients derived from statistical analysis, to produce a single composite score. This score helps assess a company's financial stability and predict potential financial distress.

*The Altman Z-Score for HOP Energy was below 1.8 for the years 2021 through 2023 indicating financial distress.*

**Ratios involving assets and the inclusion or exclusion of intangible assets**

In relation to ratios that use assets as part of their calculation, we evaluated whether to include intangible assets. Generally, exclusion or inclusion depends on the specific context, industry norms, and the purpose of the analysis. Including intangibles can provide a fuller representation of a company's assets, especially in sectors where these assets are critical. However, for a conservative assessment of solvency and liquidity, excluding intangibles may offer a more cautious and realistic view of the company's ability to meet its debt obligations. It's essential to consider both approaches and understand the implications of each to make an informed decision. Goodwill often arises from acquisitions and represents the premium paid over the fair value of identifiable assets. While it can indicate brand value or customer loyalty, its realizable value can be uncertain. Intangible assets are generally less liquid than tangible assets, meaning they cannot be easily converted to cash in times of financial distress. This makes them less reliable for meeting debt obligations. The value of intangible assets can be more subjective and volatile compared to tangible assets. For instance, the value of patents or goodwill can fluctuate based on market conditions or changes in the business environment. Excluding intangibles offers a more conservative view of the company's asset base, focusing on tangible assets that have more predictable and realizable values. This can provide a clearer picture of a company's ability to cover its debts with its more stable and liquid assets. For a company primarily dealing with physical goods and tangible assets, such as HOP Energy, excluding intangibles provides a clearer picture of its financial leverage and solvency.

CONFIDENTIAL

10

Brian Callery vs. HOP Energy, LLC and DDM Energy



HOP Energy's top line sales have risen, however, the increase in sales is not flowing through to net income.



It is also important to consider the movement in crude oil which plays a role in top line sales values. As oil prices go up so will the price of home heating oil and top-level sales. Sometimes the profit margin remains the same but sometimes the increases cannot be passed along in entirety to consumers, meaning that already low profit margins could suffer further.

CONFIDENTIAL

Brian Callery vs. HOP Energy, LLC and DDM Energy



A significant contributor to HOP Energy's poor financial performance is the cost of their debt. This chart shows how interest expense has increased year over year as interest rates have increased along with the amount of debt. In an industry with low profit margins, such a high cost of debt can cause financial hardship and bankruptcy.



Selling, general and administrative expenses (SG&A) have been climbing, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Failing to control SG&A in conjunction with the increase in interest expense plays a significant role in HOP Energy's financial difficulties.

Page | 10

Brian Callery vs. HOP Energy, LLC and DDM Energy



In 2023, liabilites exceeded assets which is a red flag of poor financial performance.





During the period of our analysis, current liabilies have exceeded current assets.  HOP Energy cannot pay what it owes to creditors in the short-term with assets that it can easily liquidate. This is an indicator of financial distress.

Page | 11

Brian Callery vs. HOP Energy, LLC and DDM Energy

## Violation of Debt Covenants / Forbearance Agreement

During May 2024, HOP Energy's revolving line of credit issued by ABL OPCO LLC became overdrawn by approximately $6.5 million. This resulted in a forbearance being agreed to between HOP Energy and ABL OPCO LLC as of May 14, 2024. The forbearance sets forth stringent liquidity requirements and related reporting for HOP Energy. The $6.5 million overdraft was paid by TCW, the entity responsible for the long-term debt of HOP Energy. Equity investors opted not to contribute the $6.5 million to alleviate the overdraft. A requirement of the funding by TCW included adding a TCW representative to the HOP Energy Board of Directors. This chain of events demonstrates the weakness of HOP Energy's financial situation.

## Qualitative Factors

While quantitative analysis provides a snapshot of a company's financial health, qualitative factors offer deeper insights into potential issues and future risks. Qualitative factors provide critical context and insights beyond what financial ratios and statements can reveal. Key qualitative factors that we considered in forming our conclusion are discussed below.

### Industry

Fuel dealers have enjoyed solid revenue growth over the five years to 2023 as demand has remained stable and oil and natural gas prices have fluctuated in the industry's favor. However, the COVID-19 pandemic disrupted demand for fuel from commercial and industrial operations as they shuttered or operated at reduced capacity. Oil prices plummeted amid the suspension of most travel, and revenue in turn plunged in 2020. Oil consumption from consumers quarantined at home helped stave off more severe losses, but this boon was dampened as most states were getting warmer through the height of stay-at-home ordinances. The Russia-Ukraine war has caused oil prices to surge, but revenue has begun to decline again as production catches up. Industry revenue is expected to increase at a CAGR of 3.8% to $52.9 billion over the past five years, including an expected decline of 8.3% in 2023 alone. Rising fuel prices raise dealers' purchasing costs, and the short-term inflexibility of demand for heating oil and propane allows dealers to pass most of these increases on to downstream customers through price hikes that also lift revenue. Dealers face external competition from natural gas and electric heating companies, though, so prices are often under pressure to remain low enough to encourage oil-based heating. This means fuel dealers can't pass on all their heightened costs, and profit usually compresses when oil prices rise. Over the next five years, fluctuating oil prices will pressure industry growth. Demand for fuel will remain inflexible since all buildings fitted with propane and heating oil systems will continue to rely on fuel, but the industry is fighting to maintain its customer base as more and more buildings are refitted with natural gas heating units. Volatile crude prices will exacerbate this trend since consumers are incentivized to switch heating systems if input prices rise. Industry revenue is anticipated to decline at a CAGR of 5.6% to total an estimated $39.8 billion over the five years to 2028.

HOP Energy operates in a challenging industry. Home heating oil faces pressure from alternative energy sources such as natural gas and electricity. The volatility of oil prices further complicates HOP Energy's financial picture and blurs its future financial performance. Lastly, the governments push for environmental sustainability continues to strengthen with all forms of

Page | 12

Brian Callery vs. HOP Energy, LLC and DDM Energy

government implementing stricter regulations regarding the fuel dealer industry. These regulatory shifts could result in higher operational costs.



## Legal Issues

HOP Energy does face uncertainty when it comes to the outcome of ongoing litigation. The origin of this report stems from legal uncertainty. Based on the financial analysis included herein, HOP Energy does not have the assets to pay any financial award, nor do they currently have the ability to obtain money from additional debt or equity financing.

## Audited Financial Statements



CONFIDENTIAL

Brian Callery vs. HOP Energy, LLC and DDM Energy

**Impact of Bankruptcy**

In the event of bankruptcy, we have been advised by counsel and have assumed for the purpose of this analysis, that the "priority debt" consisting primarily of the revolving line of credit, long-term debt (including current portion) and the pension liability would have priority over unsecured creditors such as the class members in this action. Assets that can be liquidated "Assets Less Goodwill & Intangible Assets" for cash to pay debts are less than the Total Priority Debt during the period analyzed except in 2021.

| | April 30, 2024 | | 2023 | | 2022 | | 2021 |
|---|---|---|---|---|---|---|---|
| Revolving Line of Credit | $39,189 | | $20,801 | | $26,014 | | $10,275 |
| Long-Term Debt | $85,501 | | $78,567 | | $73,633 | | $49,026 |
| Pension | $14,319 | | $14,260 | | $14,513 | | $14,844 |
| Total Priority Debt | $139,009 | | $113,628 | | $114,160 | | $74,145 |
| Total Assets | $168,189 | | $169,478 | | $182,602 | | $126,327 |
| Assets Less Goodwill & Intangible Assets | $84,221 | | $81,489 | | $87,515 | | $77,199 |

# CONCLUSION

It is our opinion, within a reasonable degree of professional certainty in the field of forensic accounting and based on information provided by HOP Energy and the assertions of their agents and counsel that HOP Energy is struggling financially and could potentially seek protection in bankruptcy. Their financial struggles would be exacerbated by the payment of damages in excess of their insurance coverage and would more than likely result in their bankruptcy, particularly if the damages calculated in our first report were awarded to class members. Because of HOP Energy's significant level of "Priority Debt" when compared with their "Assets Less Goodwill and Intangibles", it would be inconceivable that class members would receive any damages under a bankruptcy scenario.

CONFIDENTIAL

Brian Callery vs. HOP Energy, LLC and DDM Energy

# APPENDIX A - SOURCES OF INFORMATION RELIED UPON IN THIS REPORT

### Description

- Brian Callery vs. HOP Energy, LLC and DDM Energy Class Action Complaint filed June 23, 2020 including Appendix A contract between Brian Callery and DDM Energy dated April 2, 2020
- Brian Callery v. HOP Energy, LLC and DDM Energy North American Forensic Accounting Forensic Report, November 27, 2023
- HOP Energy Holdings, Inc. and Subsidiaries Consolidated Financial Statements (audited) Years Ended September 30, 2021, 2022, & 2023
- HOP Energy Holdings, Inc. Consolidated Balance Sheet, Statement of Operations, Statement of Changes in Stockholders' Equity, and Statement of Cash Flows (unaudited) for the seven months ended April 30, 2024
- Credit agreement and Forbearance HOP Energy LLC and ABL OPCO LLC Amended May 14, 2024
- *Fuel Dealers in the US*, October 2023, IBIS*World.* Comprehensive 76-page industry report
- *Horngren's Accounting "The Financial Chapters"*, Twelfth Edition, Miller-Noles, Mattison, Matsumura, Pearson, 2018 pages 902 – 927
- Dunn & Bradstreet Financial Analysis HOP Energy Holdings, Inc.
- Conference call Q&A with Michael Buenzow, FTI Consulting (representative of HOP Energy's financial matters), Matthew McLaughlin of Nixon Peabody (counsel for Defendant), M. Frances Ryan & Edward Sweeney of Wusinich, Sweeney & Ryan, LLC (counsel for Plaintiff) conducted May 15, 2024 at 10:00 AM

CONFIDENTIAL

Brian Callery vs. HOP Energy, LLC and DDM Energy

# APPENDIX B - FEE ARRANGEMENTS & LIMITING CONDITIONS

1. The fees of North American Forensic Accounting LLC are a result of the time expended by us on this engagement and the applicable hourly billing rates which for this engagement ranged between $200 and $225 per hour depending on the level of staff assigned. Our compensation is not contingent on any action or event resulting from the analyses, opinions, or conclusions in, or in the use of, this report.

