# Exhibit B

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ----------------------------------x
    RYAN MELVILLE, on behalf of himself
3   And all others similarly situated,

4                   Plaintiff,

5           v.                              21 CV 10406(KMK)

6                                                CONFERENCE
    HOP ENERGY, LLC,
7
                    Defendant.
8   ----------------------------------x

9                                       United States Courthouse
                                        White Plains, N.Y.
10                                      November 29, 2023

11

12

13  Before:  THE HONORABLE VICTORIA REZNIK, Magistrate Judge

14

15                      APPEARANCES
16
    WITTELS, McINTURFF, PALIKOVIC
17       Attorneys for Plaintiff
    J. BURKETT McINTURFF
18  DANIEL BRENNER

19
    SHUB & JOHNS
20       Attorneys for Plaintiff
    JONATHAN SHUB
21
22  NIXON PEABODY, LLP
         Attorneys for Defendant
23  MATTHEW THOMAS McLAUGHLIN
    KEVIN SAUNDERS
24
25  *Proceeding recorded via digital recording device.
```

1          THE COURT:  Good morning.

2          This is the Melville case.  Will counsel please

3    introduce themselves, starting with the plaintiff.

4          MR. McINTURFF:  Yes.  Good morning, your Honor.  This

5    is Burkett McInturff.  I also have with me my colleague, Daniel

6    Brenner.  We're from the law firm Wittels, McInturff, Palikovic

7    on behalf of plaintiff in the proposed class.

8          MR. SHUB:  Good morning, your Honor.  Jonathan Shub,

9    Shub & Johns, on behalf of plaintiff as well.

10         MR. McLAUGHLIN:  And good morning, your Honor.  This

11   is Matthew McLaughlin.  I'm joined with Kevin Saunders from

12   Nixon Peabody on behalf of the defendant.

13         THE COURT:  All right.  Good morning, everyone.

14         So we're here for a status update to address the

15   issues that the parties submitted in a joint status letter on

16   November 21st.  I had been hopeful after receiving the previous

17   letter that the parties were working towards a resolution, but

18   it seems like there's a hiccup in the process.

19         So I was looking back at my notes from our

20   conference.  So my first question is regarding sampling and the

21   sampling methodology.  So where we had left it is that I had

22   told the parties to meet and confer regarding the sampling

23   methodology and to report back to me as to the status of those

24   negotiations with the goal of moving towards a resolution of

25   getting the sample contracts produced.

1        So, Mr. McInturff, where do things stand with the

2   sampling protocol, or the sampling methodology?

3        MR. McINTURFF:  Sure, your Honor.

4        So we have taken a bit of an alternate path.  As

5   relayed in our initial status update, plaintiffs had proposed a

6   sampling methodology that the defendants were not willing to

7   agree to, so, as a fallback, we agreed to review the contracts

8   that defendant had pulled in the case called ^Calorie v. Hop

9   Energy, which is pending in Pennsylvania Federal Court.  We

10  reviewed those sample contracts.  They were produced to us I

11  think on the 17th and we reviewed them within a week and raised

12  some questions regarding the data that we had been given trying

13  to line the contracts up with the actual pricing data that we

14  have.  We raised that issue in the letter that was submitted to

15  your Honor last week, but -- and I'm happy to report that

16  yesterday afternoon the defendant provided the information that

17  we had requested.  We reviewed -- you know, last night and this

18  morning, we reviewed the additional information that was

19  requested.

20       We do have follow-up questions, but we're hopeful

21  that if the follow-up questions about some of the issues that

22  the new information has caused to surface, we're hopeful that

23  if those questions are answered promptly, that we can then be

24  in a position, from plaintiff's standpoint, to sort of bypass

25  the sampling process and simply propose a stipulation with the

1    goal of being able to agree with defendant that, for any given

2    purchase reflected in the purchasing data that they've

3    produced, the parties would agree that that purchase was

4    governed under, you know, a certain contract, whether it be one

5    version or the other.  So that would be the goal is to line up

6    the actual purchases that are the subject of the litigation

7    with the underlying contractual terms.

8            As soon as we get answers to our questions, we'll

9    propose a stipulation.  I'm hopeful that we'll be able to

10   stipulate.  If not, we'll have to come back to your Honor with

11   plan B on how to deal with this issue, but that's where we

12   currently stand.

13           I will say that we -- in order for this to work in a

14   timely fashion given Judge Karas' clear signal to the parties

15   that we're to, you know, pursue discovery with dispatch, we

16   need quick turnaround on these items because, as your Honor can

17   appreciate, we've been working on this issue now since July.

18           THE COURT:  All right.  So, at this point, it sounds

19   like you have some follow-up requests.  Have those been

20   communicated to Mr. McLaughlin?

21           And what's your position, Mr. McLaughlin?

22           MR. McINTURFF:  Well, I -- if I could just respond,

23   your Honor.

24           One follow-up request has been communicated.  The

25   other ones that relate to the information that was provided

1    yesterday afternoon have not been transmitted.

2              THE COURT:  Okay.

3              Mr. McLaughlin, what is your position on the status

4    of this compromise agreement about the contracts?

5              MR. McLAUGHLIN:  Sure, your Honor.

6              Just a couple of corrections from defendant's

7    perspective.

8              We did not say we were not willing to agree to the

9    proposed sampling methodology that plaintiff proposed.  If your

10   Honor recalls, the whole reason we were discussing a sampling

11   of contracts was to determine whether the relevant language at

12   issue in this case had changed over time or in various branches

13   in the contracts that are at issue.  And we had advised the

14   plaintiff that we had pulled running searches of the different

15   branches over the different years in the other case contracts

16   that we thought was the best way to identify whether there were

17   any changes in that language and, if not, then the parties

18   could likely potentially stipulate to some language about

19   which -- you know, what is the operative language in the

20   contracts without reviewing all ^200,000 contracts.  That was

21   our understanding of the process.

22             What we got instead from plaintiff after our last

23   conference was a proposed stipulation and court order on the

24   front end rather than after any review of contracts that said

25   here's a -- that included a methodology of us pulling an

1    additional 200 contracts based on their proposed methodology

2    and then giving them carte blanche to ask us for any additional

3    contract samples that they wanted thereafter and us agreeing to

4    a number of stipulated facts in their proposed stipulation.

5         What we said was we would indeed run the sampling

6    search for the additional 200 if they wanted us to, but we were

7    not willing to enter into any stipulation at this point,

8    because I don't believe that was contemplated by anybody at the

9    last conference, and that we would -- and we weren't going to

10   agree to have an ongoing sampling protocol where they tell us

11   after 200 that they want 200 more.  So that was our -- we

12   said -- and it was in writing.  I communicated it to

13   Mr. McInturff.  We would run the additional 200, but that was

14   all we were willing to do.  And I think that was consistent

15   with what was discussed at the last conference.

16        Now, we are -- what he's now asked us for is, if I

17   understand -- you know, we're happy to answer the additional

18   questions, but the questions are sort of changing the goal

19   post.  What we're hearing now is they want to be able to use

20   these contract samples to support some damages methodology and

21   tie it to customer account data.  I mean, that goes far beyond

22   what we were talking about in terms of pulling sample

23   contracts.  And so I do think that that is different than what

24   we had agreed we would do.