2. Information supplied to us has been accepted as correct without further verification, and we express no opinion on that information.

3. Conclusions offered in this report were based on the information provided to us (Appendix A).

4. To the best of our knowledge and belief, all statements contained herein are true and correct, and no facts have been deliberately withheld or overlooked.

5. Possession of this report, or a copy thereof, does not carry with it the right of publication of all or part of it, nor may it be used by anyone but the client or their professional advisors for any purpose without the previous written consent of the client and North American Forensic Accounting LLC.

6. This report was prepared under the direction of Michael Breon CPA, CFE, MAFF, CIA, MBA of North American Forensic Accounting LLC. Mr. Breon does not have any present or contemplated future interest in any of the parties involved, any personal interest with respect to the parties involved, or any other interest that might prevent us from expressing an unbiased opinion.

7. Throughout this report my use of the terms "us", "we" "NAFA" or other similar terms refers to myself and the professional staff working under my supervision at North American Forensic Accounting LLC. I have been directly involved in preparing this report and the expert opinions that are included.

8. North American Forensic Accounting LLC reserves the right to modify the report when and if additional information becomes available, or, when and if deemed necessary to do so.


North American Forensic Accounting LLC


Michael Breon CPA, CFE, MAFF, CIA, MBA
Partner

CONFIDENTIAL

Brian Callery vs. HOP Energy, LLC and DDM Energy

# APPENDIX C - QUALIFICATIONS OF EXPERTS (Revised 6/24)

## Michael Breon CPA, CFE, MAFF, CIA, MBA
## Partner, Forensic and Risk Advisory Services

Michael is a Partner at North American Forensic Accounting LLC where he specializes in forensic accounting, litigation support, internal investigations, internal audit, and business resiliency services. Mike has over 25 years of experience providing these services while holding positions at "big 4" public accounting firms and Fortune 500 companies. Before starting Breon & Associates & merging with North American Forensic Accounting PC, he was the Senior Director of Investigations & Ethics at Rite Aid. Mike is a Professor of Accounting at Bloomsburg University and teaches three of the advanced classes in the University's Fraud Examination minor as well as other accounting courses. He is also a frequent speaker at professional organization events covering topics such as fraud, investigation, internal audit, risk, and ethics.

### *PROFESSIONAL EXPERIENCE*

**North American Forensic Accounting LLC / Breon & Associates, Harrisburg, PA August 2009 – Present**
**Partner / Vice President / President (Breon & Associates merged with NAFA July 2022)**
Perform forensic accounting engagements including but not limited to lost profits, economic damages, and business interruption loss calculations as well as wage and hour claims. Provide accounting and auditing consulting services as an expert witness or in a litigation support role with specific experience in auditor malpractice as well as other claims involving accounting matters. Deliver forensic accounting services to recreate financial transactions and accounting records, as well as interpreting their financial outcomes. Conduct & manage investigations involving suspicions of fraud and misconduct by client employees, management, and third parties.

Provide internal audit and Sarbanes Oxley (SOX) support services to public company clients. Also deliver assessments of internal audit's performance and compliance with professional standards.

Develop and deliver forensic accounting, fraud, compliance, internal audit, and accounting training programs for professional groups, businesses, and public clients.

**Commonwealth University (Bloomsburg University) & Albright College       August 2018 - Present**
**Instructor / Professor of Accounting**
Instructor of accounting at Commonwealth (Bloomsburg) University, with a focus on courses in the fraud & forensics minor. Co-advisor for the Student Association of Certified Fraud Examiners Chapter. Courses include Managerial Accounting, Principles of Accounting II, Financial Accounting, Advanced Fraud, Investigations, & Forensic and Fraud Examination.

Adjunct professor of accounting at Albright College. Courses include Introduction to Fraud, Audit I, Audit II, and Finance.

CONFIDENTIAL

Brian Callery vs. HOP Energy, LLC and DDM Energy

**Rite Aid, Camp Hill, PA**                                    **August 2011 – January 2018**
**Senior Director Internal Assurance Services & Regulatory Compliance**
Responsible for implementing & managing Rite Aid's anti-fraud programs and controls, investigative
protocols and ethics programs designed to mitigate fraud and misconduct and promote adherence to Rite
Aid's core values. Provide reports to senior management and the board of directors on results and related
matters.

Manage Rite Aid's ethics and compliance hotline validating the timely and proper responses to
allegations, as well as adherence to investigative protocols, Rite Aid's Code of Ethics & policies, and
other applicable laws and regulations.

Manage Rite Aid's fraud risk assessment process and validate the implementation of internal controls to
reduce the risk of fraud and misconduct. Update the fraud risk assessment program to support Principle
Eight of the COSO 2013 model, working closely with the Sarbanes Oxley team, Chief Accounting
Officer, and Vice President of Internal Audit.

Establish and manage investigative standards to facilitate timely and professional results. Develop and
manage staff on investigative techniques and practices including analytical procedures, auditing
techniques, and interviewing skills. Conduct internal fraud awareness training for asset protection,
compliance, and audit staff.

Manage and conduct investigations of misappropriation of assets, embezzlement, conflicts of interest,
threats of violence, misuse of corporate assets, bribery and corruption, and policy compliance related
matters. Conduct root cause analysis meetings with management and prepare comprehensive remediation
plans to reduce the risk of future occurrences. Coordinate investigative results with legal, human
resources, and law enforcement to assist with remediation.

Provide oversight of the internal audit function including responsibility for the quality program, reporting
the results to senior management and the Audit Committee. Manage high profile internal audits.
Development and application of forensic audit techniques used to uncover red flags of fraud during audits.
Regularly consult on fraud risk factors for all audit projects.

Support Rite Aid's Compliance Department by overseeing and monitoring all HIPAA investigations.
Work closely with the Chief Compliance Officer and Privacy Officer to assess compliance risk.
Responsible for mapping the company's compliance program with elements of the Federal Sentencing
Guidelines.

**Deloitte & Touche, LLP, Philadelphia, PA**                   **January 2005 – August 2009**
**Senior Manager – Enterprise Risk Services**
Responsible for managing all aspects of a fully outsourced (subsequently co-sourced) internal audit
department generating more than $2 million in annual fees. Led annual risk assessments and development
of the annual audit plans. Successfully deployed staff to execute the annual audit plans. Reviewed
deliverables for compliance with firm policies and standards. Delivered audit results and plan updates to
client senior management and firm Directors and Partners. Prepared all Audit Committee
communications. Provided management with solutions to operational and compliance related matters as
well as assistance with allegations and investigations of fraud.

Page | 18

Brian Callery vs. HOP Energy, LLC and DDM Energy

Consulted on two additional manufacturing clients in the northeast practice providing review and firm administrative support.

Provided specialized employee benefit plan internal audit guidance to teams throughout the firm.

Conducted and reviewed results of fraud investigations and forensic accounting cases for various clients in the firm's northeast practice. Performed root cause analysis and evaluated control deficiencies providing insights into the application of best practices to help prevent future incidents. Reviewed forensic reports for quality control purposes, the application of sound principles and professional standards.

Co-authored the rewrite of the Firm's internal audit service line policies with a small group of Senior Managers and a Director. The rewrite consisted of quality control related enhancements and inclusion of updated professional standards. The new policies & guidance also included the addition of Internal Audit Department Quality Assessment Review services for which I assisted in the roll out to the northeast practice.

Co-developed and delivered fraud training programs for the Institute of Internal Auditors (IIA) through their partnership with Deloitte. Attended a week-long session on techniques to develop and deliver successful training programs. Performed all research, development, and administrative tasks for the IIA fraud training programs including obtaining copyright permissions. Presented programs during IIA sponsored events and to corporate clients.

| | |
|---|---|
| **Hershey Foods, Hershey, PA** | **May 2000 - January 2005** |
| **Manager - Retirement Plans, Total Compensation** | **April 2003 - January 2005** |

Responsible for the management of a $165 million benefits budget (all benefits including health and welfare and retirement). The budget process necessitated coordinating information from third party administrators, vendors, and actuaries for breakdown to over 100 cost centers. Managed staff and day to day activities of the plans including plan communications, plan compliance, distributions, loans, reporting, annual audits, 5500 filings, accounting, responses to DOL inquiries/audits, and corrective measures to bring plans into compliance.

Member of the company's Employee Benefit Committee and the Employee Benefit Working Committee. These committees oversaw plan design, investment decisions, accounting, compliance, and funding matters. Responsible for the preparation of and presentation of all retirement plan related matters (both defined contribution and defined benefit).

Spearheaded the rollout of Hershey's HIPAA program. Worked closely with consultants and attorneys to meet the documentation, security, and employee training requirements.

| | |
|---|---|
| **Internal Auditor** | **May 2000 - April 2003** |

Performed and managed all aspects of operational, financial, and compliance internal audit projects from planning through reporting for manufacturing facilities, pension and benefit plans, treasury operations, export sales, and trade promotion spending. Led international internal audit projects in Manila, Philippines; Guadalajara, Mexico; and Toronto, Canada.

Performed fraud investigations resulting in the recovery of corporate assets and improvement of related internal controls. Assisted in the preparation for and prosecution of perpetrators.

Brian Callery vs. HOP Energy, LLC and DDM Energy

Identified significant opportunities to enhance controls related to employee benefit plans. Identified and recovered overpayments and provided recommendations related to pension plan portfolio management and performance reporting resulting in improved monitoring and oversight. Enhanced overall compliance of both Health and Welfare and Retirement plans.

**Ernst & Young**                                                                                                    **December 1999 - May 2000**
**Senior Auditor**
Led attest engagement planning, fieldwork, and reporting for businesses primarily in the health insurance, manufacturing, and technology industries. Prepared financial statements and management letter comments.

**McKonly & Asbury CPAs and Waggoner Frutiger and Daub CPAs October 1996 - December 1999**
**Staff Auditor**
Performed audit, review, and compilation procedures for small businesses in various industries including construction, manufacturing, low-income housing, not for profit organizations, union health and welfare plans, school districts, and governmental entities. Developed post-audit management letters to help clients improve processes and controls. Gained extensive experience using the Thompson Reuters PPC approach to engagements.

Compiled documentation to assist in multiple fraud investigations. Prepared individual, nonprofit, partnership, and corporate tax returns using ProSystem tax software.