25        MR. McINTURFF:  Can I respond, your Honor?

1           MR. McLAUGHLIN:  The questions are the follow-up

2     questions with respect to -- so notwithstanding that, we did

3     turn over some additional -- he asked some questions on the

4     database data that we provided that was not something that was

5     part of our last conference at all, but we have turned over a

6     huge volume of sales data to the plaintiffs.  They're now

7     asking questions as to what -- you know, how do we tie some of

8     the sales data to the sample contracts that we've seen.  You

9     know, that's, to me, outside the scope of what we were talking

10    about.

11          And so we have been providing -- I think have been

12    very forthcoming with information, again, geared toward the

13    parties' mediation scheduled for next week because that was

14    sort of the global understanding, that we would focus on what

15    the parties need to get through mediation so that we're not

16    wasting money that could be best used for other purposes,

17    assuming we can get to a settlement, but that seems to be what

18    plaintiff wants to do, which is just spend money and create

19    problems or raise issues that don't really exist.

20          So the bottom -- so the short answer to your question

21    is we're prepared to do the 200 sample -- additional contract

22    samples, but this never-ending back and forth of raising

23    questions and then, you know, trying to figure out a

24    stipulation at this stage, when we haven't even -- they haven't

25    even told us if they're satisfied with the language in the

1    contracts I just think is premature.

2            MR. McINTURFF:  Can I respond, your Honor?

3            THE COURT:  Sure.

4            MR. McINTURFF:  This is Burkett McInturff.

5            This is very simple and, with all due respect to my

6    colleague, I don't believe that is a productive approach to

7    this simple issue.

8            This class action accuses the defendant of breaching

9    the pricing term in its customer contract.  And the issue that

10   we're talking about here today arose from the fact that we

11   said, defendant, why don't you tell us which customers are

12   covered by this pricing term and other pricing terms and what

13   we heard back was we can't, we can't do that.  So then we

14   started talking about a sample to review the contracts.  At the

15   same time, the defendant has now produced the charging data

16   that we had requested for potential class members.

17           As an aside, the defendant has represented to your

18   Honor that there are 200,000 contracts, yet they've only

19   produced charging data for 114,000 customers.  By the way, we

20   asked the defendant to explain that discrepancy.  They have not

21   responded, but that's an aside.

22           So the question raised by this case is what is the

23   relevant contractual pricing term for each of the defendant's

24   customers and did they follow that pricing term with respect to

25   each of the purchases the customers made.  So they've produced

1    the sales data, and the sales data shows that customer

2    purchases were made pursuant to certain plans.  So once we get

3    the sales data, we have to line up the contractual term with

4    the plan the customer was under, again, because defendant

5    doesn't have this information in readily available format,

6    which has been a surprise to everybody involved in this case.

7            What we are entitled to and what we need to do with

8    this is to look at each individual charge within this database

9    and be able to determine what was the pricing term that

10   governed that charge, and then we can assess to put on our case

11   to show that the pricing term was violated.

12           For example, in the main plaintiff's, Mr. Melville's,

13   instance, we know that the contract that governed all of his

14   transactions said that he would be charged the promotional

15   prevailing retail price for first-year customers.  We got an

16   expert.  Our expert went out and determined what the prevailing

17   retail price was and it showed drastic discrepancies between

18   what is available -- publicly available data about prevailing

19   retail prices and what Mr. Melville was charged.  Again, this

20   is a class action, so we can -- Mr. Melville can represent any

21   other similarly situated customers and we're trying to

22   determine which customers are similarly situated.  That's the

23   purpose of this exercise, what contracts apply to which

24   customers in which geographies and which purchases.

25           So for defense counsel to claim that all we're doing

1    is looking to see if the pricing term changed across various

2    contracts is only half of the picture.  The other half of the

3    picture is to connect that pricing term to purchases.  We're

4    not trying to do this to spend defendant's money.  We're trying

5    to do this to prosecute our case, which is within our rights.

6    And quite frankly, for defense counsel to sit here today and to

7    claim that this is a never-ending process and that it's done

8    simply to raise litigation costs is disingenuous.

9            Again, what we said at the beginning of the call --

10   what I said at the beginning of the call was we received

11   yesterday afternoon, at 4:30, an answer to our question which

12   we, unfortunately, had to raise to your Honor that has caused

13   additional questions.  We think we'll be in a position, if we

14   get our questions answered promptly, to propose a stipulation

15   to defendant to put this issue behind us, because all we're

16   trying to do is identify which purchases were covered by which

17   contracts during which period, which, again, surprisingly,

18   defendant could not easily tell us.

19           So what I think is the appropriate thing to do is we

20   will transmit our remaining questions.  Again, our outstanding

21   question is you've represented that there are 200,000 contracts

22   in the database, but you've only produced data for 114,000

23   accounts.  We asked defendant about that on November 21.  It's

24   now been more than a week and they haven't responded.  But we

25   have a few additional questions based on the data that was --

1    the information that was produced yesterday.  We're going to

2    transmit that today and we ask that the defendant respond

3    within three or four business days.  I think that's the best

4    way to move forward.  We're trying our best to work past the

5    stipulation -- to work to a stipulation because, again, this

6    issue has been outstanding since July.

7            THE COURT:  So, Mr. McInturff, with respect to

8    determining the pricing terms that apply in the contracts, is

9    that something that is determined by looking at the contracts

10    themselves, meaning the pricing terms -- the sample that you're

11    going to get has pricing terms in it and so your -- so you're

12    getting information about whether or not those pricing terms

13    are similar across the contracts that were produced?  Is that

14    accurate?

15            MR. McINTURFF:  So the defendant has already produced

16    several hundred contracts that it had produced in the other

17    case.  We reviewed those contracts.  We've sort of broken them

18    down into the various types that they exist.  Now we're trying

19    to match up those contracts with the purchases that the

20    defendant has produced within its data.

21            So, for example, if your Honor was a customer in 2022

22    and you were on plan XYZ, we're trying to match up plan XYZ

23    with the contracts.  Again, our goal here is to stipulate with

24    defendant that every purchase made under plan XYZ was pursuant

25    to this contract or to that contract.  It's not a very

1    complicated issue.

2              We've reviewed the contracts and then when we looked

3    at the data, you can't tell from the data they've produced

4    which contract applies automatically.  The contracts are not --

5    they're not such that you can just -- you can just understand

6    from the charging data which one applies.  So we're going to

7    try to link the two with a stipulation that says if a customer

8    was charged under this plan, this contract applies.

9              We're -- again, we've taken -- we would have

10   preferred a much more methodologically sound sample contract,

11   but in order to move forward on this issue, we have taken

12   defendant's methodology, we reviewed the contracts defendant

13   produced, we've issued these follow-up questions to try to link

14   up the contracts with the data, and we're prepared to propose a

15   stipulation.