**Information Available Upon Request May 1986 – September 1996**

### *EDUCATION*

- Penn State University - Capital College - Master of Business Administration (3.9 GPA) - Spring 2001
- Penn State University - Capital College - Bachelor of Science in Professional Accountancy (3.63 GPA) - Spring 1996

### *CREDENTIALS & AFFILIATIONS*

- Certified Public Accountant (CPA) - American Institute of Certified Public Accountants (AICPA) & Pennsylvania Institute of Certified Public Accountants (PICPA)
- Certified Fraud Examiner (CFE) – Association of Certified Fraud Examiners (ACFE)
- Certified Internal Auditor (CIA) - Institute of Internal Auditors (IIA)
- Master Analyst Financial Forensics (MAFF) – National Association of Certified Valuators and Analysts
- Former President (x2) & Board Member – Institute of Internal Auditors - Central Penn Chapter 2004 - 2015
- Member of Infragard (partnership between the FBI and the private sector to share information and intelligence to prevent hostile acts against the U.S.)
- Completed both the John E. Reid Interviewing Technique and the Advanced Reid Technique Programs

CONFIDENTIAL

Brian Callery vs. HOP Energy, LLC and DDM Energy

### PROFESSIONAL RECOGNITION & PRESS

Central Pennsylvania Business Journal "CPA Taps In-House Expertise to Fight Fraud", Thomas Barstow, July 12, 2019

WHTM 27 News "Tax Refund Delays, What Should You Do?", Michella Drapac, August 16, 2021

### BOOKS & PUBLICATIONS

Building an Ethical Corporate Culture to Mitigate Deviant Behavior and Prevent Fraud
How taking a "people perspective" is good for peace of mind and the bottom line
White Paper
August 2019

Fraud Case Simulation
Expense Report Fraud
Currently in use at Commonwealth (Bloomsburg) University

Fraud Case Simulation
Foreign Corrupt Practices Act / Bribery
Currently in use at Commonwealth (Bloomsburg) University

Contributor to the Book - Detecting Fraud in Organizations: Techniques, Tools and Resources, Joseph Petrucelli, Wiley, 2013

Improving Client Relations, Internal Auditor Magazine, October 2009, Pg. 19-21

Increased Cost of Capital as a Deterrent of Fraudulent Financial Information
Academic Paper
2000

### ACADEMIC COURSES & INSTITUTIONS

- Advanced Fraud – Commonwealth (Bloomsburg) University
- Investigations – Commonwealth (Bloomsburg) University
- Forensics & Fraud Examination– Commonwealth (Bloomsburg) University
- Managerial Accounting – Commonwealth (Bloomsburg) University
- Financial Accounting – Commonwealth (Bloomsburg) University
- Principles of Accounting II – Commonwealth (Bloomsburg) University
- Introduction to Fraud – Albright College
- Audit I – Albright College
- Audit II – Albright College
- Corporate Finance – Albright College
- Co-Chair of the Student Association of Fraud Examiners Chapter – Commonwealth (Bloomsburg) University

Page | 21

Brian Callery vs. HOP Energy, LLC and DDM Energy

### *EXPERT TESTIMONY & DEPOSITIONS*

Degrazia vs. Degrazia
Berks County Court of Common Pleas – September – November 2019
Expert witness for Defendant

Grivas vs. Ephrata National Bank
Lancaster County Court of Common Pleas – May 2020 – October 2021
Expert witness for the Complainant

AnimalScan, LLC vs. Live Oak Veterinary Specialists, LLC; Jason King, DVM; DACVIN; Covert Aire, LLC; and Michael Covert
United States District Court for The Middle District of PA – September 30, 2022
Deposition for Defendants

### *SELECT CASE DESCRIPTIONS / EXPERIENCE*

- Provided expert witness and litigation consulting for several wage and hour class action cases which included statistical sampling and the recalculation of thousands of time records
- Performed business interruption calculation for an insurance company that revealed data anomalies resulting in the $1.3 million claim being withdrawn and eventual federal prosecution
- Regularly perform business interruption calculations for adjusters and insurance companies
- Regularly perform calculations to determine lost profits due to breach of contract
- Regularly evaluate expert reports primarily on various economic damage calculations
- Reviewed independent auditor report and workpapers to assess compliance with Generally Accepted Auditing Standards as part of a fee dispute and provided litigation support for professional negligence
- Investigated allegations of a not-for-profit Executive Director drawing excessive compensation and benefits, referred to state Attorney General's Office
- Investigated a $5.7 million fraudulent billing and kickback scheme which included collaboration with the FBI and DOJ in prosecution
- Performed investigations and prepared forensic reports explaining employee embezzlement schemes for local governmental entities and not-for-profits with losses ranging from $70,000 to over $1 million
- Provided litigation support services / trial consultant for the defense related to a wrongful termination / retaliation case for a CFO claiming various professional ethical concerns
- Provided trial consulting related to a claim for damages for injuries sustained on the job. Rebutted expert report of future damages and identified weaknesses in plaintiffs account of the incident by reviewing depositions, interrogatories, investigation reports, medical reports, and other case exhibits.
- Calculated damages for a start-up company related to the delay in opening because of a breach of contract
- Internal corporate case descriptions available upon request. Investigations ranging from asset misappropriation and corruption (including conflicts of interest) to sexual harassment. In my last corporate role, I was responsible for overseeing between 2,000 – 3,000 investigations a year.

CONFIDENTIAL

Brian Callery vs. HOP Energy, LLC and DDM Energy

## PRESENTATIONS & TRAINING

PICPA Webinar
Fraud Isn't Hurt by a Pandemic, It Thrives on It
August 26, 2020
Online

PICPA Northeast Chapter Accounting Career Day
Forensic Accounting & Investigations
October 23, 2018
Bloomsburg, PA

Bloomsburg University ZIPD Business Conference 2017
Ethics – Doing the Right Thing
November 2 & 3, 2017
Bloomsburg, PA

Student Association of Fraud Examiners - Bloomsburg University
Fraud – Moving Beyond Controls
October 3, 2017

PICPA – Not-for-Profit Conference
Building a World Class Ethics Program
Not-for-Profit Conference June 12-13, 2017
Recording of this presentation will be available for ethics CPE on PICPA's website
Harrisburg, PA

Bloomsburg University ZIPD Business Conference 2016
Ethics – Doing the Right Thing
Helping Your Company Achieve Their Goals and Objectives
November 3 & 4, 2016
Bloomsburg, PA

Student Association of Fraud Examiners - Bloomsburg University
Managing Investigations
November 5, 2015
Bloomsburg, PA

MIS Training Institute – Fraud Summit
Fraud Track Program Chair
December 3 - 4, 2014
Orlando, FL

Bloomsburg University ZIPD Business Conference 2014
Business Ethics - Doing the Right Thing
November 13 - 14, 2014
Bloomsburg, PA

CONFIDENTIAL

Brian Callery vs. HOP Energy, LLC and DDM Energy

PICPA - Financial Institutions Conference
Building a World Class Ethics Program
Financial Institutions Conference September 22, 2014
Recording of this presentation is available for ethics CPE on PICPA's website
Philadelphia, PA

Association of Certified Fraud Examiners 25th Annual Fraud Conference
Corporate Ethics Roundtable
June 20, 2014
San Antonio, TX

Bloomsburg University Student Association of Fraud Examiners
Fraud Update
February 28, 2014
Bloomsburg, PA

Central Pennsylvania Chapter IIA
Fraud Update
February 18, 2014
Harrisburg, PA

Bloomsburg University ZIPD Business Conference 2013
Business Ethics - Doing the Right Thing
October 10, 2013
Bloomsburg, PA

Central Penn IIA
Fraud - The People Perspective
March 12, 2013
Harrisburg, PA

Bloomsburg University Student Association of Fraud Examiners
Fraud Investigation Best Practices
February 19, 2013
Bloomsburg, PA

Central Penn ACFE
Developing a World Class Ethics Program
November 15, 2012
Camp Hill, PA

Central Penn ACFE
Fraud, Understanding People
July 25, 2012
Camp Hill, PA

Tampa Bay Chapter IIA
Internal Auditing for Fraud
December 9, 2011
Tampa, FL

CONFIDENTIAL

Brian Callery vs. HOP Energy, LLC and DDM Energy

Central Penn ACFE
Ethics: Challenging Scenarios
November 8, 2011
Camp Hill, PA

Commonwealth of Pennsylvania Bureau of Audits
Internal Auditing for Fraud
October 13, 2011
Harrisburg PA

Pennsylvania State University - Harrisburg (Guest Lecturer)
Fraud Awareness and Computer Fraud
September 26, 2011
Middletown, PA

Harrisburg Lions Club
Identity Theft
August 6, 2011
Harrisburg, PA

Fulton Financial Corporation
Internal Audit Building Blocks to Detect Fraud
July 25, 2011
Lancaster, PA

Central Penn ACFE
Purchasing Fraud Workshop
July 21, 2011
Harrisburg, PA

Pertrolance, LLC
Fraud and Business Controls
June 9, 2011
Harrisburg, PA

Institute of Internal Auditors
Beginning Auditors Tools and Techniques
May 23-26, 2011
Orlando, FL

Commonwealth of Pennsylvania Bureau of Audits
Internal Audit Fundamentals
April 28, 2011
Harrisburg, PA

The TEAM Approach
Fraud and Small Businesses
March 2011
Lancaster, PA

CONFIDENTIAL

Brian Callery vs. HOP Energy, LLC and DDM Energy

Heartland-Iowa Chapter IIA
Soft Skills for Internal Auditors
March 15, 2011
Cedar Rapids, IA

Central Penn ACFE
Purchasing Fraud
July 21, 2011
Harrisburg, PA

Central Penn ACFE
Ethics: Navigating Through the Grey
November 11, 2010
Camp Hill, PA

Central Penn IIA
Internal Audits of Employee Benefit Plans
March 23, 2010
Harrisburg, PA

Central Penn ACFE
Soft Skills to Detect Fraud
August 4, 2009
Camp Hill, PA

Institute of Internal Auditors
Purchasing Fraud: Auditing and Detection Techniques
June 16-19, 2009
New York NY

Institute of Internal Auditors
Internal Auditing for Fraud
March 24-27, 2009
Las Vegas, NV