16             Again, if defendant is -- if defendant can't agree to

17   a stipulation at that point, we're going to have to get a plan

18   B and we're going to request that the defendant simply produce

19   the 200,000 contracts and then we'll do our analysis, because,

20   as your Honor had originally suggested in October, we didn't

21   want to take the 200,000 contracts because it was going to be

22   substantial additional work for us, but this process has now

23   proven to be just as much work because, unfortunately, I don't

24   believe the defendant is taking this process seriously.

25             THE COURT:  Okay.  Well, putting aside those

1    issues --

2              MR. McLAUGHLIN:  Your Honor, can I respond?

3              THE COURT:  Yes, you can, Mr. McLaughlin, but let me

4    ask you first, putting aside whether you thought that that was

5    part of the agreement in doing sampling, what is defendant's

6    problem with providing the linking data between individual

7    charges or purchases with particular contracts?  Is that

8    information that the defendants have and can obtain and can

9    provide?

10             MR. McLAUGHLIN:  So, I -- again, possibly, but Hop

11   has all of the contracts.  The contracts -- but they are not --

12   they are not linked in the system in a way that we can say this

13   particular transaction or this account we can easily match up

14   to the contract.  We can -- it's a manual process that can be

15   done.

16             But I think the more important fact is, and it's the

17   answer to the question that your Honor asked Mr. McInturff,

18   which is do the contracts set forth the pricing.  They really

19   don't in the way that is relevant here.  The contracts across

20   the Hop empire are essentially the same.  They have either a

21   fixed price or a capped price, and that changes depending on

22   the day that the particular customer and the geography of the

23   particular customer enters into that contract.  It depends on

24   what the price of heating oil is at the time that they set that

25   cap or fixed price.  Those are essentially the two types of

contracts, but then they all say, effectively, either at the

end of your allocated number of gallons of oil that's set forth

in the contract, and that's variable, too, or at the end of the

term of your one-year contract or if our -- you will revert to

our prevailing retail price.  And if our prevailing retail

price on the day of your delivery is lower than your capped

price, you'll get the lower of the two.  And that language

appears, from our view and from the document -- from the

sampling that we sent to plaintiffs from the other case, that

operative -- that concept that you're going to get either your

standard contract price or the prevailing -- Hop's prevailing

retail price, is consistent.

And so there's not really a need, from my

perspective, to tie the contract -- the specific contract to

the database, to the pricing, because that is what all of the

contracts say.

And then this case, the Melville class, and I raised

this in the last call, is limited to those customers that had

the first-year promotional concept built into their contract,

and that was language that was in lieu of this prevailing

retail rate price that exists in Hop's contracts in all of its

branches, and that is limited to Connecticut accounts in a

several-year period.  And we had talked about this at the last

conference.

So when plaintiff is now asking us for all of this

1    information, you know, going beyond these Connecticut customers

2    that have the first-year promotional language that is the class

3    that they have pursued in this case, I just think it's not

4    proportional and we should be focused on the issues at issue in

5    the claims in the complaint and not all of the customers beyond

6    that.  But at the end of the day, that's the language that's

7    relevant.

8         MR. McINTURFF:  Your Honor, this is Burkett

9    McInturff.

10        THE COURT:  I guess what I'm confused by is you have

11   sample contracts that you produced, Mr. McLaughlin.  Are those

12   sample contracts limited to that promotional language in

13   Connecticut over certain years that you believe are the subject

14   of this class?

15        MR. McLAUGHLIN:  No.  And that's -- we gave them

16   beyond that.  We were trying -- so we gave them -- because the

17   ^Calorie case in Pennsylvania is a much broader class.  That

18   includes the Melville class plus anybody that has contractual

19   language related to prevailing retail price.  So we gave them

20   the snapshot of all of our contracts.  What they will see is

21   that the only place that that promotional language appears is

22   in Connecticut.  They didn't want to do searches, which was

23   another option, of that phrase of our -- you know, of our

24   contract database, to produce samples of contracts that just

25   have that language, which also made sense to me, but that's the

1    universe, from my perspective, of the relevant contracts.  But

2    they have much more -- they have -- they've been given

3    contracts beyond that.

4              And their proposed protocol for 200 additional

5    contracts doesn't seek to limit it to the prevailing or

6    first-year customers either.  It seeks, you know, a sample

7    across Hop's entire customer database, which, again, is not

8    going to get them what it seems like they should be interested

9    in, which are the contracts at issue in their proposed class.

10             THE COURT:  Well, what I understood now is that you

11   have a compromise on the table, which is that Mr. McInturff and

12   the plaintiff has agreed to take those ^Calorie sample

13   contracts which they've reviewed and use that as the basis of

14   their review of the contract language and now have follow-up

15   questions with respect to those contracts.  And the specific

16   questions have to do with linking individual charges to

17   particular types of contracts.  So I thought that was what's on

18   the table, not these additional 200 contracts.  That seemed to

19   be an initial proposal that's not what you're doing now.

20             So, at this stage -- so it sounds to me like you have

21   individual charges -- you have charges that were provided to

22   you, Mr. McInturff, but in the aggregate, sort of charges in a

23   database, and then --

24             MR. McINTURFF:  Database --

25             THE COURT:  Is that right?

1          MR. McINTURFF:  Sorry.  Yes.  Database data.

2          THE COURT:  Right.  So that you have database data

3   with individual charges, but you're not able to link it with

4   specific contracts at this point.

5          MR. McINTURFF:  Correct.

6          THE COURT:  And then you separately have a sample of

7   contracts with the promotional language plus other language

8   that's relevant to your case and you're trying to take those

9   200 contracts, or however many you received, and link it to the

10  individual charges in the database.

11         I guess the question is, Mr. McLaughlin, is it your

12  position that you don't need to tie that data together because

13  all the sample contracts you've provided that are relevant --

14  you know, those individual -- the language is the same, so

15  whatever charges you have applied to them all equally, meaning

16  there's no reason to distinguish between one charge or the

17  other to a particular contract?

18         MR. McLAUGHLIN:  No.  I think the charges will be

19  different because the price -- the capped or the fixed price

20  would likely be different.  And so it would -- on any

21  particular delivery for those particular customers, the price

22  would be potentially different because they entered into

23  contracts at different periods of time.  So that would be

24  different.  But sort of the pricing differential, whether

25  they're being charged the contract -- the capped price or the

1   fixed price versus the prevailing retail price that was in

2   effect at the time of the delivery would be the same.  The

3   numbers would be different, but they have all the numbers.

4           THE COURT:  So how are they looking at those numbers

5   in a database and knowing which contract has the prevailing

6   promotional -- the prevailing rate promotional language and

7   those that don't?  How would they know that looking at the

8   database you provided?

9           MR. McLAUGHLIN:  Well, they wouldn't -- just looking

10  at the database, they wouldn't, but there is not a contract

11  that doesn't have that language that we've found.  They all

12  revert to that language.

13          THE COURT:  So it's your position, it sounds like,

14  that, because all the contracts have the same language, there's

15  no need to tie it to individual charges in the database --

16          MR. McLAUGHLIN:  Correct.

17          THE COURT:  -- because it doesn't change?

18          So, Mr. McInturff, from your perspective, if

19  defendants are saying all the contracts have the same language,

20  why is it important for you then to tie them to individual

21  charges?  It sounds like you have the information potentially

22  in the aggregate to be able to propose a stipulation along the

23  lines of what you had in mind.