Institute of Internal Auditors
Purchasing Fraud: Auditing and Detection Techniques
February 9-13. 2009
Phoenix, AZ

Institute of Internal Auditors
Purchasing Fraud: Prevention, Detection, and Investigation
November 3-7, 2008
San Francisco CA

Central Penn IIA
Employee Benefit Plans: Common Audit Areas & Special Areas of Focus
March 12, 2007
Lancaster, PA

CONFIDENTIAL

Brian Callery vs. HOP Energy, LLC and DDM Energy

Penn State Harrisburg (Guest Lecturer)
Fraud Awareness
February 22, 2007

Penn State Harrisburg (Guest Lecturer)
Internal Audit and Fraud
October 12, 2006
Camp Hill, PA

CONFIDENTIAL

29

Brian Callery vs. HOP Energy, LLC and DDM Energy

| APPENDIX D – FINANCIAL RATIO ANALYSIS | | | | |
|---|---|---|---|---|
| | Unaudited | Audited | Audited | Audited |

Case 2:20-cv-03652-CMR    Document 85-1    Filed 07/16/24

Brian Callery vs. HOP Energy, LLC and DDM Energy

| Solvency Ratios | October 1, 2023 – April 30, 2024 | 2023 | 2022 | 2021 |
|---|---|---|---|---|

Case 2:20-cv-03652-CMR   Document 85-1   Filed 07/16/24   P

Brian Callery vs. HOP Energy, LLC and DDM Energy



| Profitability Ratios | October 1, 2023 – | 2023 | 2022 | 2021 |
|---|---|---|---|---|

Case 2:20-cv-03652-CMR    Document 85-1    Filed 07/16/24    P

Brian Callery vs. HOP Energy, LLC and DDM Energy

| | October 1, 2023 – April 30, 2024 | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| | | | | |

Brian Callery vs. HOP Energy, LLC and DDM Energy

| Leverage Ratio | October 1, 2023 – April 30, 2024 | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| | | | | |

Brian Callery vs. HOP Energy, LLC and DDM Energy

|  | October 1, 2023 – April 30, 2024 | 2023 | 2022 | 2021 |
|---|---|---|---|---|
|  |  |  |  |  |

Brian Callery vs. HOP Energy, LLC and DDM Energy

| | October 1, 2023 – April 30, 2024 | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| Altman Z-Score | | | | |

Case 2:20-cv-03652-CMR    Document 85-1    Filed 07/16/24    P

# EXHIBIT 3

Brian Callery vs. HOP Energy, LLC and DDM Energy

# Stephen Kokoska PhD
# Senior Consultant, Numerical and Statistical Analysis and Review

## Education:

Boston College, BA: Mathematics and Economics, 1978

University of New Hampshire, MS: Mathematics, 1980

University of New Hampshire, Ph.D., 1984

Dissertation: Statistical Methods for Analysis of Cancer Chemoprevention Experiments Research Advisor: Dr. L. David Meeker

Areas of Specialization: Applied Mathematics and Statistics

## Employment:

Assistant Professor of Mathematics, Colgate University, 1984 - 1990 Associate Professor of Mathematics, Bloomsburg University, 1990 - 1994

Professor of Mathematics, Bloomsburg University, 1994 – 2020

Mathematical and Statistical Consultant for North American Forensic Accounting PC, 2022 - Present

## Bibliography:

*Published Works*:

*Journal Articles* (refereed):

Effect of Short-term Feeding of Sodium Selenium on 7-12-Dimethylbenz-anthracene-induced Mammary Carcinogenesis in the Rat, Thompson, H.J., Meeker, L.D., Becci, P.J., and Kokoska, S., *Cancer Research* 42, 4954-4958, 1982

Effect of Inorganic and Organic Forms of Dietary Selenium on the Promotion State of Mammary Carcinogenesis in the Rat, Thompson, H.J., Meeker, L.D., and Kokoska, S., *Cancer Research* 44, 2803-2806, 1984

The Analysis of Cancer Chemoprevention Experiments, Kokoska, S., *Biometrics* 43, 525-534, 1987

A Comparison of Statistical Techniques for Analysis of Growth Curves, Kokoska, S. and Johnson, L., *Growth* 51, 261-269, 1987

Including Data From Early Deaths in the Analysis of Cancer Chemoprevention Experiments, Kokoska, S., *Applied Mathematics Letters* 1, No. 2, 197-201, 1988

The Analysis of Cancer Chemoprevention Experiments in Which There is Heterogeneous Poisson Sampling, Kokoska, S., *Applied Mathematics Letters* 1, No. 4, 351-355, 1988

The Analysis of Cancer Chemoprevention Experiments in Which There is Interval Censoring, Kokoska, S., *Applied Mathematics Letters* 1, No. 5, 39-43, 1989

A Polynomial Formula for Fibonacci Numbers, Bezuszka, S. and Kokoska, S., *The Fibonacci Quarterly* 28, No. 2, 151-155, 1990

A Computer Program for the Statistical Analysis of Cancer Inhibition/Promotion Experiments, Kokoska, S. and Urlwin, J., *Computer Methods and Programs in Biomedicine* 33, 1-7, 1990

Analysis of Chemoprevention Experiments: The Indefinite Censoring Model, Kokoska. S., Meeker, L.D., and Thompson, H.J., *Mathematical and Computer Modeling* 15, 65-75, 1991

A Generated Program for Cancer Chemoprevention Experiments, Hardin, M., Hsu, C., Kokoska, S., and Grubbs, C., *ASA Proceedings*, 1991

The Statistical Analysis of Cancer Inhibition/Promotion Experiments, Kokoska, S., Hardin, J.M., Grubbs, C., and Hsu, C., *Anticancer Research*, 13, Number 4, 1993

The Development and Analysis of Interactive Videodisc Technology to Teach Speechreading, Slike, S., Thornton, N., Hobbis, D., Kokoska, S., and Job, K., *American Annals of the Deaf*, 140, Number 4, 1995

Brian Callery vs. HOP Energy, LLC and DDM Energy

A Family Perspective on Augmentative and Alternative Communication: Families of Young Children, Angelo, D., Jones, S., and Kokoska, S., *ACC Augmentative and Alternative Communication*, 11, September 1995

A Family Perspective on Augmentative and Alternative Communication: Families of Adolescents and Young Adults, Angelo, D., Kokoska, S., and Jones, S., *ACC Augmentative and Alternative Communication*, 12, March 1996

Stressors and Family Supports: Families with Children Using Augmentative & Alternative Communication Technology, Jones, S., Angelo, D., and Kokoska, S., *Journal of Children's Communication Development*, 20, No. 2, pp 37-44, 1998

An Option-Based Approach to Portfolio Performance Evaluation, Smith, S. and Kokoska, S., *Advances in Investment Analysis and Portfolio Management*, 5, pp 1-30, 1998

Life Expectancy of Major League Baseball Umpires, Cohen, R., Kamps, C., Kokoska, S., Segal, E., and Tucker, J., *The Physician and Sportsmedicine*, Volume 28, Number 5, pp 83-89, 2000

*Books*:

*Perfect Numbers*, Bezuszka, S., in collaboration with D'Angelo, L., Kenney, M., and Kokoska, S., Boston College Press, Chestnut Hill, MA, 1980

*Applications of Mathematics Through Models and Formulas*, Bezuszka, S., Kenney, M., and Kokoska, S., Boston College Press, Chestnut Hill, MA, 1986

*Statistical Tables and Formulae*, Kokoska, S. and Nevison, C., Springer-Verlag, New York, 1988, Revised Edition, 1992

*Lecture Guide and Student Notes*, to accompany *Calculus*,
by James Stewart, Strand, A. and Kokoska, S., Brooks/Cole, Volume 1, 2: 1992

*Lecture Guide and Student Notes*, to accompany *Contemporary Precalculus: A Graphing Approach*, by Hungerford, Strand, A. and Kokoska, S., Saunders College Publishing, Volumes 1,2: 1994

*Graphing Calculator Manual* a supplement to *Foundations of Statistics*, by Warren Hawley, Kokoska, S., Saunders College Publishing, 1996

*Lecture Guide and Student Notes*, to accompany *Calculus from Graphical, Numerical, and Symbolic Points of View*, by Ostebee and Zorn, Kokoska, S., Saunders College Publishing, 1996

*Graphing Calculator Manual*, a supplement to *Statistics and Probability in Modern Life*, by Newmark, Kokoska, S., Saunders College Publishing, 1997

*Graphing Calculator Manual*, a supplement to *Statistics: An Introduction*, by Mason, Lind, and Marchal, Kokoska, S., Brooks Cole Publishing Company, 1998

*Graphing Calculator Manual*, a supplement to *Elementary Statistics*, 8th Edition, by Johnson and Kuby, Kokoska, S., Brooks Cole Publishing Company, 1998

*Graphing Calculator Manual*, a supplement to *Just the Essentials of Elementary Statistics*, Second Edition, by Johnson and Kuby, Kokoska, S., Brooks Cole Publishing Company, 1999

*Graphing Calculator Manual*, a supplement to *Precalculus, Understanding Functions, A Graphing Approach*, by Goodman and Hirsch, Kokoska, S., Brooks Cole Publishing Company, 2000

*Standard Probability and Statistics Tables and Formulae*, Zwillinger, D. and Kokoska, S., Chapman and Hall/CRC, 2000

*Standard Probability and Statistics Tables and Formulae*, Student Edition, Kokoska, S. and Zwillinger, D., Chapman and Hall/CRC, 2000

*Navigating Calculus Workbook*, Kokoska, S., Houghton Mifflin, Boston, 2002

*Graphing Calculator Manual*, a supplement to *Just the Essentials of Elementary Statistics*, Third Edition, by Johnson and Kuby, Kokoska, S., Brooks Cole Publishing Company, 2003

*Teacher's Resource Binder* for *Statistics Through Applications*, Yates, D., Starnes, D., Kokoska, S., WH Freeman, 2004

*Introductory Statistics: A Problem Solving Approach*, Kokoska, S., WH Freeman, December 2009.

*Instructor's Solutions Manual* to accompany *Introductory Statistics: A Problem Solving Approach*, Kokoska, S. and Clark, J., WH Freeman, January 2010.

*Student Solutions Manual* to accompany *Introductory Statistics: A Problem Solving Approach*, by Kokoska, S. and Clark, J., WH Freeman, January 2010.