24          MR. McINTURFF:  So just to be clear, defense counsel

25  is representing on the record that the contract that

1    Mr. Melville has for the variable rate charges that he was

2    charged applies to all customers of Hop that were charged a

3    variable rate for home heating oil?

4         MR. McLAUGHLIN:  No, that's not what I'm saying.  I

5    haven't made any such representation.  What I have said is the

6    concept of the prevailing retail rate is set by the company at

7    the branch level at various points in time and that whatever

8    delivery happened -- whatever delivery happened on that

9    delivery date for that branch, the customer, if they are being

10   charged their prevailing retail rate or their first-year

11   promotional retail rate versus their capped rate or their fixed

12   rate, that number -- that number is the number.  That number is

13   not going to appear in the contract.  It's not stated because

14   that number changes.  So it's not going to be in the contract

15   itself.  It will be in the database.  You have that information

16   in the database.  You have all of the information about what

17   every customer was charged for every delivery.

18        MR. McINTURFF:  So, your Honor --

19        THE COURT:  Go ahead.

20        So when you have the actual contract, you have the

21   customer name or data that you can link to the database?

22        MR. McLAUGHLIN:  Yes.

23        THE COURT:  Or you're saying --

24        You have that, Mr. McInturff?

25        MR. McINTURFF:  Well, let me back up because this is

1    a very simple issue that has gotten confused and I think the

2    first thing to understand is the -- when we filed the case

3    after we won the motion to dismiss, the defendant moved to stay

4    our case pending this other action in Pennsylvania and Judge

5    Karas made very clear that the other action in Pennsylvania is

6    about capped price customers.

7           So the defendant offers various products.  They offer

8    a capped price product where your rate is not going to go above

9    a certain level.  They offer a fixed priced product where your

10   rate is going to be the same no matter what you consume.  And

11   then, as Mr. McLaughlin represented, after a certain period of

12   time, customers roll from those capped or fixed priced products

13   to variable rate products.  Our case is about the variable rate

14   people.  Judge Karas made clear that the Pennsylvania case is

15   about capped price products and our case encompasses variable

16   rate products.  So when you go and you look at the database,

17   what you see is there are capped price charges, there are

18   variable charges, there are fixed price charges.

19          The purpose of this exercise is, again, Mr. Melville

20   brought a breach of contract, a breach of duty of good faith

21   and fair dealing claim, saying if you look at the contract that

22   I have, it says my variable rate is going to be the promotional

23   prevailing retail rate for first-year customers and I've

24   calculated that rate and you charged me more than that rate;

25   therefore, you breached the contract and violated the duty of

1    good faith and fair dealing.

2         The question here is what language applies to

3    defendant's other variable rate customers.  If your Honor will

4    recall, in July, with defendant's prior counsel, your Honor

5    ordered the company to essentially produce all of its

6    contracts.  At that point, we found out that they couldn't

7    produce -- that they didn't have form contracts, they didn't

8    have like a template that they used and, instead, they're

9    storing these 200,000 contracts with each individual account.

10   The question we're trying to answer is, for every variable

11   charge in this database, which is covered by our class, as

12   ruled by Judge Karas, for every variable charge, what is the

13   contractual pricing language.

14        The goal of what we're doing here is we're trying to

15   stipulate with defendant what that language is.  They've

16   produced a bunch of contracts from the Calorie case.  There is

17   substantial overlap in the contractual language across the

18   geographies.  It's not identical, but it is very, very similar.

19   And so our goal is to stipulate with the defendant that this

20   language applies to variable rate purchases.

21        Defendant has raised the issue that the language of

22   Mr. Melville might be slightly different than the language of

23   other customers in other states.  We can certainly deal with

24   that in the Rule 23 process, but we need to begin.  We need a

25   starting point where we can say these customers served on the

1    variable rate at this time had this contract in effect, which,

2    again, it shouldn't be that hard, but since we've got the

3    charging data, you can't -- when you look at the database data,

4    you know, it says customer A charged a variable rate, but what

5    you can't do is look at that fact that they're being charged a

6    variable rate and then understand that maybe their pricing

7    language was like Mr. Melville's or maybe it was like somebody

8    else's who had slightly different pricing language.  That's

9    what --

10          THE COURT:  Mr. McInturff, how many contracts total

11   would you be seeking to tie to that database?

12          MR. McINTURFF:  Potentially, I think, in terms of

13   contractual pricing language, as far as I know now, in terms of

14   variable contractual pricing language, I think there's probably

15   two.  I think there's probably two variations.  Maybe there's

16   some additional minor variations, but there's not a lot of

17   variation between the pricing language across time and

18   geography.

19          THE COURT:  Well, my question is slightly different.

20   Sorry.  In terms of the sample.

21          So you have a sample of contracts the defendants have

22   produced to you.  At this point, you have follow-up questions.

23   The follow-up questions include questions relating to allowing

24   you to tie the database pricing charges -- sorry, the database

25   charges with those contracts, correct?

1              MR. McINTURFF:  That's correct.

2              THE COURT:  Okay.  So how many of those contracts --

3     and from what Mr. McLaughlin said, that would be a manual

4     process because they don't seem to have that data otherwise.

5     How many contracts are we talking about that would require this

6     tying exercise?  Is it the 200 Calorie contracts?  No, it's for

7     purposes of you getting to a stipulation, which is what we're

8     focused on.

9              MR. McINTURFF:  Oh.  So, again, we've got the 200

10    Calorie contracts.  We've looked at them.  Once we can tie --

11    so there's -- you know, there's actually not 200 in them,

12    there's some duplicates, but we've looked at them, and once we

13    can -- once we get to the bottom of the data that's been

14    produced, the pricing data, in terms of identifying -- because,

15    again, these contracts, they start with the -- either a capped

16    price or a fixed price and then you get shifted to a variable

17    rate plan.  So once we understand where in the data the

18    customer's then put on a variable rate plan, what we intend to

19    do is propose to defendant a stipulation that says, you know,

20    everybody that was on this particular variable rate plan as

21    reflected in your data, you know, code, because all of these

22    names are in code.  So like if you're on code XYZ, this

23    contract applies to you.  And we're prepared to do that.  We've

24    analyzed the 200 contracts.  We're prepared to make a proposal.

25    Personally, I am not confident the defendant is prepared to

1    agree, but we're prepared to make a proposal to say, you know,

2    for every time someone has a charge under this particular plan,

3    here's the contract that applies to govern the pricing language

4    that governs that particular charge.  That's our goal.

5            THE COURT:  You have that proposal now, before

6    getting -- having your follow-up questions answered?  Because

7    I'm --

8            MR. McINTURFF:  No.  We can't fill in the blanks.

9    Like we have the proposal.

10           THE COURT:  That's my question.

11           So you have this proposal, but I'm asking

12   specifically how many contracts would you be asking defendants

13   to specifically tie to the charges in the database?  What is

14   the -- that, to me, it seems like the main follow-up question.