Brian Callery vs. HOP Energy, LLC and DDM Energy

*Introductory Statistics: A Problem Solving Approach*, Second Edition, Kokoska, S., WH Freeman, January 2015.

*Instructor's Solutions Manual* to accompany *Introductory Statistics: A Problem Solving Approach*, Second Edition, Kokoska, S. WH Freeman, January 2015.

*Student Solutions Manual* to accompany *Introductory Statistics: A Problem Solving Approach*, Second Edition, by Kokoska, S., WH Freeman, January 2015.

*Calculus for AP: A Complete Course*, Stewart, J., and Kokoska, S., Cengage, January 2018.

*Introductory Statistics: A Problem Solving Approach*, Third Edition, by Kokoska, S., WH Freeman January 2020.

*Calculus Concepts and Contests*, Fifth Edition, Stewart, J. and Kokoska, S., Cengage, 2022.

**Scholarly Work in Progress:**

*Books*:

*Calculus for AP: A Complete Course*, Second Edition, Stewart, J., and Kokoska, S., Cengage, Expected Publication date 2024.

**Presentations:**

Perfect Numbers, Association of Teachers of Mathematics in New England, Annual Meeting, March 1981

The Analysis of Cancer Chemoprevention Experiments, Colgate Science Division Colloquium, February 1985

A Comparison of Techniques Used to Analyze Cancer Chemoprevention Experiments, Norwich-Eaton Pharmaceuticals, Inc., Statistics Section, July 1985

Detecting Treatment Differences in Cancer Chemoprevention Experiments, The 13th Annual Mathematics and Statistics Conference, Miami University, Sept. 1985

A Comparison of Statistical Techniques for Analysis of Growth Curves, Spring Regional Meeting of the Biometric Society and the American Statistical Association, Atlanta, Georgia, March 1986

Design and Statistical Analysis of Cancer Inhibition or Promotion Experiments, American Statistical Association Annual Meeting, San Francisco, CA, August 1987

Exploratory Data Analysis: Checking For Data Quality and Consistency, Boehringer Ingelheim Pharmaceuticals, Inc., Data Entry Section, Ridgefield, CT, November 1988

The Misuse of Statistics: Media Antics, Roberts Wesleyan College Colloquium, Rochester, NY, March 1989; Manhattan College Pi Mu Epsilon Induction Ceremony, April 1989; St. Lawrence University Undergraduate Mathematics Colloquium, April 1989; Colgate Science Division Colloquium, September 1989; Kings College, November 1991; Gettysburg College, October 1993; Lycoming College, November 1993

The Statistical Analysis of Cancer Chemoprevention Experiments (lecture and seminar), The University of Alabama at Birmingham and Southern Research Institute, April 1989

The Statistical Analysis of Cancer Chemoprevention Experiments (lecture and seminar), National Cancer Institute, September 1990

Performance Parameters, Estimation of Panel Size, Geisinger Hospital, September 1996

Exploring Calculus with Graphing Calculators

Marion High School, November 1992; Wyoming High School, November 1992, January 1994; Bishop Neuman High School, December 1992; Selingsgrove High School, January 1993; Cardinal Brennan High School, January 1993; Berwick High School In-Service Day, January 1993; Central Columbia High School, February 1993, September 1994; Millville High School, May 1993; Lackawana Trail Junior/Senior High School, October 1993; Luzerne County Teachers of Mathematics, Wyoming Seminary, November 1993; MMI Preparatory School, November 1993; Wymoning West Valley High School, March 1994; CSIU, Lewisburg, PA, March 1994; Sun Valley High School, April 1994; NorthWest High School (at BU), October 1994; Crestwood High School, December 1994; Pearl River High School, Graphing Calculator Workshop, March 1995

AP Calculus

Benton High School, April 1994; Central Columbia High School, April 1995, April 1996; Danville High School, April 1996; Millville High School, February 1996, April 1997; CSIU High School Teachers, January 1996

Brian Callery vs. HOP Energy, LLC and DDM Energy

Statistics and *Mathematica*, The Spring Meeting of The Biometric Society, Invited Workshop, March 1995

Calculators in the Classroom, SSHE Mathematics Mathematics Association Conference, May 1995

Workshop, NCTM Eastern Regional Meeting, Philadelphia, November 1995, TI-92

Workshop, CSIU Math/Science Consortium, Introduction to the TI-83, October 1996

Workshop, CSIU Math/Science Consortium, Introduction to the TI-92, November 1996

Workshop, College Board Middle States Mathematics Consultants, with Susan Kornstein, September 1996

Invited lecturer aboard the QE II, Introduction to Computers, August 1997

Workshop, CSIU Math/Science Consortium, Introduction to the TI-83 Plus, Summer 1999

Advanced Placement Calculus Institutes; Wilkes University, Summer 1999; St. Croix, USVI, Summer 2001

Director, Summer Math & Science Camp, 6th - 9th graders, Bloomsburg University, 1999, 2000, 2001, 2002, 2003

In-Service Course: Calculators in the Classroom, CSIU, Summer 2000

Invited presentation, HP Higher Education Forum, Houston, February 2003

Programming the Palm Pilot for Fun and Profit, Department of Mathematics, Computer Science, and Statistics Seminar, with Shaun O'Brien, Spring 2003

In-service presentation, Using the TI-89, Central Columbia High School Mathematics Department, January 2005

In-service two-day presentation, Using the TI-84, Shamokin High School Mathematics and Science Departments, February 2005

In-service presentation, Probability and Statistics Workshop, Central Columbia High School Mathematics Department, August 2005

Pre-AP Workshop: Functions, Accumulation, and Data Analysis, The American School of Brasilia, Brasilia, Brazil, September, 2005

Pre-AP Workshop: Functions, Accumulation, and Data Analysis, Old Middle School North, Maryland, June 2006.

In-service presentation, Using the TI-89, for the CSIU at BU, Fall 2006.

Advanced Placement Calculus workshop, two days, Santo Domingo, September 2006.

Introduction to Statistics using Excel, four days, Office of Civil Rights, Philadelphia, PA, Fall 2006; Intermediate Statistics using Excel, via distance education, Fall 2008.

TALE Presentation, The use of SmartBoard and other technology in the classroom, Spring 2008.

Computer Forensics with Mathematica, with S. Inch, Presented to a group at Wolfram Research via web conferencing, Spring 2008.

Introduction to Computer Forensics , Police-Community Relations Class, Luzerne Community College, April 2008.

TI-nspire workshop, with Bill Caroscio, Mission Viejo, CA, August 21, 22, 2008.

The use of technology to teach statistics, BU Summer Academy, TALE Center, July 2008.

Cell Phone Call and GPS Analysis, Paraben Corporation; Livonia Police Department, Livonia, MI, April 7, 8, 2009; San Jose, CA, May 18, 19, 2009; Nigerian Police, Sterling VA, July 10, 11, 2009.

Results of the 2011 AP Calculus AB and BC Exams, AP National Conference, San Francisco, CA, July 2011.

AP Calculus: Facts, Figures, and FAQs, MathFest, Lexington, KY, August 2011.

A Tale of Three Tangents, PCTM Conference, State College, Fall 2011.

AP Fair and two-day AP Calculus Workshop, Shanghai, China, December 2011.

Computer Algebra Systems in AP Calculus $T^3$ International Conference, Chicago, IL, March 2012

AP Calculus: Results and Recent Themes, NCTM Conference, Philadelphia, April 2012.

AP Calculus: Recent Themes and Freshman Dreams, Choate Academy invited presentation, April 2012.

AP Calculus Two-Day Workshop, Qingdao, China, September 2012.

$T^3$ Power Session, AP Calculus From Those in the Know, $T^3$ International Conference, Philadelphia, PA March 2013.

AP Calculus Panel Presenter, NCTM Meeting, Denver, CO, April 2013.

Brian Callery vs. HOP Energy, LLC and DDM Energy

AP Calculus Themes and Common Errors, The Hill School, April, 2013.

Results of the 2012 AP Calculus AB and BC Exams, AP National Conference, Las Vegas, NV, July 2013.

Results of the 2013 AP Calculus AB and BC Exams, AP National Conference, Las Vegas, NV, July 2013.

AP Calculus Panel Presenter and session presenter, NCTM meeting, New Orleans, April 2014.

T³ Power Session, T³ International Conference, Las Vegas, NV, March 2014.

Results of the 2013 AP Calculus AB and BC Exams, 2 WebEx presentations, sponsored by BFW, October 2013.

Results, Tips, and Recent Themes in AP Calculus, AP Sharing Day, Berwick High School, October 2013.

AP Calculus: Recent Themes, Dreams, and Lingo. St. John Neumann High School, Naples FL, January 2014, March 2015.

Results of the 2014 AP Calculus AB and BC Exams, 2 WebEx presentations, sponsored by BFW, October 2014.

Results of the 2014 AP Calculus AB and BC Exams, AP National Conference, Philadephia, PA, July 2014.

Roundtable Discussion: AP Calculus and Statistics, Panel Presenter, AP National Conference, Philadelphia, PA, July 2014.

AP Calculus: Student Preparation for College Mathematics, Joint Mathematics Meetings, San Antonio, TX, January 2015.

AP Calculus: What every Student Should Know; Two-Day Workshop for AP Calculus Teachers and Students, Edmonton, Canada, March, 2015.

T³ International Conference, Three presentations and Panel Moderator: The AP Calculus Curriculum Framework, Notational Fluency, AP Calculus Questions and Answers, Panel: AP Calculus Framework Opportunities and Challenges, Fort Worth, TX, March 2015.

Summary of the 2014 AP Calculus Exam, NCTM Meeting, Boston, MA, April 2015.

Two WebEx presentations: Questions and Answers with the AP Calculus Chief Reader, BFW, February and April 2015.

Results From the Administration of the 2015 AP Calculus Exam, AP National Conference, Austin, TX, July 2015.

MathFest Panel, The Updated AB and BC Calculus Courses, Washington, DC, August 2015.

NCTM Regional Conference, Sign Charts, Use and Abuse, and Other Notation Issues, Minneapolis, MN, November 2015.

T³ International Conference, AP Calculus 2015: Technology Issues, Orlando, FL, February 2016.

Mock AP Calculus Reading Chief Reader, Indiana TIP Program, Indianapolis, IN, March 2016.