15   Right?  That's the main issue.

16           MR. McINTURFF:  Okay.  Well -- so, no.  The main

17   follow-up question is -- again, we've got -- imagine you make a

18   purchase and you get a receipt and the receipt has, you know,

19   15 or 20 pieces of data on that.  We have that for all of the

20   purchases times 114,000 accounts.  And so imagine you're

21   looking down at your receipt and you want to know when you look

22   at the receipt, well, what plan am I on?  Am I on the capped

23   plan?  Am I on the variable plan?  Am I on the fixed plan?  And

24   then there's no data on the receipt.  So we're saying, okay,

25   so -- but on the receipt, it has some code, so we're saying --

1   so we asked the defendant what does this code mean and the

2   defendant has responded.  And we're making progress in that

3   process.  We're trying to decipher these codes.  And then

4   ultimately, again, we may have five or six -- it all depends on

5   the numbers of codes that are in the data.  We may have five or

6   six different codes, five or six different categories of codes,

7   where we say, you know, this code equals capped price -- in

8   other words, not part of the case -- or this code equals

9   variable price -- part of the case.

10           THE COURT:  Okay.  I get it.  So you have code.  It

11  sounds like you have a couple of different iterations of data

12  you're seeking.  Right?  And those are your follow-up

13  questions.

14           MR. McINTURFF:  Correct.

15           THE COURT:  I'm just trying to understand.

16           MR. McINTURFF:  Yes.

17           THE COURT:  So you have some follow-up questions

18  about these codes and, in addition to that, are you asking --

19  will those codes be sufficient -- the answers to those code

20  questions be sufficient for you to tie individual contracts

21  that you have?

22           MR. McINTURFF:  We're hopeful.

23           THE COURT:  Okay.  So why don't we start there.  I

24  don't -- it seems to me that's where we are now.  So the next

25  step is, by the end of this week, send Mr. McLaughlin your

1    follow-up questions and whatever you want answered.  Rather

2    than a million iterations, start with those.  Those are the

3    questions that you're going to ask him.

4              Within a week, Mr. McLaughlin, so by December 8th, no

5    later than December 8th, I want you to have responses to those

6    questions or, if you can't, you know, I want you to meet and

7    confer, be reasonable with one another, if there is a vendor

8    issue or if there is some manual process that makes it hard for

9    you to answer those questions within a week, but that will be

10   the goal.

11             And then I want the parties to let me know by

12   December 15th, by joint status letter, what progress you've

13   made on reaching an agreement about these contracts and

14   potentially proposing a stipulation.

15             MR. McLAUGHLIN:  That's fine, your Honor.  And I

16   think we have been reasonable in terms of answering questions.

17             I guess I get a little concerned when we get

18   questions like, well, you told the Court that there were

19   200,000 contracts -- there are -- there were in excess of

20   that -- why do we only have a hundred and something thousand

21   entries in the sales database system.  That's -- I mean, they

22   can ask that as part of discovery.  They can ask a witness

23   that.  But I don't think that it's appropriate for us to be,

24   you know, essentially providing testimony answers on these

25   sorts of things.

1          Now, I -- so I'm happy to be reasonable.  I think we

2    have been, but -- and I know you've built into that either

3    respond or, you know, confer and be reasonable, but, you know,

4    I see that this has taken on a turn where we're getting -- you

5    know, it's like -- it's not enough that we're producing the

6    data.  They basically want us to, you know, take on -- you

7    know, answer additional interrogatories, effectively, or

8    deposition testimony by counsel, and I think that goes too far.

9    But we will be reasonable.

10         THE COURT:  I think ultimately -- I think here's the

11   thing.  I think that the plaintiffs are reasonable in wanting

12   to understand how specific charges in the database relate to

13   the contracts you've produced so that they can propose a

14   stipulation of some kind that can short circuit having to do

15   blotter sampling of the contracts in your database.  So that's

16   what we're trying to achieve, a short-circuited approach that

17   allows you all to not have to produce 200,000 contracts and

18   analyze 200,000 contracts.  It sounds like we should be able to

19   get there based on your view that the language is not that

20   different among a variety of contracts.  The plaintiffs

21   indication is that they seem to agree that there aren't that

22   many variations.  So it seems like the parties should focus on

23   trying to answer those questions relating to the database that

24   get you to an answer that ties the charges with at least the

25   sample contracts that have been produced.

1         MR. McINTURFF:  Your Honor, can I just respond on

2    this issue about counsel's claim that we're seeking testimony

3    from counsel.

4         We've issued discovery requests for charging data and

5    if we've been given incomplete charging data, it's well within

6    the ordinary meet-and-confer process to raise issues about

7    discrepancies in the data with the producing party.  They've

8    repeatedly stated that they have 200,000 contracts.  In fact,

9    they stated now there's more than 200,000.  The data should --

10   the data should reflect that.  If the data is not reflecting

11   it, it means the data that we've been produced is incomplete.

12   That means that we've not gotten the adequate discovery we're

13   entitled to.  It's very simple.  We're not trying to --

14        THE COURT:  I understand your point, but I guess a

15   better way to handle it would probably be just to say have you

16   produced all of the data that you have, that 114,000, whatever

17   they have in the database, and they can confirm if it's

18   complete or not.  The fact that he separately said there were

19   200,000 contracts, at the end of the day, they can only produce

20   what they have and what exists.  Right?  That's their

21   obligation under the rules.  So ask them if it's complete.  And

22   I think Mr. McLaughlin can confirm whether they've produced all

23   the data or not.

24        Now, you can make a separate argument later that

25   says, well, there's a discrepancy.  You said -- we seem -- we

have information that there are 200,000 contracts and, yet,
only data for 114,000.  That's true.  You can raise that issue.
But there's only so much we can do beyond that.  If they say
they've produced everything and that's what exists, you can
then pursue that in depositions or in other ways to try to
understand the discrepancy.

          I understand your point.  You're entitled to know
that you have all the information you're entitled to.  But
raising -- and I think Mr. McLaughlin can answer those
questions.  But I don't know that he can then go a step beyond
and then try to identify for you, after he said he's produced
everything, why the discrepancy exists.  Maybe he can, but I
see his point that that might then lead to a fact question to
ask a witness who's in charge of organizing that database or
someone else.

          So I'm not prepared to draw the line on this phone
call because this is just one of many issues that you guys have
raised.  I think let's take it one step at a time.  Put forward
your follow-up questions, Mr. McLaughlin will do his best to
answer them, with the goal of trying to lead you all to a
stipulation that avoids production of 200,000 contracts that
need to be analyzed so that you can tie certain contract
pricing terms with individual charges in the database in an
aggregate way that will allow you to have a stipulation.  That
should be the goal right now.

1          And both parties should meet and confer in good faith

2    about this and not raise -- not cast dispersions upon one

3    another about whether or not you're acting in good faith.  I

4    take it both parties are trying to act in good faith here and

5    move the case forward.  So let's just move forward from here.

6          By the end of this week, as I said, Mr. McInturff,

7    provide your follow-up questions.