MCTM Meeting, Summary of the 2015 AP Calculus Exam, San Francisco, CA, April 2016.

Two WebEx Presentations, Results from the Administration of the 2015 AP Calculus Exam, Sponsored by Cengage Learning, October 2015, October 2016.

WebEx Presentation, Technology and the AP Calculus Exam, April 2016.

Two-Day AP Calculus College Board Workshop, Guangzhou, China, October 2015.

One-Day AP Calculus College Board Workshop, Vernona, NJ, October 2015.

AP Best Practices Conference, two presentations, AP Calculus: What Every Teacher and Student Should Know; Results From the 2015 AP Calculus Administration, and co-leader of panel discussion focus on assessment, Calvin College, Grand Rapids, MI, May 2016.

Texas Instruments Webinar, with Vicki Carter, LHospitals Rule: Review and Preview with TI Technology, July 2016.

Two WebEx presentations, Results from the Administration of the 2016 AP Calculus Exam, Sponsored by Cengage Learning, October 2016.

Two-Day AP Calculus College Board Workshop, Chengdu, China, December 2016.

T³ International Conference, A Few Series Errors, Chicago, IL, March 2017.

Two Texas Instruments Webinars, with Vicki Carter and Tom Dick, AP Calculus Review Sessions, April 2017.

Brian Callery vs. HOP Energy, LLC and DDM Energy

AP Calculus Focus Group participant, Cengage Learning, NCTM, San Antonio, TX, April 2017.
AP Calculus Workshop, AP National Conference, Washington, DC, July 2017.
Two-Day AP Calculus College Board Workshop, Singapore, November, 2017.
AP Calculus Course Summary, AP Course Seminar at Changshu International School, Suzhou, China, December 2017.
Two-Day AP Calculus College Board Workshop, Shenzhen, China, December 2017.
AP Calculus Exam: What Every Student and Teacher Should Know; AP Calculus Question and Answe Session, North Texas Area Association of AP Mathematics Teachers, September 2017.
Professional Development and Session presentations, T³ International Conference, TI in Focus: AP Calculus Video Series, with Tom Dick, San Antonio, TX, March 2018.
Two Webinars, TI in Focus: AP Calculus Video Series, and AP Calculus Exam Common Errors, wi Tom Dick and Vicki Carter, Texas Instruments Webinar Series, February, April, 2018.
Webinar, Preparing for the AP Calculus Exam, for Strathcona High School, April 2018.
Facebook Live Event, AP Calculus Questions and Answers, with Curtis Brown, for Texas Instruments at the NCTM Regional meeting, Hartford, CT, October 2018.
Webinar, AP Calculus: Increasing, Decreasing, Concavity, and Points of Inflection, with Vicki Carter, Texas Instruments Webinar Series, December 2018.
Webinar, Navigating the AP Calculus Exam: A Content Presentation, L'Hospital's Rule, for Cengage Learning, December 2018.
Participant, MAA Mutual Concerns Committee, appointed chair; Focus Group Participant: Technology and Electronic supplements for statistics texts, conducted by Macmillan, Joint Math Meetings, Baltimore, MD, January 2019.
All Calculus Things Improper, Calculus Conference within a Conference; TI in Focus: AP Calculus, summary and update, with Tom Dick; Focus Group Participant: Technology accessibility; AP Calculus Conversation Moderator, T3 International Conference, Baltimore, MD, March 2019.
Mock AP Calculus Reading, one-day presentation, AP-TIP, Indianapolis, IN, March 2019.
AP Calculus Podcast, with Bryan Passwater and Tony Record, March 2019.
TI in Focus: AP Calculus, summary and update, with Tom Dick; The Joy of dx, with Tom Dick a Gail Burrill, NCTM, San Diego, CA, April 2019.
Webinar: AP Calculus Q&A, with Bryan Passwater and Tony Record, May 2019.
AP Calculus Questions and Answers, Facebook Live Event, with Curtis Brown, For Texas Instruments, NCTM Regional Meeting, Boston, MA, September 2019.
TI in Focus, AP Calculus Video Series, presentation, NCTM Regional Meeting Boston, MA Septembei 2019.
AP Calculus Workshop for the College Board, Lancaster, PA, September 2019.
Presentations, A+ College Ready Program, Birmingham, AL, (1) Endpoints Discussion; (2) LHospitals Rule; (3) Scoring the AP Calculus Exam, October 2019.
CalcTalk Webinar, with Bryan Passwater, AP Calculus Scoring Lingo, November 2019.
Mock AP Calculus Reading, one-day presentation, AP-TIP, Indianapolis, IN, March 2020.
Webinar, Texas Instruments, AP Calculus, April 2020.
Monday Night Calculus, with Tom Dick, Texas Instruments Webinar series, 2021 - 2023.
TI in Focus: AP Calculus, with Tom Dick, new resources based on the 2020 AP Calculus Exam, September 2020.
Question writer and reviewer for ETS, AP Calculus Exam, 2021-2023.
Question writer for the College Board, AP Precalculus, 2022-.
AP Calculus topics virtual presentation, University of Houston, January 2022, January 2023.
Calculus resource projects, with Tom Dick, for Texas Instruments, 2022-2023.
Presentation, The Lost Art of Problem Solving, Bridgewater State APSIs, July 2022.

**Professional Activities:**

*Grants and Fellowships*:

National Science Foundation: Statistical Modeling for Cancer Chemoprevention Experiments, 1986-1987
Borland International: Course Development, Statistics and Computers, with C. Nevison, 1986-1987

Brian Callery vs. HOP Energy, LLC and DDM Energy

PEW Consortium: Course Development in Quantitative Literacy, with T. Kelly, P. Mulry, 1989

PEW Consortium: Development of Computer-based Mathematics Curricular Materials, with B. West et. al., 1990

Center for Rural Pennsylvania: to establish the Bloomsburg University Technical Assistance Center, with P. Hartung, J. Pomfret, 1992, 1993

Ben Franklin Grant: Morante CAD, 1992-1993.

Needs, Stressors and Resources of Families with Infants and Toddlers Using Assistive Technology: A Statewide Survey, State System Faculty Professional Development Council, with D. Angelo, S. Jones and J. Armstrong, 1994

Science in Bloom, State System Grant, with J. Baird and E. Schultz, Summer 1994

Outcomes Assessment Conference, State System Grant, Dee Welk et. al., 1998-1999

Math and Science Camp, The Bell Atlantic Foundation, with E. Schultz and S. Inch, Summer 1999; K'NEX Industries, Spring 2003

Alcoa Corporation, $25,000, Inch, S., Kokoska, S., and Fletcher, T., Provide cell phone analysis training to law enforcement officers, 2009.

*Colgate Grants*:

Microcomputer Grant: DEC Rainbow 100, January 1985

Science Division Grant: to attend the Council on Undergraduate Research Conference, Colgate University, May 1985

Faculty Development and IBM Grant: to attend a workshop on Multivariate Analysis and Computer Software, Ohio University, August 1985

IBM Grant: to attend the Spring Regional Meeting of the Biometric Society and the American Statistical Association, March 1986

Sloan Foundation Grant: for the purchase of Minitab for the University Computer System, May 1986

Faculty Development Grant: to attend The Second International Conference on Teaching Statistics, Victoria, BC, August 1986

Technical Advisory Committee Grant: to purchase microcomputers, peripherals, and software for Microcomputer Applications in the Sciences, Spring 1987, 1988

*Bloomsburg Grants*:

Research Grant: The Statistical Analysis of Cancer Chemoprevention Experiments, 1991

Bloomsburg University Foundation Grant: to establish a computer lab for a Scholars course, 1992.

Faculty Professional Development Grant: to present a workshop at the NCTM Eastern Regional Meeting in Philadelphia, November 1995

Reassigned Time Award: to work with Geisinger to study quality control in medicine and develop performance parameters, Summer 1996

Strategic Planning Project: An Opportunity to Excel, The Recruitment of Mathematics and Computer Science Students for the Next Century, with Scott Inch and Helmut Doll, 1996-1998, 25 presentations

Reassigned Time Award: to develop a summer math and science camp for 6th, 7th, and 8th grade students, 1999

Professional Development Award: to support textbook writing project

Sabbatical Award: Spring 2004, Spring 2015, Spring 2019.

Action Plan Grant, with Scott Inch, to develop technology movies, Spring 2005

Presidential Grant to address the Strategic Plan, Fletcher, T., Kokoska, S., and Wright, I., Educational Pathways Initiative, Spring 2012.

TALE Grant for General Education Initiatives, Kokoska, S. and Inch, S., Using a digital Notepad to Enhance Online Office Hours.

*Member*:

American Mathematical Society

Mathematical Association of America

Sigma Xi

American Statistical Association

Biometric Society

Brian Callery vs. HOP Energy, LLC and DDM Energy

*Editorial and Related Activities:*

Workshop (with S. Bezuszka): Maximum and Minimum Problems without Calculus, NCTM Meeting, Washington, D.C., April 1986

Referee for *The American Mathematical Monthly*, 1988

Referee for *Growth, Development and Aging*, 1989

Referee for *Biometrics*, 1990, 2000, 2002

Referee for *The Canadian Journal of Statistics*, 1992

Referee for *Medical and Pediatric Oncology*, 1991

Referee for *Biometrical Journal*, 1999

Editorial Advisory Board, Roxbury Publishers, 1988

Advanced Placement Calculus Reader for ETS, 1988-1991; Table Leader, 1992-2000; Exam Leader, 2001-2007, 2009, 2010; Chief Reader Designate: July 2010; Chief Reader, July 2011-2015; Table Leader, 2018, 2019, Exam Leader, 2020; Assistant Chief Reader, 2021-2023.

AP Calculus Development Committee member, July 2010 - June 2015.