8          Mr. McLaughlin, do your best to answer them by

9    December 8th.

10         By December 15th, the parties should send me a joint

11   status letter letting me know where this issue stands.

12         What are the other issues?  I know there are many,

13   but this was a big one, I understand, dealing with the sampling

14   and the exemplar contracts and a possible stipulation.

15         So, Mr. McInturff, is the next issue the ESI

16   protocol?

17         MR. McINTURFF:  Related.  And I will gladly say that

18   there aren't that many issues and we've made progress.

19         I think the next issue is actually defendant's

20   response to our search term proposal from October 13th.  So if

21   your Honor would allow me, I can address that issue.

22         THE COURT:  And to be clear, what is this search term

23   proposal?  Is it separate and apart from the sampling exercise?

24   So it's not search terms to --

25         MR. McINTURFF:  Correct, correct.

1          THE COURT:  -- try to find contracts?  It's a blotter

2    search protocol for various custodians?

3          MR. McINTURFF:  Correct.

4          It's our -- the defendant had represented previously

5    that they wanted to focus on producing documents, so we -- and

6    as agreed, we sent them search terms, and we have now been

7    waiting seven weeks for a hit report and a response to those

8    search terms.  They told us on November 17th that they had

9    finally agreed to run our search terms to provide a hit report,

10   but it's been a week and a half since that time.

11         And again, our concern here is that we asked Judge

12   Karas for eight months discovery extension and he sent us a

13   very clear message that we only had five more months to

14   complete all fact discovery.  And so we had asked in our joint

15   letter to your Honor last week that the Court order defendant

16   to provide a hit report and a counterproposal to our search

17   terms by November 28th, which was yesterday.  We still haven't

18   gotten a response.

19         Again, this is a very easy issue.  We've actually

20   worked with defendant's ESI provider in the past.  It's Epic.

21   You send Epic your search terms and they get back to you with a

22   hit report in a day or two.  And our search terms have been

23   outstanding now since October 13th.

24         And when you combine this with the other issue that

25   we would like to raise with your Honor, which is the defendant

1    not searching -- independently searching for and producing

2    documents outside of the search term process, it leads to the

3    result that we have today, which is the defendant has produced

4    only 150, you know, discovery documents outside of sample

5    contracts and database data and that that production occurred

6    on July 18th and we haven't had a single document produced

7    since then.

8            So the first step is to get defendant to respond to

9    our search term proposal that, again, we sent seven weeks ago,

10   on October 13th.

11           THE COURT:  Okay.

12           Let me ask one follow-up question, which is, aside

13   from -- when it comes to document production, is this protocol

14   supposed to cover -- aside from I guess the issue you said

15   which is outside of the protocol, you want defendants to be

16   producing documents that they know exist in other locations

17   separate and apart from the protocol, but is there any other --

18   there's the sampling issue and the exemplar contracts and then

19   there's this protocol for document production.  Would that

20   cover -- once you agree on these search terms and protocol,

21   cover all of the document production that's owed in this case?

22           MR. McINTURFF:  To our knowledge today, yes.

23           THE COURT:  Okay.

24           So, Mr. McLaughlin, what is the defendant's position?

25   Why have you not responded to the search term proposal?

1          MR. McLAUGHLIN:  Well, it's not true that we haven't

2     responded, your Honor.

3          First of all, the parties agreed and it's -- I'm just

4     frustrated to hear Mr. McInturff suggest that he sent us these

5     search terms and he was expecting us to immediately get back to

6     him.  The parties agreed that we were holding off on underlying

7     merits discovery until after the mediation next week.  And we

8     were focused on what they needed -- what each side needed to be

9     able to go in to the mediation next week and be able to assess

10    the case.  And that's what we have been focused on.  So it's

11    not true that we've been sitting on our hands and not

12    responding to their protocol.

13         What we did instead was the -- the ESI protocol

14    contemplates that they propose search terms, we respond.  That

15    would include proposing to narrow the search terms, additional

16    search terms, whatever we want.  What we said was we will --

17    rather than engage in that process in the front end, we'll run

18    all of your search terms and then we'll have a discussion based

19    on the hit count to see where it makes sense to narrow it.  And

20    that's what we're prepared to do.

21         The issue is we are -- so if your Honor recalls, we

22    agreed to a very sweeping database collection, or document

23    collection.  We have essentially collected the company's entire

24    share drive, which is, you know -- as well as the e-mail -- or

25    the mailboxes of the relevant custodians and sent it to our

1    vendor to be able to process and run these searches.  There is

2    terabytes of data that have been transferred and is still being

3    transferred.  This has taken weeks to get the data transferred

4    because it's so voluminous.  And our vendor, as of yesterday,

5    when we asked, is still not done with the transfer and

6    processing to be able to run the search terms.  It's not

7    because anybody's delaying.  It's because we are dealing with

8    such a huge volume of data.  As soon as that's done -- they

9    have the search terms that plaintiff has proposed.  They have

10   been instructed to run them and give us the hit report.

11   Nobody's -- we're not delaying on that front.  That is what was

12   called for in the ESI protocol that we're hopefully going to

13   finalize shortly, but we haven't delayed doing anything while

14   we negotiate the final points on that.  It just takes time.

15   We've got a lot of volume of data.  It's being processed.  And

16   we'll run the search terms.  And so we're -- we've been

17   consistent on that front.  And so we're prepared to give them

18   the hit report as soon as we have it.  We just can't -- you

19   know, I can't get it from our vendor if they don't have it for

20   me.

21            THE COURT:  And do you have any update as to -- or

22   any more precise timing for when you'll get your initial hit

23   report?

24            MR. McLAUGHLIN:  I asked.  I don't.  I mean, it's

25   just that it takes -- the data -- the loading -- it takes --

1    they can't give me any definitive estimate.  They are -- they

2    are hoping it will be done this week, but they -- you know, it

3    really depends on how it comes in and is processed.  So I would

4    be hopeful that it will be done this week and that we could run

5    search terms next week.  I just can't -- I can't promise that

6    because I'm not the one doing it.  And they're not -- I mean,

7    it's kind of an automated process for it to load.

8           THE COURT:  And the search term process -- so this is

9    a data transfer issue.  You haven't even run the search terms,

10   it sounds like.

11          MR. McLAUGHLIN:  Correct.

12          THE COURT:  Okay.

13          MR. McLAUGHLIN:  But that part is the easy part.

14          THE COURT:  That part would be easy.  Okay.

15          MR. McLAUGHLIN:  Right.

16          THE COURT:  Okay.

17          MR. McLAUGHLIN:  But there's a lot of search terms.

18   I mean, they've asked us -- they have, I mean, you know, pages

19   of search terms, over a hundred -- I think 140 search terms

20   that they're asking us to run.  So it's -- you know, there are

21   quite a few terms that -- and so I suspect the volume is going

22   to be fairly large and we're going to have to negotiate that

23   once we get the hits, but we're not delaying in getting them

24   the hits.

25          THE COURT:  Okay.  And then once you agree upon the

1    search terms, you'll have to do some meeting and conferring, it

2    sounds like potentially, if it's too voluminous.  What's your

3    view on how long it would take for them to produce documents

4    after you have agreed-upon search terms?  Do you have any sense

5    of that?