TICAP Participant, Clemson University, 1992-1994

Invited Participant, Discussion Group Leader, Calculus Reform Conference, Clemson University, June 1995

Invited Participant, CAE-CALC Summer Pilot Institute, TI-92, June 1995

Dissertation Committee, Chuan-Chieh Hsu, The University of Alabama at Birmingham, Defended April 1995

Editor and typesetter: Advanced Placement Mathematics Test Bank to accompany *The Calculus with Analytic Geometry*, by Louis Leithold, 1990

Typesetter: *The Calculus Virgin*, by d'Arcy Hayman and Louis Leithold, 1991

Typesetter: Advanced Placement Calculus Free Response Solutions, 1996-1999

Power Point Presentation for *Just the Essentials of Elementary Statistics*, by Johnson and Kuby, 1998

Graphing calculator accuracy check for *Elementary Statistics*, 8th Edition, by Johnson and Kuby, 1999

Power Point Presentation for *Elementary Statistics*, 8th Edition, by Johnson and Kuby, 1999

Mathematics and Statistics reviewer for AP Central, 2001, 2002

Training course in Java Programming, May 2001

Advanced Placement Calculus Question Writer, Spring 2003; Free-Response question writer, Fall 2006.

Review of College Board Assessment Workshop material, March, 2003

Focus Group co-presenter, organized by WH Freeman, Joint Statistical Meetings, Toronto, August 2004; AMATYC meeting, November 2004; Joint Mathematics Meetings, January 2005

Contributor, Advanced Placement Program Professional Development AP Calculus manual, Special Topic: Fundamental Theorem of Calculus, Spring 2005

Actively supervising several theses, Department of Audiology students, 2009-2013.

Chief Editor, AP Calculus Special Focus Material for workshops, Fall 2006.

College Board National Leader Observations, New Britain, Ct, November 2006, and Austin, TX, April 2007.

Certified Reviewer, AP Calculus Audit, Spring 2007.

Honors Independent Research student, Withers, S., A PDA program to graph points in a plane, 2007-2008.

Internship student, Neaman, J., A regression program for the Office of Admissions, Apring 2008.

Standard Setter, CLEP Exam, The College Board, Spring 2008.

Question Writer, AP Calculus practice exam, Fall 2007, Fall 2008.

Texas Instruments Calculus Summit, invited participant, Dallas, TX, June 25, 26, 2008.

TI-nspire Activity Writer, Dallas, TX, July 9, 10, 2008.

Consultant, Office of Civil Rights, Philadelphia, PA, Summer 2008, Summer 2010, Summer 2011.

Paraben Signal Analysis Course, participant, San Diego, CA, November 18, 19, 2008.

Cell Phone Tower and Call Analysis Class, Cellular Data Resources, participant, February 9, 10, 2009.

Computer Forensics Consultant, Inch, S., and Kokoska, S., Attorney Brain Crane, Bloomsburg, July, 2009.

Brian Callery vs. HOP Energy, LLC and DDM Energy

Calculus-nspired and pre-calculus-nspired author, for Texas Instruments, writing a series of TI-nspire calculator calculus activities for students and corresponding teacher documents, September 2009 - September 2011.

Advanced Placement Panel for the Calculus Conference withing the $T^3$ International Conference, invited speaker and moderator, Atlanta, GA, March, 2010.

Texas Instruments $T^3$ leadership training, certified regional instructor, Summer 2010.

TI-Nspire Handheld presentation, to local mathematics teachers, Central Columbia School District, Summer 2010.

AP Calculus: Facts, Figures, and FAQs, with Stephen Davis, presentation at MathFest, Pittsburgh, PA, August 2010.

AP Calculus: Issues and Challenges, T-Cubed International Conference, panel moderator and present, Houston, TX, February 2011.

The TI-Nspire CX CAS Handheld and Software: New Features and Cool Examples, presentation, 2011 Allegheny Mountain Section Meeting, April 8, 2011.

Statistics Nspired, reviewer of statistics action consequence documents, student worksheets, and teacher material, January 2011 - September 2011.

Editor, AP Calculus Curriculum Module, Incorporating Mathematical Reasoning Processes in the AP Calculus Classroom: Connections Among Multiple Representations with a focus on Integrals, February, 2013.

*Book Reviews*:

  *Mathematical Statistics*, Fourth Edition, Freund et al, Prentice Hall, Inc., Fall 1986

  *Probability and Statistics for Engineering and The Sciences*, Second Edition, Devore, J., Brooks/Cole Publishing Company, Fall 1988

  *Probability and Statistical Inference*, Bartoszynski, R., and Niewiadomska-Bugaj, M., McGraw-Hil Summer 1990

  *Statistics: Learning in the Presence of Variation*, Wardrop, R., McGraw- Hill, Summer 1990

  *Statistics: An Introduction*, Mason, Lind, and Marchal, HBJ, 1991

  *Precalculus*, Runyan, Richard D. Irwin, Inc., Fall 1992

  *The Calculus*, 7th Edition, by Louis Leithold, 1994

  *Just in Time Algebra and Trigonometry*, McGraw-Hill 1996

  *Calculus with Derive*, McGraw-Hill 1996

  *Probability and Statistics for Engineers*, McGraw-Hill 1996

  *Concepts in Calculus*, Stewart, Brooks/Cole 1996

  *Chance Encounters*, Wild and Seber, John Wiley & Sons, *Technometrics*, Volume 43, Number 2, May 2001

  *Calculus*, by Michael Sullivan, WH Freeman, 2013.

*Software Reviews*:

  *Microcomputer Software for Statistical Analysis for Engineers: A Computer Based Approach, IBM Version*, J. Wesley Barnes, Prentice Hall, Inc., Summer 1987

  *MYSTAT*, SYSTAT, Inc., Evanston, IL, 1987

  *ME-STATS*, Northwest Analytical, Inc., 1987

  *PowerStat*, Analytical Engineering Corporation, 1987

  $\mu$TEX, Arbortext Inc., 1989

  PTIHP, PTIVIEW, Personal TEX, Inc. 1991

*Research Assistant*:

Dr. R. England, Economics Dept., UNH, 1979

Drs. L.D. Meeker and H.J. Thompson, Summer 1981, 1982, 1983, Statistical Analysis of Treatment on Mammary Carcinogenesis, Assisted in the preparation of Induction of Mammary Gland Carcinomas by the Subcutaneous Injection of 1-Methyl-1-nitrosourea, H.J. Thompson and L.D. Meeker, *Cancer Research* 43, April 1983

Boston College Mathematics Institute, Assisted in the development of *Number Treasury*, S.J. Bezuszka and M. Kenney, Dale Seymour Publications, 1982

Graduate Assistant: MST Summer Program at UNH, 1979

Brian Callery vs. HOP Energy, LLC and DDM Energy

*Consultant Services*:

Norwich-Eaton Pharmaceuticals, Inc., Clinical Trials Analysis, 1985-1991
    Courses Taught: Minitab, Summer 1986, Summer 1987; Basic Statistics and Applications, Summer 1987; TDP, Summer 1987; Beginning SAS, Summer 1987
    7 Statistical Reports

Oxford Academy and Central School, Educational Research, 1986

Borland International, Research and Development of Statistical Software, 1986-1988

Dr. Mark Vogel, Clinical Psychologist, 1986-1987, *Statistical Report*: A Study of the Alcohol and Dru Usage Patterns of Norwich 7-12 Grade Students, 1987

National Study of Epidermolysis Bullosa and Families; Primary Investigator: Sheila Dove Jones. Submitted January 22, 1991: DEBRA of America, Inc., New York, NY. Budget Period: June 1991 - June 1992. Funded

Stressors, Needs, and Resources of Families with Adolescents using Assistive Devices: A Statewide Survey; Primary Investigator: Dianne Angelo. Co-Investigator: Sheila Jones. Submitted October 28, 1991: SSHE: Category 2-B. Budget Request $1333. Budget Period: April 1992 - December 1993. Funded

Stressor, Needs, and Resources of Families with Children using Assistive Devices: A Statewide Survey; Primary Investigator: Dianne Angelo. Co-Investigator: Sheila Jones. Financially supported by the Pennsylvania Assistive Technology Center, Harrisburg, PA. September 1991

Columbia-Montour Survey on Children: Consumer Survey; Investigators: Sheila Dove Jones, Dale Sultzbaugh, and Stephen Kokoska. Financially supported by Bloomsburg University and Bloomsburg Town Council. August 1993 - October 1993

Abraczinskas Nursery: Spreadsheet Application for Shipping Costs, Fall 1994

Advanced Placement Program, Calculus, 1990-
    Presentations: Shikellamy High School, October, 1990; Pace University, April, 1991; Penn State University, October 1991; Thomas Wootton High School, Rockville, MD, March 1992; Eastern Regional Senior High School, Washington, DC, December 1992; Hatboro-Horsham High School, Horsham, PA, March, 1993; Penn State University, October 1993; Clarion University, March 1994; Perkiomen High School, April 1994; New York University, November 1994; Gonzaga College High School, March 1995; Burnt Hills - Ballston Spa High School, October 1995; Fairport High School, November 1996; Math Specialty Conference, Lancaster, PA, February 1997; Math Specialty Conference, Atlantic City, NJ, February 1998; Oakmont High School, February 1998; Urbana High School, Ijamsville, MD, October, 1998; Math Specialty Conference, Philadelphia, PA, January 1999; Garfield High School, Garfield, NJ, April, 1999; Grove City High School, November, 1999; Math Specialty Conference, February, 2000; Taylor-Allderdice High School, February, 2000; Charles Herbert Flowers High School, October 2000; Mount Lebanon High School, November 2000; Urbana High School, Ijamsville, MD, January 2001; Math Specialty Conference, February, 2001; Math Specialty Conference, January 2002; Fox Chapel Area High School, March 2002; Math Specialty Conference, Ellenville, NY, Fall 2002; Math Specialty Conference, Baltimore, Spring 2003; Pre-AP: Functions, Baltimore, MD, Fall 2003; Pre-AP: Functions, Sparta, NJ, Fall 2003; Math Specialty Conference, Linthicum Heights, MD, Spring 2004; Distinguished Scholar Seminar, Langhorne, PA, Spring 2004; Damascus High School, Damascus, ND, Fall 2004; Pre-AP National Training, Char- lotte, NC, Spring 2005; La Roche College, Pittsburgh, PA, October 2008; Pre-AP: Functions, Niagara Falls HS, January, 2009

Invited participant, National Forum to Expand Advanced Placement Opportunities, Washington, DC, February 2000

Chairman, Committee to develop syllabus for AP calculus methods course, NYSUT - College Board Partnership, March 2000

Member, Advanced Placement Endorsement Panel, Spring 2000, Spring 2003

Judge for the College-Level Examination Program in Calculus, May 2000

Workshop for middle and high school teachers, The Mathematics and Science of Amusement Park Rides, with Emeric Schultz, Fall 2002

PDA Stats software development, with Shaun O'Brien, 2001-2003, published by WH Freeman, 2004

Brian Callery vs. HOP Energy, LLC and DDM Energy

Invited participant, Advanced Placement Professional Development National Leader Training, Summer 2003

Participant, Course Redesign Workshop, Prentice Hall, Boston, MA, August 2005

Invited participant, Advanced Placement Professional Development National Leader refresher workshop, New Orleans, August, 2005

Sabbatical proposal reviewer, for Wilkes University, September 2005

Wyoming-Sullivan County Treatment Court, Performance Evaluation, May 2014, August 2015. AP Calculus Item Bank Tagging, College Board, July - September, 2015.