6          MR. McLAUGHLIN:  I think it really largely depends on

7    the volume under the ESI protocol.  There's language that,

8    depending on the volume -- you know, there is the option to

9    discuss doing predictive learning versus sort of manual review

10   of documents.  So I think it's going to depend on what we agree

11   the universe of documents will be.

12         I mean, again, we can start -- either way, we can --

13   I expect we will do rolling productions, and so we're not going

14   to delay in starting that.  I can't give you an end date on how

15   long it will take because we just don't know how much volume

16   we're talking about yet.

17         THE COURT:  And so the discovery deadline in this

18   case, as extended by Judge Karas, at least for fact discovery,

19   is April 18th of next year and then expert disclosures in

20   September.

21         I guess in terms of depositions, how much time -- you

22   obviously, after documents are produced, Mr. McInturff, will

23   want a certain number of months to proceed with depositions, so

24   are there -- I'm assuming that's the case.  You're not going to

25   be able to proceed with depositions until the documents are

1    produced or are there some depositions that can proceed even

2    without documents?

3    MR. McINTURFF:  Unlikely.  We don't know at this

4    point because we've only had 150 documents produced, but

5    we'll -- to the extent we can begin depositions once we get

6    productions, we will, but, in my experience, it's very rare

7    that we proceed with depositions until we've reviewed at least

8    the lion's share of the document discovery.

9    THE COURT:  Okay.

10    MR. McLAUGHLIN:  And, your Honor, just -- I don't

11    mean to be -- Mr. McInturff can't help himself but say that.  A

12    hundred and fifty documents doesn't account for the 400 plus

13    contracts we've produced, doesn't include the probably millions

14    of lines of data that we've produced in electronic format.  So

15    it's just not true that we have produced 150 documents and then

16    done nothing in terms of discovery.

17    THE COURT:  Okay.

18    So in terms of -- it sounds like, though, the

19    protocol itself is something you both have negotiated and will

20    be submitted to the Court soon.  Is that true?  The protocol

21    itself.

22    MR. McINTURFF:  So the protocol was another issue

23    which was raised in our status letter.  Yesterday afternoon,

24    defense counsel gave us another term.  We returned a draft to

25    them late last night.  At this point, there is one dispute and

1    two issues remaining.  The ball is in plaintiff's court on one

2    issue and the ball is in defendant's court on the other issue.

3    We've already set up a call for 2:00 this afternoon with our

4    ESI consultant to discuss the issue that the defendants had

5    raised.

6        One way or the other, we have one crystalized

7    dispute.  We should have the other two issues worked out by the

8    end of the week.  I believe that plaintiffs can respond to the

9    issue that the ball is in our court on by close of business

10    tomorrow.  We would hope that the defendant could respond to

11    the issue that is in their court by close of business tomorrow.

12    And then we either submit an ESI protocol that contains what is

13    not in dispute for your Honor's endorsement or submit ESI

14    protocol with the couple of -- you know, one or two concrete

15    disputes and then ask the Court to rule.

16        But, critically, none of the disputes are preventing

17    the parties from moving forward.  And I will say defense

18    counsel had not disclosed to us that they hadn't loaded the

19    data.  That is news to us.  We, in fact, understood as of

20    September 29th that Hop had made disclosures about the size of

21    the custodial and noncustodial data sources that were

22    collected, which is why, on October 13th, we proposed search

23    terms.  So, to be honest, I don't understand how it's taken

24    this long, but we are where we are.

25        But on the ESI protocol, we expect to be able to

1    submit something, if not an agreed-upon version for the Court

2    to endorse, then we can supplement with a couple of issues, or

3    a more complete version where we ask the Court to rule on

4    whatever remaining disputes we have, but we should be able to

5    do that in short order.

6          THE COURT:  Okay.  I'm not going to set a deadline

7    for the ESI protocol to be submitted to me.  I'll leave it to

8    the parties to try to work out the remaining issues and to

9    decide, if you're at an impasse, whether you actually want

10   Court intervention and have me just decide it for you.

11         The same goes for the search terms.  I'm not going to

12   set a clear deadline for that, but what I will say is that I

13   expect Mr. McLaughlin to push his vendor to work as quickly as

14   possible to get the data loaded so that the search terms can be

15   applied.  And I want that issue to be addressed in the joint

16   status letter that you send me on December 15th.

17         At that point, I have an eye towards what your

18   discovery deadlines are, so we're going to have to address in

19   short order setting some deadlines after that for substantial

20   completion of documents and the like so that the parties can

21   then start scheduling depositions and be ready -- and to be

22   done with depositions and all fact discovery by mid-April.  So

23   that will probably have to be done in short order, after the

24   parties work through search terms.  So that is -- I will be

25   keeping a short leash on the process to make sure that the

1    deadlines don't slip.

2            Are there any other issues that need to be addressed

3    today?

4            Mr. McInturff?

5            Mr. McLaughlin?

6            MR. McINTURFF:  Yes, your Honor.  This is Burkett

7    McInturff.

8            That raises the last issue, which is certainly tied

9    into the timing issue, which is we found out on November 10th

10   that defendant's new lawyers are taking the position that they

11   do not have an independent obligation to search for and produce

12   documents outside of the search term process that was agreed to

13   in the ESI protocol.  And as we said in our joint submission to

14   your Honor, first of all, this was agreed to in writing with

15   prior defense counsel on June 21.  The production of 150

16   documents that I've referred to occurred on July 18th, just

17   before the defendant changed counsel.  Again, we haven't gotten

18   a production of those documents -- of documents like that since

19   July 18th.  It's well settled that a search terms protocol does

20   not relieve a party of an independent duty to search for -- to

21   perform a reasonable search for documents that can be located

22   through reasonable traditional means.

23           I'll also add that, at the October 31st conference,

24   if your Honor will recall, we had issued an interrogatory

25   asking that the defendant identify the categories of data and

1    documents that it relies on and references in setting variable

2    rates and your Honor ordered, instead of -- for defendant,

3    instead of responding to that interrogatory, that defendant

4    would identify the Bates numbers of the documents it was going

5    to produce that are responsive to that interrogatory.  Again,

6    no documents have been produced, so we haven't gotten that

7    information.

8            And then finally, on October 13th, in reviewing this

9    production from July 18th, we identified to defense counsel

10   certain categories of documents that involve changes to Hop's

11   heating oil prices and explaining those changes.  It's a

12   discrete category of documents.  And we reached out to defense

13   counsel and asked if they would go ahead and produce those

14   documents.  We did not get a response.  And then we found out

15   on November 10th, after Judge Karas had put us on a much

16   tighter discovery leash, that defendant is taking the position

17   that it can essentially rely on the search term process.  And

18   again, that is not consistent with the case law and it is

19   especially prejudicial to plaintiff given the discovery

20   schedule.