College Board Consultant Training, Chicago, IL, April 2016.

AP Calculus Modules, Question and Video Author, College Board, May 2016 January 2017.

AP Calculus Standard Setting Panelist, Kansas City, MO, June 2017.

TI in Focus: AP Calculus, A series of videos based on the AP Calculus Exam, with Tom Dick, for Texas Instruments, 2017, 2018, 2019.

Review of Khan Academy Calculus Videos, for the College Board, August 2017.

Member, College Board-MAA Mutual Concerns Committee, San Diego, CA, January 2018.

*Honors and Awards:*

Elected to Phi Beta Kappa, May 1977

Elected to Alpha Sigma Nu: Jesuit Honor Society, May 1977

Boston College Nominee for a Danforth Fellowship, March 1978

Recipient of a Gold Key Award for service to the Boston College Community, May 1978

Honorable Mention: National Science Foundation Fellowship Program, May 1978

Elected as a Marshal in The Order of The Cross and Crown of Boston College, May 1978

Awarded Departmental Honors in Mathematics, May 1978

Received the Alice Bourneuf Award in Economics, May 1978

Graduated Summa Cum Laude from Boston College, May 1978

Recipient of a three-year Fellowship from The University of New Hampshire, September 1978

Recipient of a Dissertation Fellowship from The University of New Hampshire, Spring 1984

Elected to Sigma Xi: Scientific Honor Society, 1984

Nominated for Professor of the Year, 1989-1990

Dean's Salute for Excellence Award, Fall 2000

Elected to Phi Kappa Phi, Spring 2012

APSCUF Distinguished Service Award, 2019.

*Teaching Experience:*

*Bloomsburg University:*

Math Thinking, Finite Mathematics, College Algebra, Essentials of Calculus, Analysis I, II, Introduction to Statistics, Probability and Statistics, Statistical Methods, Probability Models and Applications, Special Topics: Statistics, Introduction to Statistics via Distance Education.

*Colgate University:*

Microcomputer Applications in the Sciences, Introduction to Minitab, Introduction to Statistics, Calculus I, Calculus II, Probability and Statistics I, Probability and Statistics II

*The University of New Hampshire:*

Calculus I, Calculus II, Differential Equations Recitation, Multidimensional Calculus Recitation, Probability and Statistics for Applications

*Portsmouth School System:*

General Mathematics, General Mathematics: Adult Education, Introduction to Computers, BASIC, Adult Education, Computer Literacy

*Pease Air Force Base:*

General Mathematics

**Service:**

*Bloomsburg University:*

Brian Callery vs. HOP Energy, LLC and DDM Energy

Chair, State APSCUF Chapter Presidents, 2009-2019.
BU Strategic Planning Steering Committee, 2009.
BU Inauguration Co-Chair, 2008.
Member, Search Committee, Head Women's Basketball Coach, Spring 2008.
Interim Director, BU Honors Program Fall 2006; Director, Spring 2009 - Spring 2015.
Governor Rendell's Class Size et al Committee, 2004-2005.
Summer Chairman, 1997-2001, 2003-2005
University Grievance Committee, 1999, Chair 2000-2003
Bloomsburg University APSCUF President 2003-2020: Co-Chair, Planning and Budget, member of
    Budget Subcommittee, Space and Facilities, Secretariat, President's Advisory Committee; advisor
    to the BU Foundation Board and the BU Council of Trustees.
Member, BU Presidential Search Committee, 2007.
Member, University Distance Education Committee, 2009, 2010.
Member, State APSCUF Meet and Discuss Committee, 2002-2005.
Member, State APSCUF Negotiations team, 2005-2006.
University Academic Grievance Committee, 1995-1996, Chair, 2001-2002.
Faculty Council on Scholarship, 1996, 2002.
University Promotion Committee, 1995-1997.
Department Five Year Review Committee, 1995-1996 (Co-Chairman), 2005-2006.
Department representative to COST Learning Community, 2005-2006.
University Enrollment Management and Clientele Study Group, Recruitment Subcommittee Chairman,
    1994-1995.
Prometheus Special Project Work Group, Subcommittee Chairman, 1997.
Department Promotion and Sabbatical Committee, 1994-1995.
Conflict of Interest Committee, 1994-1995.
Internship Planning Committee, 1993.
Library Technology Committee, 1993.
Special Initiatives Review Committee, Fall 1991.
Mathematics/Statistics Curriculum Committee, 1990-1995, Chairman, 1990-1992.
Department Evaluation and Tenure Committee, 1990-1993.
Department Evaluation Committee, 2011, 2014, 2015.
Recruitment and Retention Committee, 1991-1995, Chairman, 1992-1995.
Interactive Technology Committee, 1990-1991.
Personnel Committee, 1999-2002, Chairman.
Search and Screen Committee, 1992-1993, Chairman; 1998-1999, Chairman.
Minitab Seminars, 1990-1992.
KME presentation, Fall 1990.
Math Club presentation, Spring 1994.
Scholar Athlete Luncheon, Invited Guest, 1991, 1994, 1999, 2007, 2013, 2014.
Honors Interviews, 1994, 2000, 2002, 2007.
Outcomes Assessment grant and conference committee, 1998-1999.
Parents' and Family Weekend Information Station, Fall 1998.
SSHE Faculty Professional Development Peer Reviewer, Fall 1993.
Foundation Board review, Spring 1994.
Department Colloquium, The Statistical Analysis of Cancer Chemoprevention Experiments, Fall 1990.
Department Colloquium, The TI-89 Graphing Calculator, Fall 1999.
Advisor, Bloomsburg University Ice Hockey Club, 1990-1992.
Faculty Mentor, BU Women's Basketball Team, 2004-
BU Foundation Naming Committee, April 2009.
Music Ministry, BU Catholic Campus Ministry, 2008-2011, 2012-2020.
CU STEM Magnate Committee, 2013.
Strategic Enrollment Management Steering Committee, 2016-2017
Admission presentation to tour groups, 2016-2020.

Brian Callery vs. HOP Energy, LLC and DDM Energy

Ad Hoc Distance Education Committee to evaluate outside proctoring companies, Fall 2017.

*Colgate University:*

Department of Mathematics Secretary, AY 1984-1985, 1985-1986

Department of Mathematics Calculus Syllabus and Textbook Selection Committee, AY 1984-1985

Active Member of Colgate's Chapter of Phi Beta Kappa, 1984-1989

Department of Mathematics Problem of the Week Author, 1985-1987

Colloquium Coordinator, Division of Natural Sciences and Mathematics, AY 1986- 1987

Department of Mathematics Advising Session, Fall 1986, 1987, 1988

Faculty Link Advisor, Fall, 1987, 1988, 1989

Faculty participant in Wilderness Adventure for incoming students, Fall 1988

Department of Mathematics, Freshman Prize Exam Author, Spring 1987, 1989

Committee to develop Microcomputer Applications in the Sciences, Established the Department of Mathematics Computer Lab, 1987-1989

TEX Seminar, Spring 1989

Academic Affairs Board, Term: 1989-1990

*Statistical Consulting:*

Dr. R. Hoffman, The Statistical Analysis of Growth Curves, 1985-1986

Mary Jane Walsh, Survey and Statistical Analysis of Library Holdings and Use, Fall 1986, Fall 1988

Dr. P. Gares
  1. Regression Analysis and Diagnostics, Eolian Sediment Transport and Dune Formation on Undeveloped and Developed Shorelines, 1986
  2. A Computer Program for the Calculation of Water Exchange, 1989

Dr. J. Carter, Database Management of 1) Professors of Asian Studies, and 2) Music Collection Card Catalog, 1986

Dr. R. Fuller, Analysis of Variance on Stream Insect Distributions, 1988- 1989

Dr. J. McLelland, Regression Analysis of Geological Data, 1989

Dr. A. Goldstein, Multivariate Regression Analysis, Magnetic Susceptibility Anistrophy and Strain in Deformed Rocks, 1989

Colgate Alumni Corporation, Design and Statistical Analysis of Alumni Corporation Survey, 1989

Connie Jones, Statistical Analysis of The Effect of Maternal Emotions on Children's Personality Organization, 1989

Dr. Turner, Statistical Comparisons of Methods for Testing the Construct Validity of Valuation Questions in Contingent Valuation Mechanisms, 1989

Michael Williams, Regression Analysis dealing with the Equilibrium between Garnet and Biotite, 1989

Dr. William Oostenink, Regression Analysis of Concentration of a Substance versus its Spectral Absorbance, 1990

Dr. Sheila Jones, Analysis of Survey Data, 1992-1993 Charlie Remington, Berwick United Way, 1994

James Tomlinson, statistical analysis of data for legal proceeding, Fall 1998

**References:**

Dr. Scott Inch, Department of Mathematics, Computer Science, and Statistics, Bloomsburg University, Bloomsburg, PA 17815, (570) 389-4509

Dr. Robert Marande, Former Dean, College of Science and Technology, Bloomsburg University, Bloomsburg, PA 17815, current address: 106 Arbutus Park Road, Bloomsburg, PA 17815, (570) 784-8809

Dr. Jessica Kozloff, President Emerita, Bloomsburg University, Academic Search, 1825 K Street NW Suite 705, Washington, DC 20006, (480) 299-4872

Dr. Thomas Dick, Department of Mathematics, Oregon State University, Corvallis, OR 97331

Dr. Craig Wright, Senior Director, AP Precalculus Assessment Specialist, AP Curriculum and Assessment, The College Board, (215) 696-9841

**Depositions / Testimony:**

None in the last four years.