21           So we would ask that your Honor direct defendant to

22   interview their custodians, perform a reasonable search, and

23   begin producing documents responsive to our discovery requests

24   in the near term, while the parties work out the search term

25   protocol.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1          As an added benefit to negotiating search terms, when

2     we have a decent size document production of documents that can

3     be located at hand, it allows the parties to focus their search

4     term discussion.  At this point, with 150 documents, we're

5     having to rely on our past experience in other cases.  It's a

6     much less tailored project.  So it will also help streamline

7     search term negotiations if the defendant would discharge its

8     duty, interview its people, find the documents that they can

9     find through traditional means and produce them promptly.

10          THE COURT:  Mr. McLaughlin.

11          MR. McLAUGHLIN:  Your Honor, may I respond?

12          THE COURT:  Yes.  Of course.

13          MR. McLAUGHLIN:  So the communications that

14    Mr. McInturff sent to us with respect to prior counsel involved

15    prior counsel's efforts to identify certain folders that

16    existed on the share drive where it was likely documents that

17    would be relevant to the claims in this case could be found

18    after discussing those folders with custodians.  We've also had

19    those discussions.

20          The issue was and what we discussed on the last call

21    was there's not a great -- all of the -- all of the relevant

22    material exists on the share drive or in the mailboxes or in

23    the sales database.  They've got the sales database.  We've

24    identified the custodians that we're going to search mailboxes

25    of and we have captured the entire share drive to run search

1    terms through.

2           The notion that we have an obligation to run an

3    initial round of search terms separate and apart from the

4    search terms that the parties are going to negotiate, I mean, I

5    don't think there's support there.  We're not talking -- there

6    are no -- it's not like there are paper files here, which I

7    would agree we would have an obligation to review and produce

8    if they didn't exist in an electronic format as well.  That's

9    not the case here.

10          So I don't know why we're talking -- I mean, we are

11   trying to get to the point and we're -- I just heard your

12   Honor, you know, give us the instruction, which I've already

13   given, but I will reiterate to our vendor that this needs to be

14   the priority as soon as the data is loaded to run the search

15   terms so that we can start negotiating and reviewing those

16   potentially responsive documents.  To add another layer is just

17   another, to me, waste of time and energy and it's totally

18   inefficient.  They have captured -- I'm happy to share the

19   proposed search terms, your Honor, that plaintiff has -- I

20   don't think there is a category that is not represented by the

21   broad search terms that they've requested that -- where they

22   would expect us to do an additional investigation to capture

23   documents.  I think -- and it's in my experience -- this is the

24   normal course.  We run search terms to the extent we are

25   capturing all of the relevant -- you know, the relevant

1    universe of responsive documents and we use the search terms to

2    capture the relevant documents in that universe, and that's

3    exactly what's going to happen in this case.

4            THE COURT:  And is there any set of readily

5    identifiable documents like the ones that plaintiff references

6    in their letter, the joint status letter, that can be obtained

7    short of search terms that wouldn't be duplicative of your

8    search term efforts?

9            MR. McLAUGHLIN:  I don't believe so because what I

10   remember -- what I recall him referencing was running searches

11   for certain e-mails that were routinely sent and those searches

12   will be run through the e-mails in the normal course.  I just

13   think it's going to be inefficient to -- I'm not aware of any

14   to answer your question.

15           THE COURT:  Okay.  And in terms of these custodial

16   interviews that defendants are proposing, was that something

17   that you did as part of identifying what share drives to

18   search, for example, or, rather, which folders on the share

19   drives to search for purposes of the search terms?

20           MR. McLAUGHLIN:  Yes.  So we certainly spoke to

21   custodians, but where we erred on the side of

22   over-inclusiveness.  Is we agreed to literally pull the

23   company's entire share drive.  We didn't limit it to the

24   custodians that we both identified and agreed with the relevant

25   custodians whose mailboxes we were going to search.  We are

1    pulling, which is part of the problem, why it's taking long,

2    the company's entire share drive.  So it is going to capture,

3    you know, everything that exists at the company regardless of

4    if it was maintained by the particular custodian.

5            THE COURT:  Okay.  So, in general, the way I view

6    defendant's obligation here is that it's defendant's obligation

7    to produce responsive documents in response to plaintiff's

8    requests, but it is not my role to tell defendants how best to

9    meet those obligations.  It's up to defendants to decide how

10   they want to identify responsive documents and produce them.

11   They certainly have an obligation to do that and to find all

12   responsive documents subject to whatever objections they might

13   make, but I'm not going to be in a position to tell defendants

14   how best to conduct those searches to produce those documents

15   that respond to the discovery requests and that meet their

16   discovery obligations.

17           So, at this stage, I'm not going to order defendants

18   to do a separate production of documents, separate and apart

19   from the parties' search term negotiations, absent information

20   or a reason to believe that there are documents outside of

21   those search terms that could be readily identifiable and

22   produced.

23           So, at this point, I want the parties to focus on

24   producing the sample -- producing the documents and reaching an

25   agreement on the sample contracts and the follow-up questions

1    that plaintiff has, identify -- running search terms so that

2    you can negotiate the documents that are going to be produced

3    across all custodians, and to do that as soon as possible.

4            As I mentioned, I will want an update on all of this

5    in the joint status letter on December 15th.

6            If all of this -- my view on not ordering the

7    defendants to do more at this point is based on my

8    understanding that the search terms will be run as soon as

9    possible and that document productions will begin on a rolling

10    production shortly after the parties agree upon the search

11    terms to be applied and that all of this will be done quickly

12    enough to allow the parties to meet the ultimate fact discovery

13    deadline of April -- I guess it's April 18, I believe, 2024.

14    And as I mentioned, I will be checking in with the parties on a

15    very regular basis to make sure that that deadline doesn't slip

16    and that the documents get produced as soon as possible so the

17    parties can begin depositions.

18            If, at some point, it looks like documents aren't

19    getting produced quickly enough and the parties aren't reaching

20    agreement, I will set strict deadlines and may change my view

21    about ordering defendants to conduct more limited searches and

22    specific documents with specific custodians to speed up the

23    process.  At this point, I don't believe that's necessary.

24            So is there anything else that needs to be addressed

25    today?

1              MR. McINTURFF:  Not from plaintiffs, your Honor.

2              THE COURT:  Okay.

3              Mr. McLaughlin.

4              MR. McLAUGHLIN:  Nothing from defendants.  Thank you,

5    your Honor.

6              THE COURT:  Okay.  Great.

7              So I will wait to hear from the parties by joint

8    status letter on December 15th in hopes that you've made

9    progress towards reaching a resolution on these issues.  If

10   not, obviously I will quickly schedule another conference and

11   we will try to work through that and address them as soon as

12   possible.

13             I also wish you luck at your mediation on December

14   7th.  That is the date, correct?

15             MR. McINTURFF:  Correct.  Thank you, your Honor.

16             MR. McLAUGHLIN:  Correct.

17             THE COURT:  Okay.  So, for now, we will adjourn

18   without a conference date.  I'll decide the next conference

19   after hearing from the parties on December 15th.

20             MR. McLAUGHLIN:  Thank you, your Honor.

21             MR. McINTURFF:  Thank you, your Honor.

22             THE COURT:  Okay.  Thank you.  Have a good day.

23                            ----

24

25

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103